**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | | |
|---|---|---|
| SILVER SPRING JEWISH CENTER, INC., *et al.*, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | No. 8:26-cv-2963 |
| | ) | |
| MONTGOMERY COUNTY, MARYLAND, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ii

FACTS .......................................................................................................................... 1

    I.   MONTGOMERY COUNTY'S BAN ON FIREARMS IN PLACES OF WORSHIP ................... 1

    II.  PLAINTIFFS' INJURIES ......................................................................................... 2

        A.  Plaintiff Silver Spring Jewish Center .......................................................... 2

        B.  Plaintiff Rabbi J. Menashe Shapiro .............................................................. 5

    III. PLAINTIFFS' CLAIMS ......................................................................................... 5

TEMPORARY RESTRAINING ORDER AND  PRELIMINARY INJUNCTION
STANDARD ................................................................................................................. 6

ARGUMENT ................................................................................................................ 6

    I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ......................................... 6

        A.  The Ban Violates the Second Amendment ...................................................... 6

        B.  The Ban Violates Plaintiffs' First Amendment Right to Free Exercise
           of Religion ................................................................................................. 12

           1.   The Ban Burdens Plaintiffs' Sincere Religious Practice. .......................... 13

           2.   The Ban Is Not Neutral or Generally Applicable. .................................... 14

           3.   The Ban Fails Strict Scrutiny. ............................................................... 16

        C.  The Ban Violates the Establishment Clause .................................................. 17

        D.  The Ban Violates Plaintiffs' Fourteenth Amendment Right to Equal
           Protection of the Law .................................................................................. 20

    II.  PLAINTIFFS LACK AN ADEQUATE REMEDY AT LAW AND WILL SUFFER
        IRREPARABLE HARM WITHOUT A TEMPORARY RESTRAINING ORDER AND
        PRELIMINARY INJUNCTION .................................................................................. 21

    III. THE BALANCE OF HARMS AND PUBLIC INTEREST FAVOR A PRELIMINARY
        INJUNCTION ........................................................................................................ 21

CONCLUSION ........................................................................................................... 22

## TABLE OF AUTHORITIES

**Cases**

*Antonyuk v. Chiumento,*
  89 F.4th 271 (2d Cir. 2023) ................................................................. 13, 14, 15, 17

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993) ................................................................................ 13, 14, 21

*GeorgiaCarry.Org, Inc. v. Georgia,*
  687 F.3d 1244 (11th Cir. 2012) .......................................................................... 19

*Hardaway v. Nigrelli,*
  640 F. Supp. 3d 422 (W.D.N.Y. 2022) ................................................................ 8

*Holt v. Hobbs,*
  574 U.S. 352 (2015) .......................................................................................... 17

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,*
  565 U.S. 171, 184 (2012) .............................................................................. 18, 19

*Jesus Christ Is the Answer Ministries, Inc. v. Baltimore County,*
  915 F.3d 256 (4th Cir. 2019) ............................................................................ 20

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.,*
  344 U.S. 94 (1952) ............................................................................................ 18

*Kennedy v. Bremerton Sch. Dist.,*
  597 U.S. 507 (2022) .......................................................................... 12, 13, 15, 16

*Leaders of a Beautiful Struggle v. Balt. Police Dep't,*
  2 F.4th 330 (4th Cir. 2021) ........................................................................... 6, 21

*Maages Auditorium v. Prince George's County,*
  4 F. Supp. 3d 752 (D. Md. 2014) ........................................................................ 6

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) ............................................................................................ 6

*Mills v. District of Columbia,*
  571 F.3d 1304 (D.C. Cir. 2009) ......................................................................... 21

*Morris Cnty. Bd. of Chosen Freeholders v. Freedom From Religion Found.,*
  586 U.S. 1213 (2019) ........................................................................................ 20

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,*
  597 U.S. 1 (2022) .................................................................................... 7, 8, 9, 10

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
  591 U.S. 732 (2020) ...................................................................................... 18, 19

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
  592 U.S. 14 (2020) ........................................................................................ 14, 16

*Serbian E. Orthodox Diocese for the U.S. & Can. v. Milivojevich*,
    426 U.S. 696 (1976) ........................................................................................ 18
*Spencer v. Nigrelli*,
    648 F. Supp. 3d 451 (W.D.N.Y. 2022)..................................................... 17
*Tandon v. Newsom*,
    593 U.S. 61 (2021) ................................................................................. 15, 16
*Wolford v. Lopez*,
    116 F.4th 959 (9th Cir. 2024)................................................................ 8, 10
*Wolford v. Lopez*,
    146 S. Ct. 2032 (2026) ................................................. 6, 7, 11, 12, 16

