**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| SILVER SPRING<br>JEWISH CENTER, INC., *et al.*, | : | |
| Plaintiffs, | : | Case No.: 8:26-cv-02963-DKC |
| v. | : | |
| MONTGOMERY COUNTY,<br>MARYLAND, *et al.* | : | |
| Defendants. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF OPPOSITION BY DEFENDANTS, MONTGOMERY COUNTY, MARYLAND, MARC ELRICH, AND MARC YAMADA TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** .......... ii

**I. INTRODUCTION** .......... 1

**II. PERTINENT FACTS AND PROCEDURAL BACKGROUND** .......... 2

A. The County's Long-Standing Law On Weapons, Including Firearms. .......... 2

B. This Court's Denial of Injunctive Relief in Related Case, *Maryland Shall Issue, Inc. v. Montgomery County, Maryland*, Civil Action No. 8:21-1736-TDC. .......... 6

**III. APPLICABLE LAW AND ARGUMENT** .......... 9

A. SSJC Lacks Standing. .......... 10

B. Plaintiffs *Cannot* Demonstrate a Substantial Likelihood of Prevailing on the Merits. .......... 12

1. The Bill Does Not Violate the Free Exercise Clause. .......... 13

2. The Bill Does Not Violate the Establishment Clause. .......... 18

3. The Bill Does Not Violate the Second Amendment. .......... 21

4. The Bill Does Not Violate the 14th Amendment. .......... 26

C. Plaintiffs Will Not Suffer Irreparable Harm if the Court Does Not Issue a Preliminary Injunction. .......... 27

D. The Balance of the Equities and the Public Interest Weigh in Favor of Denying Plaintiffs' Request for a Preliminary Injunction. .......... 28

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez*, 585 U.S. 579 (2018) ........ 28

*Action NC v. Strach*, 216 F. Supp. 3d 597 (M.D.N.C. 2016) ........ 11

*Alive Church of the Nazarene, Inc. v. Prince William Cnty., Virginia*, 59 F.4th 92 (4th Cir. 2023) ........ 15

*American Union of Baptists, Inc. v. Trustees of Particular Primitive Baptist Church at Black Rock, Inc., et al.*, 644 A.2d 1063 (Md. 1994) ........ 19, 20

*Andrews v. State*, 50 Tenn. 165 (Tenn. 1871) ........ 24

*Ass'n of Cmty. Cancer Cntrs. v. Azar*, 509 F. Supp. 3d 482 (D. Md. 2020) ........ 28

*Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) ........ 26

*Byrd v. DeVeaux*, Civil Action No. DKC-17-3251, 2019 WL 1017602, at *5 (D. Md. Mar. 4, 2019) ........ 19

*Canaan Christian Church v. Montgomery Cnty., Maryland*, 29 F.4th 182 (4th Cir. 2022) ... 14, 16

*Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928 (D. Md. 2020) ........ 12

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) ........ 13, 15

*Clapper v. Amnesty Int'l*, 568 U.S. 398 (2013) ........ 10, 27

*Cutter v. Wilkinson*, 544 U.S. 709 (2005) ........ 19

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........ 21, 22

*Dyer v. Maryland State Bd. of Educ.*, 187 F. Supp. 3d 599 (D. Md. 2016), *aff'd*, 685 Fed. Appx. 261, 2017 WL 1423298 (4th Cir. 2017) ........ 26

*Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872 (1990) ........ 13, 14, 15, 16

*Engage Armament v. Montgomery Cnty., Md.*, 356 A.3d 79 (Md. 2026) ........ 16, 17, 18

*English v. State*, 35 Tex. 473 (Tex. 1872) ........ 24

*Epperson v. Arkansas*, 393 U.S. 97 (1968) ........ 18

*Equal Rights Center v. Equity Residential*, 798 F. Supp. 2d 707 (D. Md. 2011) ........ 11

*Frazee v. Ill. Dept. of Emp. Sec.*, 489 U.S. 829 (1989) ........ 13

*Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315 (4th Cir. 2002) ........ 10

*GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012) ........ 21

*Goldstein v. Hochul*, 680 F. Supp. 3d 370 (S.D.N.Y. 2023) ........ 14, 17, 25

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ........ 11

*Hill v. State*, 53 Ga. 472 (Ga. 1874) ........ 24

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012) .............. 20

*Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp*., 17 F.3d 691 (4th Cir. 1994) ............ 9

*Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333 (1977) ................................ 10

*JAK Productions, Inc. v. Bayer*, 616 Fed. Appx. 94 (4th Cir. 2015)............................................. 9

*Jones v. Wolf*, 443 U.S. 595 (1979) ............................................................................................ 19

*Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94 (1952) ....................................................... 19, 20

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022) ..................................................... 13, 14

*Kipke v. Moore*, 165 F.4th 194 (4th Cir. 2026)............................................................................. 26

*Maages Auditorium v. Prince George's Cnty., Md*., 4 F. Supp. 3d 752 (D. Md. 2014), *aff'd sub nom. Maages Auditorium v. Prince George's Cnty., Maryland*, 681 Fed. Appx. 256 (4th Cir. 2017) ..................................................................................................................................... 9

*Mark Vogel Acquisitions, LLC v. Prince George's Cnty. MD*, No. 24-CV-03008-LKG, 2025 WL 2374695, at *6 (D. Md. Aug. 14, 2025), *aff'd sub nom*. *Mark Vogel Acquisitions, LLC v. Prince George's Cnty*., No. 25-2030, 2026 WL 936901 (4th Cir. Apr. 7, 2026)..................... 26

*Maryland Shall Issue, Inc*. *v. Hogan*, 963 F.3d 356 (4th Cir. 2020) ........................................... 12

*Maryland Shall Issue, Inc. v. Montgomery County, Maryland*, 680 F. Supp. 3d 567 (D. Md. 2023) ........................................................................................................................... passim

*Maryland v. King*, 567 U.S. 1301 (2012) ..................................................................................... 28

*Matter of Rounds*, 279 A.3d 1048 (Md. App. 2022)...................................................................... 4

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) (per curiam) ............................................................ 9

*McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010)...................................................... 21, 22

*MicroStrategy Inc. v. Motorola, Inc*., 245 F.3d 335 (4th Cir. 2001) ............................................. 9

*Minersville School Dist. Bd. Of Ed. v. Gobitis*, 310 U.S. 586 (1940).................................. 13, 15

*Mountain Valley Pipeline, LLC v. 6.56 Acres*, 915 F.3d 197 (4th Cir. 2019) ............................. 27

*Munaf v. Geren*, 553 U.S. 674 (2008)............................................................................................ 9

*N. Carolina State Conference of NAACP v. N. Carolina State Bd. of Elections*, 283 F. Supp. 3d 393, 402 (M.D.N.C. 2017).......................................................................................................... 11

*New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022).............................. passim

*Nken v. Holder*, 556 U.S. 418 (2009) .......................................................................................... 28

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020) ..................................... 20

*Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164 (4th Cir. 1985)............ 19

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020)......................................... 14

*Roswell v. Mayor & City Council of Baltimore*, 671 F. Supp. 3d 607 (D. Md. 2023) ........... 27, 28

*Schall v. Martin*, 467 U.S. 253 (1984) .......... 29
*Serbian Eastern Orthodox Diocese for the U.S. & Can. v. Milivojevich*, 426 U.S. 696 (1976)... 20
*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) .......... 10
*United States v. Morrison*, 529 U.S. 598 (2000) .......... 29
*United States v. Rahimi*, 602 U.S. 680 (2024) .......... 22
*United States v. Salerno*, 481 U.S. 739 (1987) .......... 29
*Washington v. Davis*, 426 U.S. 229 (1976) .......... 26
*White Tail Park, Inc. v. Stroube*, 413 F.3d 451 (4th Cir. 2005) .......... 10, 11
*Wilson v. Thomas*, 43 F. Supp. 3d 628 (E.D.N.C. 2014) .......... 10
*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) .......... 9, 27
*Wolford v. Lopez*, 116 F.4th 959, 997 (9th Cir. 2024) .......... 25