## Statutes

Montgomery County Code § 57-1 ....................................................................... 2, 18
Montgomery County Code § 57-11(a)(1) ...................................................... 2, 7, 18, 19

## Other Authorities

Benjamin Boyd,
    *Take Your Guns to Church: The Second Amendment and Church Autonomy*,
    8 Liberty U. L. Rev. 653 (2014)............................................................. 11
Clayton Cramer,
    *Colonial Firearm Regulation*,
    16 J. on Firearms & Pub. Pol'y 1 (2004)............................................... 11
David B. Kopel & Joseph G.S. Greenlee,
    *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*,
    13 Charleston L. Rev. 205 (2018) ........................................................ 9, 11

Montgomery County's ban on firearms in places of worship violates the Second Amendment on its face because it infringes on the right to keep and bear arms for self-defense and has no basis in our nation's historical traditions. It also violates Plaintiffs' rights under the Free Exercise Clause, the Establishment Clause, and the Equal Protection Clause.

Plaintiffs respectfully ask this Court to enter a temporary restraining order and/or a preliminary injunction against the ban's enforcement. Plaintiffs are likely to succeed on the merits of their constitutional claims. Without injunctive relief, they will suffer irreparable harm for which they have no adequate remedy at law. And the balance of harms and public interest favor an injunction because enjoining an unconstitutional law causes the government no cognizable harm and serves the public interest.

## FACTS

### I.    MONTGOMERY COUNTY'S BAN ON FIREARMS IN PLACES OF WORSHIP

On July 21, 2026, the Montgomery County Council voted to amend the Montgomery County Code to impose new restrictions on the possession and carrying of firearms in Expedited Bill No. 23-26.[1] Montgomery County Executive Marc Elrich then signed the bill on July 27, 2026. *See* Ex. A, Decl. of Pl. Rabbi J. Menashe Shapiro ("Shapiro Decl."), ¶¶ 2–3. Because it was an "expedited bill," the new law took effect immediately upon Elrich's signing.

---

[1] https://apps.montgomerycountymd.gov/ccllims/DownloadFilePage?FileName=2911_1_26898_Bill_23-26E_Enacted_20260721.pdf.

1

Among other provisions, the new legislation commands that a person "must not … sell, transfer, possess, or transport a ghost gun, undetectable gun, handgun, rifle, or shotgun, or ammunition or major component for these firearms" "[i]n or within 100 yards of a place of public assembly." Montgomery County Code § 57-11(a)(1). The new legislation defines "place of public assembly" to include any "place of worship." *Id.* § 57-1.[2]

Thus, the new law forbids, among other things, the possession and carrying of firearms at any place of worship and within 100 yards of any place of public assembly in Montgomery County. Hereafter, these provisions' prohibition on firearms in places of worship, and within 100 yards of any place of assembly, are referred to as "the Ban."

## II.   PLAINTIFFS' INJURIES

The Ban injures Plaintiffs by preventing them from possessing firearms for self-defense in their place of worship, and by preventing them from fulfilling their religious obligations with respect to self-defense.

### A.   Plaintiff Silver Spring Jewish Center

Plaintiff Silver Spring Jewish Center ("SSJC") is an Orthodox Jewish synagogue in Silver Spring, Maryland. Especially since the events of October 7, 2023, antisemitic incidents have threatened SSJC's normal operations. Ex. B, Decl. of

---

[2] Other "places of public assembly" under the law include parks, schools, libraries, recreational facilities, hospitals, community health centers, long-term care facilities, multipurpose exhibition facilities, childcare facilities, government buildings, polling places, courthouses, legislative assemblies, and "gathering[s] of individuals to collectively express their constitutional right to protest or assemble."

Rabbi Yaakov Greiniman ("Greiniman Decl."), ¶ 2. For example, in October of 2024, a visibly Jewish member of the synagogue was attacked just outside the building. *Id*. More recently, in the early morning hours of June 9, 2026, an unknown individual attempted (unsuccessfully) to gain entry to the synagogue. *Id*.

To ensure the synagogue's safety, SSJC has implemented a comprehensive security plan. *Id*. ¶ 3. This includes upgrades to its infrastructure and security protocol training for members of the synagogue. *Id*.