**Statutes**

Md. Code Ann., Criminal Law § 4-209 .......... 17



22995339_6

Defendants, Montgomery County, Maryland (the "County"), Marc Elrich, and Marc Yamada (together the "County Defendants") by and through their counsel, Jeffrey M. Schwaber, Deanna L. Peters, and the Law Firm of Stein Sperling Bennett De Jong Driscoll, PC, and Erin J. Ashbarry, of the Office of the County Attorney, pursuant to Fed. R. Civ. P. 65, hereby oppose Plaintiffs Silver Spring Jewish Center ("SSJC") and Rabbi J. Menashe Shapiro's ("Shapiro") (collectively "Plaintiffs") Motion for Temporary Restraining Order or Preliminary Injunction (ECF No. 5) (the "Motion" and its supporting "Memorandum"), and in support thereof, state as follows:

## I. INTRODUCTION

The County has maintained a substantially similar restriction against firearms in places of worship for nearly four decades. Plaintiffs' belated and tactically contrived decision to challenge it now does not transform long-settled policy into an emergency warranting preliminary relief. Nor can Plaintiffs credibly claim irreparable harm when they have availed themselves of—and continue to avail themselves of—lawful alternatives throughout this litigation, undercutting any suggestion that this case cannot proceed at the deliberate pace that permits this Court to make proper and carefully reasoned findings on a full record. What Plaintiffs seek is not preservation of the status quo but rather a rush to preliminary judgment, and the extraordinary disabling of democratically enacted legislation without full adversarial review, on a record that fails to pass muster for issuance of a preliminary injunction.

In their First Amendment challenge, Plaintiffs conjure a constitutional emergency out of a neutral law. The ordinance does not target worship but instead prohibits firearms across a variety of secular and religious locations. Plaintiffs' attempt to recast lawful exercise of legislative discretion as religious hostility is a label that simply does not fit. The Second Amendment challenge is equally unavailing at this preliminary stage, as this Court already has ruled in previous

versions of this now recycled claim that no likelihood of success on the merits can be shown. Recent Fourth Circuit law reinforces that determination. Finally, the Fourteenth Amendment is inapposite here.

## II. PERTINENT FACTS AND PROCEDURAL BACKGROUND

### A. The County's Long-Standing Law On Weapons, Including Firearms.

The County enacted Chapter 57, "Weapons," of the County Code in 1981. Almost 30 years ago, in 1997, the County enacted Section 57-7A, prohibiting (with certain enumerated exceptions) the sale, transfer, possession, or transport of a firearm "in or within 100 yards of a place of public assembly." Ex. 1, 1997 Laws Montgomery Cnty. Ch. 14 (Bill 4-97) ("Bill 4-97") at 5-6. Bill 4-97 defined a "place of public assembly" to include, among other places, a place of worship, a government owned park, a public library, and a government owned or operated recreational facility, as well as "all property associated with the place, such as a parking lot or grounds of a building." *See id.* In 2001, Section 57-7A became 57-11—the provision that Plaintiffs now challenge. Ex. 2, 2001 Laws Montgomery Cnty. Ch. 11 (Bill 2-01) ("Bill 2-01"). Bill 2-01 maintained places of worship, government owned parks, public libraries, government owned or operated recreational facilities, and "all property associated with the place, such as a parking lot or grounds of a building" as places of public assembly. *See id*. at 2, 3, and 4.

In 2021, the County responded to the increasing use of "ghost guns"—homemade unserialized (and therefore untraceable) firearms, which can easily be assembled from kits or built using 3D printers by individuals without any required background check—by enacting Bill 4-21. *See* Ex. 3, Council Staff Action Packet. Bill 4-21 became effective on July 16, 2021. *See* Ex. 4, 2021 Laws Montgomery Cnty. Ch. 7 (Bill 4-21) ("Bill 4-21"). Bill 4-21 also expanded a place of public assembly to include "a place where the public may assemble, whether the place is publicly

or privately available, including" and among other things, parks, places of worship, schools, libraries, recreational facilities, and multipurpose exhibition facilities. *Id*. at 4-5.

On June 23, 2022, the United States Supreme Court decided *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022) (hereafter "*Bruen*"). The *Bruen* Court articulated a new test to evaluate whether governmental firearms regulations pass muster under the Second Amendment. The Court stated that banning firearms in "sensitive locations" is constitutionally permissible, and identified five locations—schools, legislative assemblies, government buildings, polling places, and courthouses—as "sensitive places" where weapons may be totally prohibited. The Court also contemplated that other locations where weapons were historically banned—or the modern counterparts of those locations—could similarly qualify as "sensitive places."[1]

*Bruen* led the County to enact changes to Chapter 57, designed to adhere to the new guidance from the U.S. Supreme Court. Specifically, the County enacted Bill 21-22E, effective November 28, 2022, wherein it narrowed its definition of "place of public assembly" to align with *Bruen*. *See* Ex. 5, 2022 Laws Montgomery Cnty. Ch. 36 (Bill 21-22) ("Bill 21-22E"). Bill 21-22E continued the existing prohibition of carrying a firearm within 100 yards of a place of public assembly but removed the statement that a place of public assembly was a place "where the public may assemble." *See id.* at 3. The Bill also removed the statement that a place of public assembly "included" locations listed. *See id*. By removing "included," Bill 21-22E narrowed its scope. Pertinent to this case, Bill 21-22E continued to include parks, places of worship, schools, libraries, recreational facilities, and multipurpose exhibition facilities—as well as all property associated with the place, such as a parking lot or grounds of a building—as places of public assembly. *See*

[1] *Bruen* will be discussed and cited in more detail below.

*id*. at 3-4. Bill 21-22E also added several "sensitive places" that *Bruen* expressly indicated were locations where weapons could be constitutionally restricted. *See id*.

Prior to *Bruen*, Maryland required a person to demonstrate "good and substantial reason" to receive a wear-and-carry gun permit. Immediately after *Bruen,* Maryland Governor Larry Hogan instructed the Maryland State Police to no longer enforce this requirement.[2] In the weeks after Governor Hogan's instruction, the number of applications for concealed carry permits received by Maryland State Police increased eleven fold.[3] *See* Ex. 6, Racial Equity and Social Justice (RESJ) Impact Statement regarding Bill 21-22E. Since concealed carry permit holders no longer would have to demonstrate any justification for a concealed carry permit, Bill 21-22E added language to prevent the carry of a firearm within 100 yards of a place of public assembly. *See* Ex. 7, Report of Staff of Montgomery County Council, Expedited Bill 21-22 (November 10, 2022) at 2 (stating "[e]xpedited Bill 21-22 would prevent an individual from possessing a firearm within 100 yards of a place of public assembly even when the individual has a wear-and-carry permit from the State of Maryland"). Importantly, that restriction has been the law in Montgomery County *since 2022*.

On July 27, 2026, the County enacted Expedited Bill 23-26—the Bill that Plaintiffs challenge in the above-captioned litigation. *See* Ex. 8, 2026 Laws Montgomery Cnty. Ch. 18 (Bill 23-26) ("Bill 23-26E" or the "Bill"). By no means a "new law" with "new restrictions" (*see* Mem. at 1), Bill 23-26E further narrows the County's firearm prohibitions to ensure compliance with the

---

[2] Also, after *Bruen*, the Appellate Court of Maryland struck down the "good and substantial reason" requirement. *See Matter of Rounds*, 279 A.3d 1048 (Md. App. 2022).