A central feature of this plan is the synagogue's armed security team (the "Security Team"). *Id*. ¶ 4. Although the synagogue never prohibited members from carrying firearms in the building, it organized the Security Team in the wake of the October 7 attacks. *Id*.

For both practical and *halachic* (Jewish Law) reasons, SSJC relies primarily on volunteer members of the synagogue for its Security Team. *Id*. ¶ 4. Practically, the Security Team, as members of the synagogue, are naturally familiar with the layout of the synagogue and are known to the other members. *Id*. ¶ 5. The synagogue's rabbi believes that, in the event of an incident, Security Team members are better equipped to respond than hired security or even the police. *Id*.

SSJC's Security Team is highly qualified and trains extensively. *Id*. ¶ 6. Many Security Team members are former members of the military, and every member has undergone the extensive process required by the State of Maryland to be licensed to carry a firearm. *Id*. As a group, the Security Team trains together at least quarterly, and members of the group train individually on a biweekly basis. *Id*.

3

*Halachically*, reliance on volunteer members of the community is preferred under Jewish law. *Id.* ¶ 7. Talmudic and later religious sources command Jews to proactively provide their own security and the security of other Jews. *Id.* And, due to the threat environment that the synagogue and its members face, they consider it a religious obligation to ensure that at least some of the members carry firearms. *Id.*

The Ban makes it impossible for SSJC to continue to implement its security plan and to use its volunteer Security Team, as the Ban forbids even members who are licensed to carry a firearm to do so in and within 100 yards of the synagogue. The synagogue has never faced a security or safety risk from an armed member, and its rabbi considers it unlikely that it ever would face such a threat. *Id.* ¶ 10. On the other hand, SSJC believes that having armed members present helps ensure its safety from external threats and compliance with Jewish law. *Id.*

Although SSJC hires one armed guard for much of the day, it does so only as a supplement to its volunteer team. *Id.* ¶ 8. Even if it would want to, it would be prohibitively expensive for SSJC to hire an armed guard for the entirety of its operations. *Id.* ¶ 9. There are usually people in the synagogue from 6:00 a.m. until 11:00 p.m. each day. *Id.* SSJC conducts six prayer services each weekday and three considerably longer services during the Sabbath and Jewish holidays. *Id.* The earliest of these services starts at 6:50 a.m. and the latest finishes at approximately 9:45 p.m. *Id.* Outside of formal prayer times, its sanctuary is open for the study of Jewish texts. *Id.*

### B.    Plaintiff Rabbi J. Menashe Shapiro

Like SSJC, Plaintiff J. Menashe Shapiro holds the sincere religious belief that Jewish law requires him to carry a firearm for personal, family, and communal protection. Shapiro Decl. ¶ 9. It is also his belief that this requirement, like other requirements of Jewish law, is to be performed personally and not by others. *Id.* For that purpose, he holds a Wear and Carry permit issued by the Maryland State Police. *Id.* ¶ 10.

On the Sabbath and Jewish holidays, Rabbi Shapiro's sincerely held religious beliefs require that he walk to the synagogue for communal prayer. *Id.* ¶ 11. The only path between his home and his synagogue requires him to walk within 100 yards of two public schools, two private schools, two parks, and three other houses of worship—each one a "place of public assembly" under the Ban. *Id.* Thus, under the Ban, he may not carry a firearm as he passes by those locations—which means he cannot carry a firearm while walking to his synagogue.

But for the Ban, he would carry his firearm to the synagogues he regularly attends in Montgomery County. *Id.* ¶ 10. Thus, the Ban prevents Rabbi Shapiro from fulfilling what he sincerely believes to be his obligations under Jewish law.

## III.    PLAINTIFFS' CLAIMS

Plaintiffs filed this lawsuit to obtain declaratory relief—as well as temporary, preliminary, and permanent injunctive relief—against the Ban. Their Complaint alleges that the Ban violates the Second Amendment right to keep and bear arms, their First Amendment right to free exercise of religion, the First Amendment's Establishment Clause, and the Fourteenth Amendment's Equal Protection Clause.

**TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION STANDARD**

"The standard for a temporary restraining order is the same as [the standard for] a preliminary injunction." *Maages Auditorium v. Prince George's County*, 4 F. Supp. 3d 752, 760 n.1 (D. Md. 2014). A preliminary injunction is warranted where plaintiffs "establish that 1) they are likely to succeed on the merits; 2) they are likely to suffer irreparable harm absent preliminary relief; 3) the balance of equities favors relief; and 4) the relief is in the public interest." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021).