[3] *See also* Fredrick Kunkle, *Supreme Court ruling sets off rush for concealed gun permits in Maryland,* The Washington Post (July 25, 2022) *https://www.washingtonpost.com/dc-md-va/2022/07/15/concealed-carry-maryland-guns-hogan/*.

current landscape of federal and state law. Section 57-11—the only section that Plaintiffs challenge in their Complaint and Motion—reads in pertinent part as follows:

> **57-11. Firearms in or near places of public assembly.**
>
> (a) In or within 100 yards of a place of public assembly, a person must not:
>
> (1) sell, transfer, possess, or transport a ghost gun, undetectable gun, handgun, rifle, shotgun, or ammunition or major component for these firearms; or
>
> (2) sell, transfer, possess, or transport a firearm created through a 3D printing process.
>
> (b) This section does not: …
>
> (2) apply to a law enforcement officer, or a security guard licensed to carry the firearm; … or
>
> (6) apply to a firearm that is carried or transported in a motor vehicle if the firearm is:
>
> (A) locked in a container; or
>
> (B) a handgun worn, carried, or transported in compliance with any limitations imposed under Section 5-307 of the Public Safety Article of the Maryland Code, as amended, by a person to whom a permit to wear, carry, or transport the handgun has been issued under the Public Safety Article of the Maryland Code, as amended.

Ex. 8, Bill 23-26E at 5-6. Bill 23-26E further reduced the places of public assembly to which Section 57-11(a) applies, to state:

> **57-1. Definitions.**
>
> In this Chapter, the following words and phrases have the following meanings:
>
> * * *
>
> *Place of public assembly*: A "place of public assembly" is:
>
> (1) a publicly or privately owned:
>
> (A) park;
>
> (B) place of worship;
>
> (C) school;

> (D) library;
>
> (E) recreational facility; or
>
> (F) multipurpose exhibition facility, such as a fairgrounds or conference center;
>
> (2) government building open to the public for the business of government or community use;
>
> (3) polling place;
>
> (4) courthouse; or
>
> (5) legislative assembly.
>
> A "place of public assembly" includes all property associated with the place, such as a parking lot or grounds of a building.

*Id*. at 2-3. Finally, Section 3 of Bill 23-26E states, "If any provision of this Act, or any provision of Chapter 57 is found to be invalid by the final judgment of a court of competent jurisdiction, the remaining provisions must be deemed severable and must continue in full force and effect." *Id.* at 8.

Seeking to capitalize on the fact that a new bill was enacted while ignoring entirely the fact that the bill narrowed, rather than expanded the restrictions that had been on the books for years, this "emergency" litigation followed.

### B. This Court's Denial of Injunctive Relief in Related Case, *Maryland Shall Issue, Inc. v. Montgomery County, Maryland*, Civil Action No. 8:21-1736-TDC.

In 2021, Maryland Shall Issue, Inc. ("MSI"), along with other plaintiffs (collectively, the "MSI Plaintiffs"), filed a lawsuit against Montgomery County in which they challenged certain County restrictions in Bill 4-21 (the "MSI Litigation"). Case No. 8:21-1736-TDC, ECF No. 7.[4]

[4] On July 27, 2026, MSI joined with a new set of individual plaintiffs (the "MSI/Barreto Plaintiffs") to file *Barreto, et al. v. Montgomery County, Maryland*, Case No. 8:26-cv-02912-DKC. In the Civil Cover Sheet, the MSI/Barreto Plaintiffs identified the MSI Litigation as a related case, described in this Court's Local Rules as follows: "If counsel for a plaintiff in a civil action believes that the action being filed and one (1) or more other civil actions or proceedings previously decided or pending in this Court (1) arise from the same or identical transactions, happenings, or events; (2) involve the identical parties or property; (3) involve the same patent or trademark; or (4) for any other reason would entail substantial duplication of labor if heard by different judges, counsel shall indicate that fact by designating

The MSI Plaintiffs subsequently filed a First Amended Complaint, followed by a Second Amended Complaint. Case No. 8:21-1736-TDC, ECF No. 49. While Counts I, II, and III of the Second Amended Complaint presented state law claims that were remanded to the Circuit Court for Montgomery County, Maryland (*see* Case No. 8:21-1736-TDC, ECF No. 77), this Court retained jurisdiction of Counts IV through VIII. Pertinent here, those counts challenged certain components of Bill 21-22E, including Section 57-1's definition of "place of public assembly" and Section 57-11 under the Due Process Clause of the Fourteenth Amendment (Count IV) and the Second Amendment (Count VII). Case No. 8:21-1736-TDC, ECF No. 49.

On December 6, 2022, the MSI Plaintiffs filed their Emergency Motion for a Temporary Restraining Order and Emergency Motion for a Preliminary Injunction, seeking to enjoin enforcement of Section 57-11(a). Case No. 8:21-1736-TDC, ECF No. 54. Addressing the ***precisely identical provision*** in that bill that is being challenged again now regarding places of worship, the MSI Plaintiffs argued as follows:

> In fact, "places of worship" in the County have long used permit holders among their congregations to provide much-needed armed protection for these locations. The State Police, in the past, found such use to be a "good and substantial reason" for the issuance of a carry permit under MD Code, Public Safety, § 5-306(a)(6)(ii). Plaintiff Eliyahu Shemony, an Orthodox Jew, is a former head of security for his synagogue and provided armed security for the synagogue with a permit issued for this reason. SAC, ¶ 74. This reality is also attested to by the accompanying declarations from six other persons who, as members of their respective congregations, provide armed security to their houses of worship. Such persons were issued permits by the State Police, prior to Bruen, specifically in order to provide that protection. See, e.g, Decl. of John Doe No. 1 ¶¶ 3,4, Decl. of John Doe No. 2, ¶ 2; Decl. of Allan Barall, ¶¶ 2,3.
>
> Chapter 57 has now precluded these individuals from serving that function, leaving these houses of worship and associated private schools defenseless. Thus, in its zeal to "minimize" public carry with the enactment of Bill 21-22E, the County has disarmed even those persons who had satisfied the "good and substantial reason" requirement that the State Police applied prior to Bruen. The County's ban

---

the case as a "related case" on the civil cover sheet." Local Rule 103.1.b). While the SSJC Plaintiffs in this case identified the *Barreto* case as a related case, they tellingly chose to ignore reference to the MSI Litigation.

> on carry by permit holders negates the ability of places of worship to provide for their own security. See https://youtu.be/COWCwb6KU8wj (testimony on HB 302 before the Senate Judicial Proceedings Committee in the 2020 Session of the General Assembly); https://bit.ly/3VDGKJs (testimony on HB 302 before the House Judiciary Committee). There can be no dispute that places of worship and associated private religious schools have a vital need for armed security. Id. Even those who advocated in favor of the Bill told the County Council that "[h]ouses of worship should be left to establish their own security plans." Exhibit D at 61 (testimony of JCRC, purporting to represent synagogues, and Jewish schools throughout the region). Yet, Bill 21-22E makes that virtually impossible, as a practical matter.

Case No. 8:21-1736-TDC, ECF No. 54-1 at 22-23.

This Court (The Hon. T.D. Chuang) issued a Memorandum Opinion 7 months later—***and more than three years ago***—on July 6, 2023. *Maryland Shall Issue, Inc. v. Montgomery County, Maryland*, 680 F. Supp. 3d 567 (D. Md. 2023). Stating that "the Court finds that [the MSI] Plaintiffs have not established a likelihood of success on the merits of the claims at issue on the Motion," this Court denied the Motion. *Id*. at 593. As it relates to places of worship, this Court ruled:

> Plaintiffs are not likely to succeed on the merits of their claim that the County's restriction on carrying a firearm at a place of worship violates the Second Amendment. The historical record in the years following the ratification of the Fourteenth Amendment, as presented by the County, demonstrates a well-established and representative number of statutes that prohibited firearms in places of worship.
>
> * * *
>
> These historical statutes and ordinances demonstrate that there is "historical precedent" from the time period of the ratification of the Fourteenth Amendment that "evinces a comparable tradition of regulation" of firearms at places of worship. *Bruen*, 142 S. Ct. at 2131–32. Where the historical record provides a strong basis upon which to conclude that Section 57-11's bar on carrying a firearm in a place of worship is "consistent with the Nation's historical tradition of firearm regulation," *id*. at 2130, the Court finds that Plaintiffs are not likely to succeed on the merits of their Second Amendment claim relating to the carrying of firearms in places of worship.