**ARGUMENT**

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

A.    **The Ban Violates the Second Amendment**

The Ban violates the Second Amendment right to keep and bear arms—both by prohibiting firearms in places of worship, and by prohibiting firearms within 100 yards of any place of public assembly.

The Second Amendment, which applies to the States through the Fourteenth Amendment, protects the "fundamental" right of "individual self-defense." *McDonald v. City of Chicago*, 561 U.S. 742, 776–68 (2010). This includes "the right of Americans to carry arms for self-defense as they go about their daily lives." *Wolford v. Lopez*, 146 S. Ct. 2032, 2041 (2026).

To determine whether a law regulating firearms violates the Second Amendment, a court must first determine whether the "Second Amendment's plain text covers" the "conduct" that the law restricts. *N.Y. State Rifle & Pistol Ass'n, Inc.*

6

*v. Bruen*, 597 U.S. 1, 24 (2022). If it does, then "the Constitution presumptively protects that conduct" and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (citation omitted).

Here, it is beyond question that the Second Amendment's plain text covers the conduct that the Ban restricts: the "possess[ion]" of a "handgun, rifle, or shotgun, or ammunition or major component of these for these firearms" in or within 100 yards of "any place of public assembly." Montgomery County Code § 57-11(a)(1). Thus, the Ban "is presumptively unconstitutional" and may only be upheld if the government meets its burden to show that it does "not infringe the historical understanding of the codified right." *Wolford*, 146 S. Ct. at 2044; *see also Bruen*, 597 U.S. at 33–34 (explaining that "the burden falls on respondents"); *id.* at 38–39 (concluding that "respondents have failed to meet *their burden* to identify an American tradition") (emphasis added). Montgomery County cannot meet that burden here.

To try to meet its burden, a government may cite "historical analogues"—i.e., "old legal rules from which a court may draw a strong inference that the modern law at issue is consistent with the codified right." *Wolford*, 146 S. Ct. at 2044. In evaluating purported analogues, a court should consider: (1) the number of jurisdictions in which they were adopted; (2) the extent to which they were well-accepted; and (3) "whether any analogue or collection of analogues is 'relevantly similar' to the modern law." *Id.* (quoting *Bruen*, 597 U.S. at 29).

In other cases that have presented Second Amendment challenges to bans on firearms in places of worship, governments have been unable to identify *any* relevantly similar historical analogues—and courts have accordingly enjoined those bans. *See Wolford v. Lopez*, 116 F.4th 959, 996 (9th Cir. 2024) (California could "not point[] to a single regulation banning firearms at places of worship or at any analogous place" "[f]rom colonial times through … the ratification of the Fourteenth Amendment"), *rev'd in part on other grounds*, 146 S. Ct. 2032 (2026); *Hardaway v. Nigrelli*, 640 F. Supp. 3d 422, 440 (W.D.N.Y. 2022) (New York did "not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense at all places of worship or religious observation"), *vacated as moot sub nom. Antonyuk v. James*, 120 F.4th 941, 1013–15 (2d Cir. 2024) (amendment of statute eliminated plaintiffs' injury).

The only historical laws banning firearms in places of worship that governments have cited as purported analogues have been scattered statutes enacted long after the founding era and after ratification of the Fourteenth Amendment. *See Wolford*, 116 F.4th at 996 (rejecting as historical analogues laws enacted by states in 1870, 1875, 1878, 1889, and 1890); *Hardaway*, 639 F. Supp. 3d at 442 (rejecting reliance on "enactments involving a small minority of jurisdictions governing a small minority of [the] population," enacted "nearly a century after the Second Amendment's ratification"). These cannot suffice, as "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 597 U.S. at 66 (citing *District of Columbia v.*

8

*Heller*, 554 U.S. 570, 614 (2008)). A few scattered laws, all different from each other and enacted well after the Founding era, are not the "well-established and representative" analogues that *Bruen* requires, 597 U.S. at 30, and therefore are not good evidence of the Nation's traditions at the founding. *See also id.* at 38 (rejecting reliance on laws from "a handful of late-19th-century jurisdictions"); *id.* at 46 ("[W]e doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation."); *id.* at 65–66 ("[W]e will not give disproportionate weight to a single state statute and a pair of state-court decisions … [or] stake our interpretation of the Second Amendment upon a single law in effect in a single State, or a single city, that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms in public for self-defense.") (cleaned up).