*Id*. at 585.

## III. APPLICABLE LAW AND ARGUMENT

Temporary injunctive relief is an "extraordinary remed[y] involving the exercise of very far-reaching power [which is] to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (internal quotation marks omitted). A preliminary injunction is an "extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted), which "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). Because such relief "requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way," "[t]he danger of a mistake in this setting is substantial." *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994) (internal quotation marks omitted).

Plaintiffs must establish that "[they are] likely to succeed on the merits, [are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Maages Auditorium v. Prince George's Cnty., Md.*, 4 F. Supp. 3d 752, 760 (D. Md. 2014), *aff'd sub nom. Maages Auditorium v. Prince George's Cnty., Maryland*, 681 Fed. Appx. 256 (4th Cir. 2017). As the test is conjunctive, failure to establish any single factor is fatal to the Motion. "[A]ll four requirements must be satisfied to obtain the extraordinary remedy of a preliminary injunction." *JAK Productions, Inc. v. Bayer*, 616 Fed. Appx. 94, 95 (4th Cir. 2015) (internal citations omitted). Plaintiffs have no standing to bring this action, but in any event cannot establish any one of the four prerequisite factors for injunctive relief.

**A. SSJC Lacks Standing.**

To establish Article III standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct...and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "[W]hen reaching the merits of the dispute would force [the Court] to decide whether an action taken by one of the other branches of…[g]overnment was unconstitutional," the "standing inquiry [i]s especially rigorous[.]" *Clapper v. Amnesty Int'l*, 568 U.S. 398, 407 (2013). Organizations may demonstrate standing to sue in two ways: on behalf of their members (associational standing) or on their own behalf (organizational standing). *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir. 2005). SSJC fails in both regards.

SSJC cannot establish associational standing because the interests at stake here are not germane to its purpose. *See e.g.*, *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002) (associational standing established to bring action on "behalf of its members when: (1) its members would otherwise have standing to sue as individuals; (2) the interests at stake are germane to the group's purpose; and (3) neither the claim made nor the relief requested requires the participation of individual members in the suit."); *see also Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 344 (1977) (germaneness where suit sought to protect Washington apple growers' ability to market state grades, a right "central" to the plaintiff's purpose of protecting and enhancing the Washington apple market); *Wilson v. Thomas*, 43 F. Supp. 3d 628, 632 (E.D.N.C. 2014) (germaneness to satisfy associational standing where disability rights organization sued to challenge allegedly discriminatory driver-licensing practices, because the organization's primary function was to protect the rights of individuals with disabilities). Unlike the organizations in *Hunt* and *Wilson*, SSJC is not seeking to protect an interest central to the reason it exists—as a house of worship; SSJC is not a firearms-rights organization, security

association, or advocacy group formed to protect Jewish members' ability to carry weapons. Rather, the asserted interests concern congregants' rights to carry firearms in synagogue.

SSJC's assertion of organizational standing fares no better. A corporate plaintiff establishes organizational standing only "when it seeks redress for an injury suffered by the organization itself." *White Tail Park, Inc.*, 413 F.3d at 458. This requires an allegation that the "defendant's practices have hampered [the] organization's stated objectives causing the organization to divert its resources as a result." *Action NC v. Strach*, 216 F. Supp. 3d 597, 616 (M.D.N.C. 2016) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). The cases recognizing organizational standing involve organizations forced to spend resources counteracting conduct that directly impaired their missions. In *Equal Rights Center*, discriminatory housing practices caused a fair-housing organization to expend significant resources investigating and counteracting those practices, diverting resources from other programs and impairing its mission. *Equal Rights Center v. Equity Residential*, 798 F. Supp. 2d 707, 722-23 (D. Md. 2011). In *N. Carolina State Conference of NAACP*, the organization alleged that it had been forced to divert valuable and limited resources away from voter-mobilization, voter-protection, and voter-education work to investigate, respond to, and mitigate the defendants' unlawful practices. *N. Carolina State Conference of NAACP v. N. Carolina State Bd. of Elections*, 283 F. Supp. 3d 393, 402 (M.D.N.C. 2017).

SSJC asserts nothing comparable. The Complaint identifies no organizational objective supposedly frustrated, institutional program supposedly disrupted, or resource supposedly diverted. *See* Compl. at ¶¶ 1-84. SSJC alleges that the Bill interferes with its preferred volunteer security team and security plan, but does not allege impairment to worship services, religious education, member programming, community outreach, pastoral functions, or any other institutional activity. The Motion concedes that SSJC already hires one armed guard for much of

the day, but does not allege that SSJC has diverted staff time, money, programming, or resources away from any organizational function to respond to the Bill. *See* Mem. at 4.

The Complaint and the Motion both suggest that SSJC would rather not bear the cost of additional coverage from their permitted armed guard. *See, e.g.*, Compl. at ¶ 35; Mem. at 4. The fact that compliance with the law may require a security option that would be more expensive does not create a constitutional crisis, and certainly not a need for emergency action by this Court. This deficiency is underscored by *Maryland Shall Issue, Inc.*, in which the Fourth Circuit declined to find organizational standing where the plaintiff alleged that a law "undermined" and "acted as an obstacle" to its purpose but did not allege any resulting expenditure of resources or explain how the law impeded its activities or mission. *Maryland Shall Issue, Inc. v. Hogan*, 963 F.3d 356, 362 (4th Cir. 2020); *see also Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 946-47 (D. Md. 2020) (no organizational standing where plaintiff merely alleged that rules put strain on their resources and failed to allege any kind of direct impairment of their ability to operate). SSJC offers even less: no diverted resources, no impaired programming, no displaced institutional work, and thus, no concrete organizational injury.

### B. Plaintiffs *Cannot* Demonstrate a Substantial Likelihood of Prevailing on the Merits.

Plaintiffs cannot demonstrate a substantial likelihood of success on the merits because the Bill does not offend the First, Second or Fourteenth Amendments. The County's ongoing regulation of firearms in places of worship constitutes a lawful public-safety measure directed at weapons in sensitive gathering places, not an attack on religious exercise. Nor does the Second Amendment require the County to permit firearms in every location where Plaintiffs would prefer to carry them, particularly where, as Judge Chuang previously ruled on this very same issue, the challenged restrictions are consistent with the historical tradition of regulating arms in places of

public assembly. Plaintiffs' Equal Protection claim fails at the outset: the Bill draws no distinction among places—applying uniformly to secular and religious venues alike—and Plaintiffs offer nothing beyond bare conjecture to suggest that the County acted with animus or discriminatory purpose.

1. <u>The Bill Does Not Violate the Free Exercise Clause.</u>

As the Supreme Court has interpreted it, the Free Exercise Clause prohibits laws that "discriminat[e] against some or all religious beliefs or regulat[e] or prohibi[t] conduct because it is undertaken for religious reasons." *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532; 542-548 (1993) (violation of Free Exercise Clause where, after religious sect whose faith involved animal sacrifice announced plans to establish a church and practice its faith there, the City of Hialeah enacted ordinances prohibiting and criminalizing that practice). "Purely secular [beliefs] do not suffice." *Frazee v. Ill. Dept. of Emp. Sec.*, 489 U.S. 829, 833 (1989). An individual's religious beliefs do not excuse "compliance with an otherwise valid law prohibiting conduct that the state is free to regulate." *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 879 (1990); *see also Minersville School Dist. Bd. Of Ed. v. Gobitis*, 310 U.S. 586, 594-95 (1940) ("The mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities.").

Plaintiffs bear the preliminary burden of demonstrating an infringement of their rights under the Free Exercise Clause. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022). Plaintiffs must demonstrate not only that the law burdens their sincere religious practices, but also that such burdening is "pursuant to a policy that is not neutral or generally applicable." *Id*. at 525 (internal citation and quotations omitted). A facially neutral and generally applicable law is subject to rational basis review, "even where it has the incidental effect of burdening religious exercise."