It is true that the Supreme Court has recognized, in dicta, a historical tradition of "forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Bruen*, 597 U.S. at 30 (citation omitted). But the Court also recognized that "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were prohibited—*e.g.*, legislative assemblies, polling places, and courthouses." *Id.*; *see also* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205 (2018) (surveying the history of restrictions on firearms in "sensitive places"). Thus, the Court has said that "courts can use analogies to *those* historical regulations of 'sensitive places' to determine that modern regulations

9

prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Bruen*, 597 U.S. at 30 (emphasis added).

The "sensitive places" exception cannot save the Ban here. Places of worship are not a "new" sensitive place; of course, they have existed for the entirety of the Nation's history. The potential need to defend against violence in places of worship is therefore not new, either. And, as the Court explained in *Bruen*, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." 597 U.S. at 26. The "Founders themselves could have adopted" a ban on firearms in places of worship, to address the same "perceived societal problem— firearm violence." *Id*. at 27. That they did not do so evinces that such bans are *not* part of the nation's historical tradition of permissible firearm regulation. *See id*. at 26–27. Thus, the Ninth Circuit enjoined California's ban on firearms in places of worship—for lack of historical analogues—even as it upheld bans on firearms in other purported "sensitive places" for which the government *did* identify historical analogues that the court considered sufficiently similar. *See Wolford*, 116 F.4th at 982–990 (reversing injunction against enforcement of bans on firearms at bars and restaurants that serve alcohol, playgrounds, youth centers, parks, athletic areas, athletic facilities, certain state property, casinos and similar gambling

10

establishments, stadiums, arenas, public libraries, amusement parks, zoos, museums, and certain parking areas).[3]

Moreover, in the Founding era, there was a tradition of governments *mandating* the carrying of arms in places of worship. *See* Clayton Cramer, *Colonial Firearm Regulation*, 16 J. on Firearms & Pub. Pol'y 1, 12–15 (2004) (surveying such laws from the colonial era). So "[t]o maintain that the scope of the right to bear arms did not extend to the church makes no sense; colonial Americans bore arms in the church on a regular basis and were expected to do so." Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 Liberty U. L. Rev. 653, 699 (2014); *see also* Kopel & Greenlee, *supra*, at 232 ("Americans certainly did not think that bringing guns to town was a problem; to the contrary, laws typically required that arms be brought to churches or to all public meetings.").

Finally, the Ban's prohibition on the carrying of firearms "within 100 yards of a place of public assembly" separately violates the Second Amendment, as it is an unjustified obstruction of an individual's right to carry a firearm at all. Like the Hawaii law that the U.S. Supreme Court recently struck down in *Wolford*, the Ban "severely hampers the ability of a law-abiding citizen to exercise the right [to carry a firearm that] *Bruen* recognized." *Wolford*, 146 S. Ct. at 2049. As explained above, it

---

[3] Plaintiffs do not concede that the government defendants in *Wolford* identified historical analogues that could justify its other "sensitive place" restrictions. But the Ninth Circuit's decision in *Wolford* shows that even if one accepts the government's arguments as to those other places, the government still cannot justify banning firearms in places of worship.

makes it impossible for Plaintiff Shapiro to walk to his synagogue while armed, as he must pass within 100 yards multiple schools and houses of worship. In effect, the Ban strips Montgomery County residents of their ability to go about their usual business while armed—that is, to exercise precisely "the right of Americans to carry arms for self-defense as they go about their daily lives" that the Court recently reaffirmed in *Wolford*. 146 S. Ct. at 2041. As in *Bruen* and *Wolford*, the government cannot identify any historical analogue that would justify such a severe restriction.

Because the government cannot meet its burden, Plaintiffs are likely to succeed on the merits of their Second Amendment challenge to the Ban.

**B.     The Ban Violates Plaintiffs' First Amendment Right to Free Exercise of Religion**

Plaintiffs are also likely to succeed on the merits of their claim that the Ban violates their First Amendment right to free exercise of religion.

The First Amendment provides that "Congress shall make no law … prohibiting the free exercise" of religion. U.S. Const. amend. I. This "protects not only the right to harbor religious beliefs inwardly and secretly"; it also does "perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022) (quoting *Employment Division v. Smith*, 494 U.S. 872, 877 (1990)).

To establish a violation of the right to free exercise of religion, a plaintiff may "show[] that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Id.* at 525. If a

12

plaintiff makes that showing, the Court must find a First Amendment violation "unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Id.* (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993)). Here, Plaintiffs can show that the Ban burdens their sincere religious practice and is not neutral or generally applicable; and Defendants cannot meet their burden under strict scrutiny.