*Canaan Christian Church v. Montgomery Cnty., Maryland*, 29 F.4th 182, 198 (4th Cir. 2022) (quoting *Emp't Div. Dep't of Human Res.*, 494 U.S. at 879).

Plaintiffs baldly suggest—without any textual support—that their religious obligation to defend themselves requires them to carry firearms to do so, and further that they somehow cannot fulfill the obligation by hiring a trained and paid security guard. The Complaint offers no support for the notion that firearms are the *required* religious instrument of self-defense. Absent such link, the insistence on firearms is a secular preference—that is, a philosophical choice about how Plaintiffs would *like* to fulfill a religious duty—not a religious belief. The method is not the mandate and cannot override the role and responsibility of the legislative authority.

The distinction is sharpened when measured against cases where courts found cognizable burdens on religious exercise. In *Kennedy*, the Supreme Court determined that the plaintiff satisfied his preliminary burden of demonstrating that the governmental entity imposed a burden on his "sincere religious practice," by establishing that the defendant had disciplined him for "giving 'thanks through prayer.'" *Kennedy*, 597 U.S. at 525. In *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 16-18 (2020), the plaintiff met its burden by showing that the government-imposed attendance caps and physically restricted individuals from entering houses of worship. *See id.* at 16-18. In both cases, government conduct prevented individuals from *practicing* their religion in their houses of worship. By contrast, in *Goldstein*, the Court found: "[ca]rrying a gun is not a religious act and cannot be analogized to praying or being able to enter one's house of worship." *Goldstein v. Hochul*, 680 F. Supp. 3d 370, 398 (S.D.N.Y. 2023). As is the case here, the *Goldstein* plaintiffs failed to sufficiently "allege a burden on their religious practice." *Id.*

Here, the Bill prevents no one from praying, attending synagogue, or observing any particular tenet of Jewish law or religious practice, including an obligation to defend oneself and one's community. It regulates only the instrumentality Plaintiffs wish to use for doing so. The Free Exercise Clause does not ensure any particular method of self-defense that Plaintiffs have failed to tether to any religious command—and what it does not shield, the County may lawfully regulate. *See, e.g.*, *Emp. Div., Dep't of Hum. Res.*, 494 U.S. at 878-79; *see also Minersville School Dist. Bd. Of Ed. v. Gobitis*, 310 U.S. at 594-95.[5]

Even assuming *arguendo* that religious burden could be established, Plaintiffs' Free Exercise claim fails because the Bill is a "valid and neutral law of general applicability." *Emp. Div., Dep't of Hum. Res.*, 494 U.S. at 879. In determining the Bill's neutrality, this Court must first determine its object. *Alive Church of the Nazarene, Inc. v. Prince William Cnty., Virginia*, 59 F.4th 92, 108 (4th Cir. 2023) (citing *Lukumi*, 508 U.S. at 534). Where a law has "no object that infringes upon or restricts practices because of their religious motivation," the law is neutral. *Id*. at 108 (internal citation and quotations omitted). When a law affects religious practice, "even if indirectly," the court must examine whether it was enacted "because of" its effect on religion, not merely "in spite of" that effect. *Id*. Doing so requires the court to "look at contemporaneous statements made by decisionmakers or community members surrounding the law's passage, and any deviations from standard decision-making procedures." *Id*. That inquiry is fatal here, as the legislative record identifies a secular object: aligning County firearms law with the Maryland Supreme Court's decision in *Engage Armament v. Montgomery Cnty., Md.*, 356 A.3d 79 (Md.

[5] SSJC's claim is further undermined by the fact that the Bill includes an exemption that SSJC already admits utilizing, by hiring an armed guard for "much of the day." *See* Mem. at 4. There can be no burdening when the Bill provides lawful alternatives that SSJC actively employs. The Bill cannot be said to force SSJC to outsource when SSJC already does so.

2026) and preserving longstanding, enforceable restrictions on firearms in broadly defined public gathering places. *See* Ex. 9, Council Staff Action Packet for Bill 23-26E at 2.

Plaintiffs isolate "places of worship" from the Bill's broader text, then ask the Court to look through this myopic lens and find religious targeting. The record suggests the contrary. The Bill—which flowed from the legislator's efforts to conform to the Maryland Supreme Court's ruling—defines "place of public assembly" to include a specifically defined list of secular *and* religious locations: parks, places of worship, schools, libraries, recreational facilities, multipurpose exhibition facilities, government buildings open to the public, polling places, courthouses, legislative assemblies, and associated grounds or parking areas. *See* Ex. 8, Bill 23-26E at 2-3. Section 57-11(a), in turn, regulates firearms and ammunition "[i]n or within 100 yards" of each of these places, not in houses of worship alone. *Id*. at 5.

The Bill imposes the same firearms restriction on religious and secular gathering places alike—it does not single out religious actors while exempting comparable secular assembly locations. Any asymmetry between houses of worship and other categorical places of public assembly that are not subject to restriction is, at most, an incidental consequence of regulating firearms in enumerated public-assembly locations that include both secular and religious sites—not evidence that the Bill was enacted *because of* its effect on religious practice. An incidental burden arising from an otherwise neutral and generally applicable law does not trigger heightened scrutiny. *See Canaan Christian Church*, 29 F.4th at 198 (quoting *Emp't Div. Dep't of Human Res.*, 494 U.S. at 879).

The County's inclusion of a "place of worship" as a place of public assembly, and its attendant restriction of firearms carry, is pursuant to express language in the Maryland Code.[6] Section 4-209(b)(1)(iii) of the Criminal Law Article of the Maryland Code provides localities may regulate certain firearms "within 100 yards of or in a park, church, school, public building, and other places of public assembly." That local authority has been the law in Maryland since 1985. *See* Ex. 10, 1985 Md. Laws Ch. 724. Maryland's identification of a place of worship as an example of a place of public assembly, along with other secular locations, further supports the neutrality of the County's law.[7]

The court in *Goldstein* addressed the precise argument Plaintiffs advance here. *See Goldstein*, 680 F. Supp. 3d at 398-99 (firearm restriction neutral and generally applicable because it imposed identical restrictions on both religious and secular sensitive locations without singling out houses of worship for disparate treatment). Here, the Bill regulates firearms at a defined category of public-assembly sites—both religious and secular, and nothing more. The Free Exercise Clause does not mandate strict scrutiny every time a neutral public-safety law incidentally affects how a religious institution would prefer to manage its property or security.

The legislative record makes clear that Bill's object unequivocally is secular. The Bill was designed "to bring the County law into alignment with the Supreme Court's opinion in *Engage Armament* so that the County law is valid and enforceable under Maryland law." *See* Ex. 9 at 4. Every supporting document confirms that purpose. The staff materials frame the Bill as a specific response to the Maryland Supreme Court's decision in *Engage Armament*, not to any religious

[6] *See* Ex. 3 at 2 (citing Criminal Law § 4-209 as the authority for County regulation in or near places of public assembly).

[7] State law mandates notice to the Maryland Attorney General's Office if Plaintiffs contend that Criminal Law § 4-209(b)(1)(iii)'s authorization of local gun regulation in or within 100 yards of a church is unconstitutional. *See* Md. Code Ann., Cts. & Jud. Proc. § 3-405(c) (2020).

practice. *See id*. The Office of Legislative Oversight materials describe the Bill as clarifying the ghost-gun definition, narrowing the "place of public assembly" definition, removing a provision concerning ghost guns in the presence of minors, adding a permit-holder travel exemption, and removing certain gun-shop regulations. *See* Ex. 11, Climate Assessment for Expedited Bill 23-26. The racial equity and social justice materials discuss gun violence and racial inequities without any reference to religious practice. *See* Ex. 12, Racial Equity and Social Justice Impact Statement for Expedited Bill 23-26. Not a single document mentions religion, houses of worship, or faith-based practice as a motivating concern.