### 1. The Ban Burdens Plaintiffs' Sincere Religious Practice.

As explained above, Plaintiffs sincerely believe that Jewish law commands them to defend themselves and their fellow Jews, and that Jewish law generally requires them to fulfill this and other commandments personally, rather than by hiring others to do it for them. The Ban prevents Plaintiffs from fulfilling these religious obligations: SSJC's volunteer Security Team and Plaintiff Shapiro may not carry firearms to defend themselves and others at the synagogue, and they must hire others to provide armed defense if the synagogue is to be defended at all. As discussed above, the Ban even prevents Plaintiff Shapiro from being armed while walking to the synagogue, as Jewish law obligates him to do on many occasions.

The Ban therefore burdens Plaintiffs' religious practice, as "the burden element is fulfilled when an individual plaintiff is prevented from engaging in a religious practice by state action." *Antonyuk v. Chiumento*, 89 F.4th 271, 347 (2d Cir. 2023), *vacated sub nom.*, *Antonyuk v. James*, 144 S. Ct. 2709 (2024) (Mem.), *amended and reinstated in part by* 120 F.4th 941 (2d Cir. 2024). In considering a Free Exercise Clause challenge to a substantially similar ban, the Second Circuit concluded that it

burdened religious practice for that reason. The plaintiffs in that case were Christians who believed members of their congregation had a "religious calling" to carry firearms on their church campus, and leaders of the church encouraged members to do so. *Id.* It was enough that church leaders could no longer encourage this practice. *Id.* And it did not matter that the statute, after it was amended in response to the plaintiffs' lawsuit, allowed members whom the church designated as "responsible for security" to carry firearms, because "[t]he need to make this designation [was] not an obstacle faced by secular establishments that wish[ed] to authorize the carriage of firearms." *Id.* Nor did it matter that the practice of carrying firearms might not have "form[ed] part of an orthodox religious doctrine" and was not considered a "mandatory" religious obligation. *Id.*

### 2. The Ban Is Not Neutral or Generally Applicable.

The Ban is not neutral. To make that determination, a court "must begin with [the law's] text, for the minimum requirement of neutrality is that a law not discriminate on its face." *Church of Lukumi*, 508 U.S. at 533. A law is not facially neutral if it "single[s] out houses of worship for especially harsh treatment." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 17 (2020). Here, the Ban is not facially neutral: by its plain text, it singles out "places of worship."

Nor is the Ban generally applicable. Under this requirement, the government may not, "in a selective manner[,] impose burdens only on conduct motivated by religious belief." *Church of Lukumi*, 508 U.S. at 543. A law "will fail the general applicability requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way,' ... .'"

14

*Kennedy*, 597 U.S. at 526 (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021)). Here, the Ban is not generally applicable: it specifically targets carrying firearms in places of religious worship while allowing the possession of firearms by people engaged in a wide range of secular activities.

True, the County and the State have forbidden the carrying of firearms in some secular settings. But "[i]t is no answer that [the government] treats some comparable secular businesses or other activities as poorly as or even less favorably than the religious exercise at issue." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). "[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Id.* And the County does treat comparable secular activities more favorably: private property owners generally, including but not limited to secular clubs and the proprietors of secular businesses, may allow any person licensed to carry a firearm to do so on their premises. *See Antonyuk*, 89 F.4th at 350 (place-of-worship ban was "not neutral because it allow[ed] the owners of many forms of private property, including many types of retail businesses open to the public, to decide for themselves whether to allow firearms on the premises while denying the same autonomy to places of worship"); *see also Tandon*, 593 U.S. at 63–64 (restrictions on at-home religious gatherings were not neutral and generally applicable as the state did not place the same restriction on "hair salons, retail stores, personal care services, movie theaters, private suites at sporting events and concerts, and indoor restaurants"); *Roman Cath. Diocese of*

15

*Brooklyn*, 592 U.S. at 16–17  (enjoining limits on people admitted to a church or synagogue where state placed no limits on people admitted to businesses the state deemed "essential"). Moreover, the Supreme Court has held that governments *may not* make such decisions for comparable secular organizations—even by switching the default rule to one requiring an owner's express consent, let alone by prohibiting firearms entirely. *See generally Wolford*, 146 S. Ct. 2032.

Thus, the Ban is not a neutral law of general applicability and is subject to strict scrutiny—which it cannot survive.