The Council heard public comment reflecting disagreement on firearms policy—including the objections Plaintiffs now press—and still retained places of worship within a broader category that includes schools, parks, libraries, government buildings, polling places, courthouses, and legislative assemblies. *See* Ex. 13, public comment regarding Expedited Bill 23-26. The Council's decision to retain places of worship alongside dozens of secular categories—rather than carving them out—itself evidences neutral, generally applicable treatment, not religious targeting.

Because the Bill is neutral and generally applicable, rational basis review applies. The rational basis is self-evident: conforming County firearms law to *Engage Armament* so that the law remains valid and enforceable. *See* Ex. 9 at 4.

2. <u>The Bill Does Not Violate the Establishment Clause.</u>

Plaintiffs next contend they are likely to succeed on the merits because the Bill offends the Church Autonomy Doctrine rooted in the Establishment Clause. "The First Amendment mandates governmental neutrality between religion and religion…The State may not adopt programs or practices…which aid or oppose any religion." *Epperson v. Arkansas*, 393 U.S. 97, 104; 106 (1968) (internal citation and quotations omitted). Stated differently, government conduct may not "confer[ ] [a] privileged status on any particular religious sect," nor may it "single[ ] out [any] bona fide

faith for disadvantageous treatment." *Cutter v. Wilkinson*, 544 U.S. 709, 724 (2005). The Church Autonomy Doctrine relies on the premise that churches have the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1167 (4th Cir. 1985) (quoting *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952)). However, the First Amendment "does not...remove all controversies involving religious institutions from the purview of civil courts." *Byrd v. DeVeaux*, Civil Action No. DKC-17-3251, 2019 WL 1017602, at *5 (D. Md. Mar. 4, 2019) (citing *Jones v. Wolf*, 443 U.S. 595, 602-03 (1979); *American Union of Baptists, Inc. v. Trustees of Particular Primitive Baptist Church at Black Rock, Inc., et al.*, 644 A.2d 1063, 1068 (Md. 1994)). Indeed, as the Maryland Supreme Court instructs, "[e]ach set of circumstances must be evaluated on an individual basis by the court to determine whether, under the facts of that particular case, a court would be forced to wander into the 'theological thicket' in order to render a decision." *Am. Union of Baptists, Inc.*, 644 A.2d at 1068; *see id.* (noting the "many cases [in which Maryland's Courts have] been able to resolve church [ ] disputes with the application of neutral principles of law"). Regulating where firearms may permissibly be carried is not a matter of "faith and doctrine," see *Rayburn*, 772 F.2d at 1167, and no amount of doctrinal repackaging can transform a generally applicable public-safety measure into the kind of ecclesiastical intrusion the Church Autonomy Doctrine was designed to prevent.

Contrary to Plaintiffs' suggestion, the Church Autonomy Doctrine is not implicated in the facts at issue here. Indeed, each case upon which Plaintiffs rely confirms its inapplicability. *See* Mem. at 17-20. *In Our Lady of Guadalupe School*, the Court protected a Catholic school's selection of teachers performing "important religious functions" and simultaneously explained the doctrine's outer limit: "[t]his does not mean that religious institutions enjoy a general immunity

from secular laws, but it does protect their autonomy with respect to internal management decisions that are essential to the institution's central mission." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020). In *Hosanna-Tabor Evangelical Lutheran Church & Sch.*, the Court held that the categorical bar against government intrusion applied where the state sought to dictate employment of a minister—because "[r]equiring a church to accept or retain an unwanted minister…interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188 (2012). The Court expressly cabined its holding: "We express no view on whether the [Doctrine] bars other types of suits." *Id*. at 193; *see also Kedroff*, 344 U.S. at 119-121 (legislature erroneously transferred cathedral control from one religious faction to another); *see also Serbian Eastern Orthodox Diocese for the U.S. & Can. v. Milivojevich*, 426 U.S. 696, 708-09; 720-25 (1976) (court improperly reinstated a defrocked bishop by overriding the church's own canonical proceedings).

Each of Plaintiff's cited cases involve the state inserting itself into a dispute over religious doctrine, religious leadership, or religious governance—the very "theological thicket" that civil courts are forbidden to enter. *Am. Union of Baptists, Inc*., 644 A.2d at 1068. The Bill does none of these things. It does not touch SSJC's governance, liturgy, or doctrine in any respect. It regulates private concealed carry of a secular object at a defined category of public-assembly locations that includes religious and non-religious sites alike. The gap between choosing who personifies a church's beliefs and choosing whether lay congregants may carry on a synagogue premises is more than an apple to an orange; it is an apple to a carburetor. Plaintiffs additionally cite *GeorgiaCarry.Org, Inc.*, which upheld Georgia's statutory framework restricting firearms in places of worship. *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1258-9; 1266 (11th Cir.

2012). That holding buttresses rather than undermines the County's position: courts sustain precisely this type of legislation because regulating firearms on premises is not an ecclesiastical determination. The Church Autonomy Doctrine does not constitutionalize every internal management preference merely because the institution invoking it is a place of worship. SSJC's volunteer security team may be motivated by *halachic* values, but its function—armed physical protection of a premises—is something that can be done by professional security as permitted by the Bill, already in practice by SSJC, and indistinguishable from the security arrangements of any school, office building, or community center. The Establishment Clause was not designed to shield that detail—namely who is providing the armed security—from neutral regulation.

3. The Bill Does Not Violate the Second Amendment.

In 2008, the United States Supreme Court conducted its "first in-depth examination" of the Second Amendment in *District of Columbia v. Heller* and held that a ban against handgun possession in the home violates the Second Amendment. 554 U.S. 570, 635 (2008). Two years later, in *McDonald v. City of Chicago*, the Court determined that the Second Amendment applies to the States via the Fourteenth Amendment. 561 U.S. 742, 750 (2010). Over a decade after *McDonald*, the Court decided *Bruen*, holding that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." 597 U.S. at 10.

All three cases recognize, however, that "the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. *See also id*. at 626 (the right to bear arms for self-defense is not a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose"); *Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring) ("[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations" (quoting *Heller*, 554 U.S. at 636));

*McDonald*, 561 U.S. at 786 (noting that it is "important to keep in mind" that *Heller* did not cast doubt on certain "longstanding regulatory measures" in connection with firearms).

The most well-settled permissive regulations are those involving sensitive places—the only provision of the County Code that is challenged here. Starting with *Heller*, the Supreme Court clarified that "nothing in our opinion should be taken to cast doubt on…laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Heller*, 554 U.S. at 626. In *Bruen*, the Court considered *Heller's* "discussion of [those] 'longstanding' 'laws'" and noted "no disputes regarding the lawfulness of such prohibitions." 597 U.S. at 30. The *Bruen* Court declined "to comprehensively define 'sensitive places,'" but rather invited courts to "use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." 597 U.S. at 30. *See also United States v. Rahimi*, 602 U.S. 680, 691-2 (2024) ("By that same logic, the Second Amendment permits more than just those regulations identical to those that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers."). It is at that step where Plaintiffs seemingly intentionally ignore not only this Court's determination in the MSI Litigation that the very sensitive places at issue here pass Constitutional muster—at least at a preliminary injunction phase, but further ignore the Fourth Circuit's acceptance of historical analogues that transcend the time period of the ratification of the Second Amendment.