### 3.    The Ban Fails Strict Scrutiny.

A law can only survive strict scrutiny if the government shows that "its restrictions on the plaintiff's protected rights serve a compelling interest and are narrowly tailored to that end." *Kennedy*, 597 U.S. at 532. To show that a law is narrowly tailored, the government must "show that measures less restrictive of the First Amendment activity could not address its interest." *Tandon*, 593 U.S. at 63. "Where the government permits other activities to proceed with precautions, it must show that the religious exercise at issue is more dangerous than those activities even when the same precautions are applied. Otherwise, precautions that suffice for other activities suffice for religion, too." *Id.*

Here, Defendants presumably will assert a compelling interest in protecting people from violence—and Plaintiffs do not dispute that this is a compelling interest. The Ban is not, however, narrowly tailored to serve that interest. Again, the County allows the owners of many other types of private property to decide whether to allow firearms on their premises. "There is no evident justification for the view that secular

16

business owners are more qualified than religious leaders to determine whether to allow armed self-defense on their property." *Spencer v. Nigrelli*, 648 F. Supp. 3d 451, 464 (W.D.N.Y. 2022), *aff'd sub nom.*, *Antonyuk*, 89 F.4th 271. Conversely, there is no reason to think that allowing firearm possession by those at a place of worship is more dangerous than allowing firearm possession by people at the many other places where people gather and firearm possession is lawful. Nor is there any reason to believe that the County's Ban is the least restrictive means of advancing its interest. (Indeed, it is a highly questionable means of serving the government's interest, as the Ban puts would-be outsider aggressors—the very people Plaintiffs have armed themselves to defend against—on notice that law-abiding religious congregants will be defenseless against any attacks. *Cf. Antonyuk*, 89 F.4th at 351 ("It hard [sic] to see how the law advances the interests of religious organizations, as a whole, by denying them agency to choose for themselves whether to permit firearms.").) The fact that no other counties in Maryland similarly restrict firearms in houses of worship suggests either that the interest is not compelling or the existence of a less-restrictive means of achieving an interest all counties would find compelling. *Cf. Holt v. Hobbs*, 574 U.S. 352, 367–68 (2015).

Thus, the law fails strict scrutiny and violates the Free Exercise Clause of the First Amendment.

### C.    The Ban Violates the Establishment Clause

In addition, the Ban violates the First Amendment's Establishment Clause. The Establishment Clause protects the right of religious institutions "to decide for themselves, free from state interference, matters of church government as well as

those of faith and doctrine." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 737 (2020) (quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)). This "general principle of church autonomy" is "broad," and it prohibits interference with a religious entity's "independence in matters of faith and doctrine and in closely linked matters of internal government." *Id.* at 747. Government intrusion into that sphere offends the Religion Clauses on two independent grounds: it "would obviously violate the free exercise of religion," and separately, "any attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion." *Id.* at 746. Thus, courts have found First Amendment violations, grounded in part in the Establishment Clause, where the government has interfered with disputes over church property and governance, *see, e.g., Serbian E. Orthodox Diocese for the U.S. & Can. v. Milivojevich*, 426 U.S. 696, 708–09, 720–25 (1976); *Kedroff*, 344 U.S. at 107–08, 116–19, and over church hiring decisions, *see Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 184, 188–89 (2012) ("The Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own.").

The Ban intrudes on matters "closely linked" with SSJC's right to determine how best to conduct its own affairs. *Our Lady of Guadalupe*, 591 U.S. at 747. By its terms, the Ban applies to "place[s] of worship." Montgomery County Code §§ 57-1, 57-11(a)(1). And it tells religious organizations what otherwise-lawful items worshippers

may "possess" while in those places, *id.* § 57-11(a)(1), and how religious institutions may (and may not) protect worshippers during their worship. That makes the Ban's intrusion arguably worse than many of those found to violate the Establishment Clause in cases involving property or employment disputes. Ejectment actions and employment disputes are at least matters in which the state commonly is involved; but the state ordinarily has no power to tell private property owners whom to admit to their property and under what conditions. Every "private property owner" ordinarily has the "right to control who may enter, and whether that invited guest can be armed." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1264 (11th Cir. 2012). And indeed Maryland generally allows private property owners to exercise that right while conducting secular activities—but restricts whom and what religious institutions may admit, and how they may protect themselves, even during worship.