Plaintiffs start by casting a lens elsewhere, suggesting—incorrectly—that "governments have been unable to identify *any* relevantly similar historical analogues" in "other cases that have presented Second Amendment challenges to bans on firearms in places of worship" (Mem. at 8 (emphasis in original)). In so doing, Plaintiffs glaringly overlook the squarely relevant decision of

*this Court* in the MSI Litigation. In finding that the MSI Plaintiffs "are not likely to succeed on the merits of their Second Amendment claim relating to the carrying of firearms in places of worship," this Court determined that the County's cited "historical statutes and ordinances demonstrate that there is 'historical precedent' from the time period of the ratification of the Fourteenth Amendment that 'evinces a comparable tradition of regulation' of firearms at places of worship." *Maryland Shall Issue*, 680 F. Supp. 3d at 585. This Court properly based its ruling on the following analogues:[8]

- Georgia in 1870 and 1882 prohibited the carrying of a pistol or revolver, or any kind of deadly weapon, to any place of public worship, "or any other public gathering" in the state.[9] Georgia's 1882 prohibition did not apply to law enforcement. *Id*. In 1870, 1871, and 1879, Texas prohibited any person from going into any church or religious assembly with a gun, and its laws in the latter two years also prohibited guns at "any other public assembly."[10] The Texas laws did not apply to law enforcement. *See id.*

- Missouri in 1875, 1879, and 1883 prohibited firearms in any church or place where people assembled for religious worship.[11] In the 1890s, two localities in Missouri prohibited weapons at religious assemblies. Columbia, Missouri, prohibited the carry of dangerous weapons "into any church, or place where people have assembled for religious worship" in 1890.[12] In 1894, Huntsville, Missouri, prohibited the carry of a deadly or dangerous

---

[8] These same analogues apply here with equal force, because Bill 23-26E includes the same prohibition in the same "places of worship" that Bill 21-22E presented to Judge Chuang.

[9] *See* Ex. 14, An Act to Preserve the Peace and Harmony of the People of this State, and for Other Purposes, Penal Code, Title 16, No. 285, *Acts and Resolutions of the General Assembly of the State of Georgia* 421 (1870); Ex. 15, Georgia Code, Part IV, Title I, Division IX, § 4528, *The Code of the State of Georgia* (1882).

[10] *See* Ex. 16, An Act Regulating the Right to Keep and Bear Arms, Ch. 46, § 1, *General Laws of the Twelfth Legislature, of the State of Texas* 63 (1870); Ex. 17, An Act Regulating the Right to Keep and Bear Arms, Art. 6511 (1870) and An Act to Regulate the Keeping and Bearing of Deadly Weapons, Crim. Code Art. 6514(1871), *A Digest of the Laws of Texas* 1322, 1323 (1875); Ex. 18, Texas Code, Tit. 9, Ch. 4, Art. 320, Carrying Arms in Church or Other Assembly, *The Revised Statutes of Texas* 43 (1879).

[11] Ex. 19, An Act to Prevent the Carrying of Weapons in Public Assemblies of the People, § 1, *Laws of Missouri, General and Local Laws Passed at the Regular Session of the Twenty-Eighth General Assembly* 50-51 (1875); Ex. 20, Revised Statutes of the State of Missouri (1879); Ex. 21, An Act to Amend Section 1274, Article 2, Chapter 24 of the Revised Statutes of Missouri, Entitled "Of Crimes and Criminal Procedure," § 1, *Laws of Missouri Passed at the Session of the Thirty-Second General Assembly* 76 (1883).

[12] *See* Ex. 22, Chapter XVII: Carrying Concealed Weapons—Firing Guns, Pistols, Fire Crackers, Etc., May 22, 1890, *General Ordinances of the Town of Columbia, in Boone County, Mo.* 34, 35 (1890).

weapon in "any church or place where people have assembled for religious worship."[13] This prohibition did not apply to police officers.[14]

- Virginia in 1877 prohibited pistols or other dangerous weapons in "any place of worship while a meeting for religious purposes is being held at such a place, or without good or sufficient cause therefor."[15]

- Arizona, while still a territory in 1889 and 1901, prohibited the carrying a pistol or other firearm in any church or religious assembly.[16] This did not apply to law enforcement. *See id.* When it was still a territory, Oklahoma in 1890 and 1893 prohibited the carry of firearms into "any church or religious assembly."[17]

These historical precursors match the County's prohibition of guns in places of worship. Indeed, like most of these laws, the County's law exempts law enforcement officers or security guards.

In addition, several courts in the 1870s viewed churches or places of worship as no place for firearms. *See Hill v. State*, 53 Ga. 472, 475 (Ga. 1874) (carrying arms at places of worship "[i]s a thing so improper in itself, so shocking to all sense of propriety, so wholly useless and full of evil, that it would be strange if the framers of the constitution have used words broad enough to give it a constitutional guarantee"); *English v. State*, 35 Tex. 473, 478-79 (Tex. 1872) (finding it "[l]ittle short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance, into a church…"); *Andrews v. State*, 50 Tenn. 165, 182 (Tenn. 1871) (observing a "[m]an may

---

[13]Ex. 23, Huntsville, Missouri, Ordinance in Relation to Carrying Deadly Weapons, § 1 *The Revised Ordinances of the City of Huntsville, Missouri of 1894* 58 (1894).

[14] *See id.* § 2.

[15] Ex. 24, Acts of Virginia Assembly, Ch. 7, of Offences [sic] Against Morality and Decency –Protection of Religious Meetings § 21, *Acts and Joint Resolutions of the General Assembly of the State of Virginia* 305 (1878).

[16] Ex. 25, An Act Defining and Punishing Certain Offenses Against Public Peace, § 3, *Session Laws of the Fifteenth Legislative Assembly of the Territory of Arizona* 17 (1889); Ex. 26, Arizona Territory Statutes, Crimes and Punishments § 387, *The Revised Statutes of the Arizona Territory* 1252 (1901).

[17] *See* Ex. 27, Territory of Oklahoma Statutes, Crimes and Punishment, Art. 47, § 7, *The Statutes of Oklahoma 1890, Laws Passed by the First Legislative Assembly of the Territory* 496 (1890); Ex. 28, Oklahoma Territory Statutes, Art. 45, § 7,*Statutes of Territory of Oklahoma, 1893* 504 (1893).

well be prohibited from carrying his arms to church, or other public assemblage, as the carrying them to such places is not an appropriate use of them").[18] Similarly, this Court credited the County's citation of "numerous examples of laws prohibiting firearms in buffer zones of a certain distance around a 'sensitive place' or other location at which the government could prohibit the carrying of firearms" to decide that the MSI Plaintiffs "are unlikely to succeed on the merits of their challenge to Section 57-11's 100-yard buffer zones." *Maryland Shall Issue*, 680 F. Supp. 3d at 590. That buffer zone was untouched by the new Bill.

Having apparently willed this Court's well-reasoned decision out of existence, Plaintiffs then ignore the law of this Circuit, to advance non-binding approaches of other Circuits that they prefer. Plaintiffs cite to the Ninth Circuit's rejection of certain historical analogues because they prohibited the carry of firearms in places of worship after the ratification of the Fourteenth Amendment. *See* Mem. at 8 (citing *Wolford*, 116 F.4th at 996); *see also id*. at 997. But, the Ninth Circuit recognized that strict uniformity among the Circuits is not the rule, finding "District courts have divided on this question" and even citing this Court's Memorandum Opinion in the MSI Litigation—which tellingly Plaintiffs do not cite at all in their Motion—as one District Court that has "reach[ed] the opposite conclusion." *Id.* On that point, this Court concluded that "historical sources from the time period of the ratification of the Fourteenth Amendment"—such as those discussed above—"are equally if not more probative of the scope of the Second Amendment's right to bear arms as applied to the states by the Fourteenth Amendment." *Maryland Shall Issue*, 680 F. Supp. 3d at 582.

[18] Plaintiffs' suggestion that this Court should recognize "a tradition of government *mandating* the carrying of arms in places of worship" (Mem. at 11 (emphasis in original)) would fail the "why" test (*United States v. Hermani*, 146 S. Ct. 1677, 1686 (2026)) of analogue comparability. As even the Court in *Wolford v. Lopez*—a case cited by Plaintiffs—explains, "those laws clearly addressed a different perceived societal problem—protection of the colony from raids by Native Americans and from slave revolts." 116 F.4th 959, 997 (9th Cir. 2024). Thus, the regulations that Plaintiffs cite "are rooted in racism not the Second Amendment." *Goldstein*, 680 F. Supp. 3d at 396. That line of comparison clearly was rejected by the Supreme Court in *Wolford*.