The Establishment Clause "does not mean that religious institutions enjoy a general immunity from secular laws, but it does protect their autonomy with respect to internal management decisions that are essential to the institution's central mission." *Our Lady of Guadalupe*, 591 U.S. at 746. And, as discussed above, the Ban does concern matters that are "essential" to the "central mission" of houses of worship. *Id.* And once government action reaches that zone, the Religion Clauses foreclose it categorically—courts do not weigh the government's interest against the intrusion because "the First Amendment has struck the balance for us." *Hosanna-Tabor*, 565 U.S. at 196; *see also id.* at 188–90 (rejecting application of the generally-applicable-law framework of *Employment Division v. Smith*, 494 U.S. 872 (1990), for

19

claims implicating church autonomy). That categorical bar disposes of the Ban here, regardless of any interest Defendants might assert.

Even if the Ban's intrusion into worship security and a religious institution's governance were subject to scrutiny, rather than categorically barred, the result would be the same. As explained above, the Ban is not neutral or generally applicable, so it can survive only if Defendants meet their burden to show that it satisfies strict scrutiny—which they cannot do.

Plaintiffs are therefore likely to succeed with their claim that the Ban violates the Establishment Clause.

### D.    The Ban Violates Plaintiffs' Fourteenth Amendment Right to Equal Protection of the Law

Finally, Plaintiffs are also likely to prevail on their claim that Ban violates the Equal Protection Clause.

The Equal Protection Clause forbids state action that discriminates on the basis of religion. *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore County*, 915 F.3d 256, 265 (4th Cir. 2019). A state or local government violates the Equal Protection Clause, in the context of the rights of religious Americans, when laws or policies "discriminate against religion generally." *Morris Cnty. Bd. of Chosen Freeholders v. Freedom From Religion Found.*, 586 U.S. 1213, 1214 (2019) (Kavanaugh, J., respecting denial of certiorari) (citing *Larson v. Valente*, 456 U.S. 228, 244 (1982)).

By singling out religious institutions and their attendees, and not similarly treating secular groups in similar numbers and similar circumstances, the Ban

20

discriminates on the basis of religious belief and practice. That targeting is "never permissible" and denies Plaintiffs the equal protection of the laws. *Church of Lukumi*, 508 U.S. at 533. As explained above, the Ban cannot survive strict scrutiny because it is not narrowly tailored to serve a compelling government interest.

Plaintiffs are therefore likely to prevail on their Equal Protection Clause claim.

## II.    PLAINTIFFS LACK AN ADEQUATE REMEDY AT LAW AND WILL SUFFER IRREPARABLE HARM WITHOUT A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Without injunctive relief, Plaintiffs will suffer irreparable harm for which they have no adequate remedy at law. "It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Thus, where plaintiffs have shown "a likely constitutional violation, the irreparable harm factor is satisfied." *Leaders of a Beautiful Struggle*, 2 F.4th at 346 (citing *Mills*, 571 F.3d at 1312). Therefore, because Plaintiffs have shown that they are likely to succeed on the merits of their constitutional claims, they have shown that they require a preliminary injunction to avoid irreparable harm.

## III.    THE BALANCE OF HARMS AND PUBLIC INTEREST FAVOR A PRELIMINARY INJUNCTION

The balance of harms and the public interest favor an injunction. Under Fourth Circuit precedent, the government "is in no way harmed by issuance of a preliminary injunction which prevents [it] from enforcing restrictions likely to be found unconstitutional." *Id.* (quoting *Centro Tepeyac v. Montgomery County*, 722 F.3d 184,

21

191 (4th Cir. 2013)). "If anything, the system is improved by such an injunction." *Id.* And "it is well-established that the public interest favors protecting constitutional rights." *Id.*; *see also Centro Tepeyac*, 722 F.3d at 191–92 ("commend[ing]" the district court for treating "the balance of equities and the public interest" prongs as met "when there is a likely First Amendment violation").

## CONCLUSION

For these reasons, Plaintiffs respectfully ask this Court to enter a temporary restraining order and a preliminary injunction prohibiting Defendants from enforcing the Ban.

Dated: July 30, 2026

Respectfully Submitted,

*/s/* Andrew J. Morris
Andrew J. Morris
Jacob Huebert*
New Civil Liberties Alliance
4250 N. Fairfax Drive
Suite 300
Arlington, VA 22203
(202) 869-5210
andrew.morris@ncla.legal
jacob.huebert@ncla.legal
* *Application for pro hac vice admission forthcoming*

Attorneys for Plaintiff Silver Spring Jewish Center

/s/ J. Menashe Shapiro
Rabbi J. Menashe Shapiro,
Pro Se Plaintiff
805 Whittington Terrace
Silver Spring, Maryland 20901
(216) 645-2094
RabbiMenasheShapiro@gmail.com

23