This Court's approach is, in fact, the approach mandated by the Fourth Circuit in *Kipke v. Moore*, 165 F.4th 194 (4th Cir. 2026). In *Kipke*, the Fourth Circuit continued its approach developed in *Bianchi v. Brown*, 111 F.4th 438, 472 (4th Cir. 2024), and concluded that "the sources we look to at *Bruen* step two [of finding historical analogues] can come throughout American history." 165 F.4th at 207. In other words, this Circuit expressly has rejected the approach taken by the authority from other Circuits upon which Plaintiffs misplace their reliance.

4. <u>The Bill Does Not Violate the 14th Amendment.</u>

The Equal Protection Clause "commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *Dyer v. Maryland State Bd. of Educ*., 187 F. Supp. 3d 599, 618 (D. Md. 2016), *aff'd*, 685 Fed. Appx. 261, 2017 WL 1423298 (4th Cir. 2017) (internal quotations and citations omitted). To establish a religion-based claim premised on a "violation of the Equal Protection Clause, [Plaintiffs] must allege that they were treated differently from similarly situated individuals, and that this differential treatment was both intentional and base[d on their religion]." *Mark Vogel Acquisitions, LLC v. Prince George's Cnty. MD*, No. 24-CV-03008-LKG, 2025 WL 2374695, at *6 (D. Md. Aug. 14, 2025), *aff'd sub nom*. *Mark Vogel Acquisitions, LLC v. Prince George's Cnty*., No. 25-2030, 2026 WL 936901 (4th Cir. Apr. 7, 2026) (citing *Washington v. Davis*, 426 U.S. 229, 239 (1976)).

Plaintiffs' equal protection claim fails for two reasons. First, Plaintiffs fail to make a showing of differential treatment between them and other similarly situated individuals. The Bill applies to all individuals, regardless of their religious beliefs, practices, or identity, and prohibits the possession of firearms not only in places of worship but also in a series of secular and non-religious, public and private locations.

Second, even if Plaintiffs could show differential or selective treatment, they cannot show that such treatment was based on their religion. Apart from conclusory statements alleging that they have been targeted and "singled out" and "not similarly treated [to other] secular groups in similar numbers and similar circumstances," Plaintiffs have not pled any facts nor provided any evidence suggesting that the County was motivated by religious considerations, religious animus or discriminatory purpose. *See* Compl. at ¶ 82; *see also* Mem. at 20-21. Consequently, the Court should find that they are unlikely to succeed on the merits of their Equal Protection claim.

**C. Plaintiffs Will Not Suffer Irreparable Harm if the Court Does Not Issue a Preliminary Injunction.**

Plaintiffs fail to make a clear showing that "irreparable injury is **likely** in the absence of an injunction." *Winter,* 555 U.S. at 22 (2008) (emphasis in original). The harm to be suffered may not be "remote [o]r speculative, but actual and imminent." *Mountain Valley Pipeline, LLC v. 6.56 Acres*, 915 F.3d 197, 216 (4th Cir. 2019) (citation and quotations omitted). Additionally, harm is irreparable when it "cannot be fully rectified by the final judgment after trial." *Id.*

The *only* irreparable harm that Plaintiffs posit they will suffer is a purported "'loss of constitutional freedoms.'" Mem. at 21. However, "the likelihood of irreparable harm on this basis is dependent on the likelihood of success on the merits of the claim." *Maryland Shall Issue*, 680 F. Supp. 3d at 593. Because Plaintiffs have not shown a likelihood of success on the merits of their claims, Plaintiffs' Motion does not support irreparable harm here.[19]

Moreover, similar to the MSI Plaintiffs that preceded them in this Court on the very same issue and regulation, Plaintiffs here "have not provided any examples of prosecutions…for

---

[19] Plaintiffs' two-paragraph argument on three out of the four elements of injunctive relief hardly satisfies their "'heavy burden' of making a 'clear showing' that [they] satisf[y] *all four factors*." *Roswell v. Mayor & City Council of Baltimore*, 671 F. Supp. 3d 607, 616 (D. Md. 2023). This is particularly true when challenging a decision of another branch of government as unconstitutional. *See Clapper*, 568 U.S. at 407.

possessing a firearm in the scenarios they have referenced, such as a prosecution for possessing a firearm on a public street or area that happens to be within 100 yards of a place of public assembly, or for carrying a firearm at a place of worship." *Maryland Shall Issue*, 680 F. Supp. 3d at 594. That failure negates the "likelihood" of "arrest and conviction for a felony firearm offense"—and therefore a lack of imminent harm. *Maryland Shall Issue*, 680 F. Supp. 3d at 593. Indeed, these same prohibitions have existed in County law, in substantially the same form, *since 1997*. *See* Section II.A. above. There is no support for the notion that a different Judge in the same court should now find that Plaintiffs suddenly are suffering irreparable harm with the passage of Bill 23-26E, when these Plaintiffs have not sought injunctive (or any other) relief before now. That delay alone is sufficient support to find a lack of irreparable harm—and therefore to deny the Motion altogether. *See Roswell*, 671 F. Supp. 3d at 618.

### D. The Balance of the Equities and the Public Interest Weigh in Favor of Denying Plaintiffs' Request for a Preliminary Injunction.

When injunctive relief is sought against the government, and "the government's interest is the public's interest," the third and fourth elements necessary for an injunction—the balance of the equities and the public interest—"merge." *See Ass'n of Cmty. Cancer Cntrs. v. Azar*, 509 F. Supp. 3d 482, 501 (D. Md. 2020) (citing *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) and *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

"'[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (internal citation omitted). That notion applies equally to the County here. Moreover, a government's "[i]nability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). This is especially true when the law involves public safety. *See Maryland*, 567 U.S. at 1303.

Courts historically recognize that public safety—albeit in a means-end scrutiny context—is a compelling governmental interest. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 750 (1987) ("the Government's general interest in preventing crime is compelling"); *Schall v. Martin*, 467 U.S. 253, 264 (1984) ("[t]he legitimate and compelling state interest in protecting the community from crime cannot be doubted" (citation and quotations omitted)). The Founders reserved to the states, and by extension local governments such as the County, police powers to protect the public and to prevent violence. *See United States v. Morrison*, 529 U.S. 598, 618 (2000) (stating there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims"). Staying enforcement of Bill 23-26E will undermine the strong interest that the County has in the safety of the public, and in preventing gun violence in areas where people, especially vulnerable populations, congregate.

Finally, as this Court previously has explained, "there is a public interest in not prematurely enjoining Section 57-11 before a final determination on constitutionality is made." *Maryland Shall Issue*, 680 F. Supp. 3d at 594. This fact weighs especially in favor of the County, when Plaintiffs here have asserted no previous challenge to County law that—for purposes of the alleged application to Plaintiffs—has been on the books for decades.

Respectfully submitted,

JOHN P. MARKOVS
COUNTY ATTORNEY

By: /s/ Jeffrey M. Schwaber

Jeffrey M. Schwaber (Bar ID #06095)
jschwaber@steinsperling.com
(301) 354-8110 (facsimile)
Deanna L. Peters (Bar ID #15674)
dpeters@steinsperling.com
(301) 354-8131 (facsimile)
STEIN SPERLING BENNETT
DE JONG DRISCOLL PC
1101 Wootton Parkway, Suite 700
Rockville, Maryland 20852
(301) 340-2020

/s/ Erin J. Ashbarry

Erin J. Ashbarry (Bar ID #26298)
Chief, Division of Government Operations
erin.ashbarry@montgomerycountymd.gov
Office of the County Attorney
101 Monroe Street, 3rd Floor
Rockville, Maryland 20850
Tel: (240) 777-6700
Fax: (240) 777-6705

*Attorneys for Defendants, Montgomery County, Maryland, Marc Elrich, & Marc Yamada*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 24th day of August, 2026, a copy of the foregoing was sent to all counsel of record via CM/ECF.

/s/ Jeff M. Schwaber

Jeffrey M. Schwaber (Bar ID 419681)