# EXHIBIT 13

**Testimony of Mark W. Pennak, President of Maryland Shall Issue, Inc.,**
**In Opposition to County Bill 23-26**

**Summary:**

I am counsel and President for Maryland Shall Issue, Inc., and appear today in opposition to Bill 23-26. I am also counsel of record for the petitioners in the Maryland Supreme Court's decision in *Engage Armament, LLC, et al. v. Montgomery County, MD*, --- Md. ---, --- A.3d ----, 2026 WL 1144313 (April 28, 2026). A copy of that decision is attached to the Staff Report for the Bill.

Bill 23-26 is a flawed attempt to bring County law into compliance with the Court's decision in *Engage Armament.* As detailed below, that attempt fails. In so far as the Bill bans firearms completely within 100 yards of places of public assembly or in or on private property held open to the public (including a privately owned library), the Bill also violates the Second Amendment under controlling precedent. Federal court of appeals precedent also makes clear that the Bill's imposition of bans on places of worship likewise violates the Second Amendment. The Bill's bans in other places, such as in "recreational" facilities or at a "multipurpose exhibition facility" are the types of bans under active litigation in the federal courts and will also likely also fail. In so far as it incorporates vague,

undefined terms in a criminal statute, the Bill fails under the Due Process Clause of the State and federal Constitutions.[1]

Any suit in federal district court challenging Bill 23-26 will also challenge the County-wide application of Section 57-10 as unauthorized by MD Code, Criminal Law, § 4-209. While *Engage Armament* did not reach Section 57-10, the reasoning of the Court makes clear that the County's power of enact firearms legislation is allowed only to the extent of the authority granted by MD Code, Criminal Law, § 4-209(b)(1). That section cannot be read as allowing the County to enact County-wide restrictions. The federal district court will have ancillary jurisdiction over these State law claims. Should plaintiffs prevail on either the State law claims or the federal Constitutional claim, County will then be liable for equitable relief and substantial attorneys' fees and costs under federal law, 42 U.S.C. § 1988. Those fees will be sought in the *Engage Armament* litigation and will likely be quite substantial.

To be clear, Section 1988 fees are available in cases where state law claims are mixed with federal claims filed under Section 1983, and Section 1988 fees may be awarded even though the plaintiff prevails only on the State law claims. See, e.g.,

---

[1] Bill 23-26 amends Chapter 57 of the County Code. Under Section 57-15, any violation of Chapter 57 (other than for Section 57-8) "is a Class A violation to which the maximum penalties for a Class A violation apply." Under Section 1-19 of the County Code, a Class A violation is punishable by a $1,000 fine and 6 months in jail. Under Section 1-20(c) "[e]ach day any violation of County law continues is a separate offense."

*State v. Braverman*, 228 Md. App. 239, 253-54, 137 A.3d 377 (2016) (collecting case law). See also *Maher v. Gagne*, 448 U.S. 122, 132 (1980) (holding that an award of fees is permitted where "the plaintiff prevails on a wholly statutory, non-civil-rights claim pendent to a substantial constitutional claim."); *Osterweil v. Bartlett*, 92 F.Supp.3d 14, 23 (N.D.N.Y. 2015) (same). "It is enough" that a court order has "provide[d] a party with some of the relief sought in the complaint." *Cities4Life, Inc. v. City of Charlotte,* 52 F.4th 576, 580 (4th Cir. 2022), citing *Maher*, 448 U.S. at 127-130. "[A] civil-rights plaintiff need not prevail on every claim or obtain all relief sought to receive attorney's fees." *Id.* at 581. "[T]he prevailing party inquiry does not turn on the magnitude of the relief obtained." *Id.*, citing *Farrar v. Hobby*, 506 U.S. 103, 114 (1992). Any suit challenging Bill 23-26 will be precisely such a mixed case as it will include a federal challenge under the Second Amendment and state law challenges as permitted by *Engage Armament*.

The *Engage Armament* litigation is precisely such a mixed case as plaintiffs in that case sought relief on a federal claim in the initial Complaint (Count IV) filed in 2021, on two federal claims in the First Amended Complaint (Counts IV and V) and in multiple federal claims in the Second Amended Complaint (Counts IV-VIII).[2]

---

[2] In Maryland such attorney fee requests are collateral to and independent of the merits. See, e.g., *Williams v. Board of Education of Prince Georges Co.*, 2023 WL 3476326 at *9 (MD Appellate Ct. 2023), citing *Grove v. Grove*, 192 Md. App. 428, 430, 994 A.2d 1032 (2010).

The fee award in *Engage Armament* will soon be determined by the Circuit Court of Montgomery County and is likely to be hundreds of thousands of dollars. The pending **federal court** litigation against the County on **federal** claims with respect to Bill 21-22E, enacted in 2022 and Bill 4-21, enacted in 2021, will result in additional Section 1988 fees liability against the County.[3] If the County wishes to avoid a similar substantial fee liability with respect to Bill 23-26, it must reject Bill 23-26 or amend the Bill to bring it into full and strict compliance with the Maryland Supreme Court's decision in *Engage Armament* and the Second Amendment.

**Article XI-A of the Maryland Constitution and *Engage Armament*:**

In the *Engage Armament* decision, the Maryland Supreme Court held that Section 57-11(a), of the County Code constituted an impermissible "general law" within the meaning of Article XI-A of the Maryland Constitution. The Court stated: "We hold that § 57-11(a), as amended, is not a local law because of its application to holders of State-issued wear-and-carry permits traveling on public highways who cross within 100 yards of a place of public assembly." Slip op. at 61. The Court explained that "[i]n effect, the County's regulation creates pockets of roadway

[3] Plaintiffs' Second Amendment claim as to these bills is currently pending in the United States Court of Appeals for the Fourth Circuit. *Maryland Shall Issue, Inc. v. Montgomery Co.*, Nol 23-1719 (4th Cir.). Those proceedings are currently stayed pending the upcoming decision of the Supreme Court in *Wolford v. Lopez*, No. 25-1046 (argued Jan. 20, 2026), and petitions for certiorari filed in *Moore v. Kipke*, No. 25-1206 (SCt), and in Novotny v. Moore, No. 25-1324 (SCt). See note 7, *infra.*

throughout the County's lengthy and complex highway system in which travelers with State-issued wear-and-carry permits are banned from carrying firearms based on the proximity of those segments of roadway to buildings or locations that might not abut or even be visible from the road." *Id.*

The Court rejected the County's proposed solutions for permit holders, under which permit holders could create "maps" of all banned areas and avoid those areas, or by "placing their firearms in an enclosed case or locked firearms rack." *Id.* at 61-62. The Court explained that "both options burden permit holders, including the many who reside outside the County but drive within it, with the choice of significant travel restrictions or regularly yielding their benefits as permit holders." *Id.* at 62. The Court thus concluded that "[a]s currently constructed, § 57-11(a) has significant extraterritorial impact" that made it into a prohibited general law. *Id.*

Bill 23-26 attempts to read *Engage Armament* as allowing the County to narrow the scope of Section 57-11(a) to permit holders while traveling in vehicles. The Bill provides that Section 57-11(a) does not "apply to the possession of a handgun by a person who has a permit to carry the handgun under State law while the person travels on public highways within 100 yards of a place of public assembly." That amendment is simply insufficient to convert Section 57-11(a) into a permissible local law within the meaning of Article XI-A of the Maryland Constitution. Permit holders outside the County do not simply drive through the

County without stopping and getting out of their vehicles. Rather, such permit holders come into the County to work, to shop and to conduct other activities that involve getting out of their vehicles. This Bill would slap criminal penalties on every such permit holder the moment he or she gets out of the vehicle or walked within 100 yards of a place of public assembly, as that term is defined by the Bill.[4]

Even as narrowed by the Bill, places of public assembly literally encompass thousands of locations. Specifically, Montgomery County is home to **1,262** public bikeways, https://bit.ly/40MxYgZ, **605** houses of worship, https://bit.ly/3OLbfvG, **693** *public* parks, https://bit.ly/3qjHLfb (not including four federal parks and any privately owned "parks"), **258** private schools, https://bit.ly/3RyA0wd, **137** public elementary schools, https://bit.ly/40JIzcB, **40** middle schools, https://bit.ly/3PTz8RL, **25** high schools, https://bit.ly/4htvDNF, **42** public recreation centers, https://bit.ly/3WB1VhL, **10** colleges and universities, https://bit.ly/3Csn5Yr, **29** municipalities https://bit.ly/4g9jAE8, **45** Post Offices, https://bit.ly/4h8YAhZ, **38** fire stations, https://bit.ly/4gfCxVy, 15 public swimming

[4] Specifically, the Bill narrows the definition of places of public assembly to include: "a publicly or privately owned park, place of worship, school, library, recreational facility; multipurpose exhibition facility, such as a fairgrounds or conference center," or a "government building open to the public for the business of government, polling place, courthouse, or legislative assembly." The Bill further provides that "[a] 'place of public assembly' includes all property associated with the place, such as a parking lot or grounds of a building." This narrowing does not save the Bill from attack.

pools, https://bit.ly/4awPtW2, **13** Metro stations, https://bit.ly/4aySiG0, and **11** MARC commuter train locations, https://bit.ly/3Cdo3b7.

In short, the 100-yard zones for each of these places often encompass ordinary places of commerce and associated public sidewalks. A few additional examples are sufficient to illustrate the point. Caroline Freeland Urban Park on Arlington Road in downtown Bethesda is easily within 100 yards of Giant Foods grocery store across Elm street from the park. That park is also within 100 yards of the Shoppes of Bethesda, part of Bethesda Row, a Lenscrafter store and a Tesla supercharger station. Similarly, the 100-yard zone from either side of the Capital Crescent Trail that runs through downtown Bethesda includes numerous stores, such as Ourisman Honda, Anthropologie, a Safeway grocery store, a CVS drug store and the Chevy Chase Pediatric Center, which is precisely the type of licensed medical facility that the *Engage Armament* held the County may **not** regulate under Section 4-209(b)(1)(iii). See slip op. at 34-35.

Further up Arlington Road in Bethesda, the 100-yards zone, as measured from the outer edge of parking lot of Bethesda Elementary School or Canaan Oromo Evangelical Church on Wilson Lane, sweeps broadly to include shops along Old Georgetown Road, including the Prestipino Dental Group, another licensed medical facility that the County may not regulate. The 100 yards zone from Elm Street Urban Park in Bethesda includes a Panera Bread outlet and the entirety of the large adjacent

public parking lot. Similar effects can be found along Wisconsin Avenue in Bethesda within 100 yards of Chase Avenue Urban Park (an area that includes a public parking lot, a CVS drug store, Chase Bank and United Bank) and Cheltenham Drive Urban Park (an area that includes the same CVS drug store, an Acura car dealership and still another large public parking area). People do not "assemble" in these locations. See *Engage Armament,* slip op. at 32 ("a place of public assembly is a location that is open for members of the public *to gather for a common purpose*, such as deliberating, legislating, worship, entertainment, education, or recreation") (emphasis added).

The same kind of broad scope can be found within every urban area in the County, including Silver Spring and Rockville. These are all places in which visitors from outside the County may shop, work or conduct other activities outside of vehicles. See *Engage Armament,* slip op. at 60 (noting that Section 57-11(a) "prohibits all permit holders from carrying their firearms in a substantial portion of Montgomery County"). Banning carry within these areas "burden permit holders, including the many who reside outside the County but drive within it, with the choice of significant travel restrictions or regularly yielding their benefits as permit holders." *Id.* at 62. Basically, the Bill would prevent permit holders from outside the County from shopping or working or even walking on public sidewalks within "a substantial portion" of the County. Bill 23-26 plainly has "significant extraterritorial

impact." *Id.* Bill 23-26 would thus enact a general law for the same reason that the existing version of Section 57-11(a) was struck down in *Engage Armament*. Bill 23-26 will suffer the same fate.

Indeed, in *Engage Armament,* the Maryland Supreme Court **specifically warned the County** not to narrowly construe its opinion as limited to vehicular travel. Specifically, in footnote 23, the Court stated: "Our holding that § 57-11(a) is not a local law because it reaches non-Montgomery County residents traveling within the County on public highways **should not be interpreted** as a determination that an exception for travel on public highways would alone remedy the problem and transform § 57-11(a) into a local law." *Id.* at 63 n.23 (emphasis added). The Court noted that the constitutionality of any amended law (like Bill 23-26) "will depend on the scope of the amended law and evidence concerning its effects." *Id.* As outlined above, the scope of Bill 23-26 is self-evident in its effect on non-resident permit holders who shop, work or walk within the County. The evidence of such effect will be simple to present in court. A challenge to Bill 23-26 will succeed on this ground alone. In the face of footnote 23, Bill 23-26, if enacted, would effectively constitute County defiance of the Maryland Supreme Court. That claim will be presented in any suit challenging Bill 23-26.

**Bill 23-26 is Vague:**

The Bill also suffers from vagueness. Vagueness is particularly evident in Bill 23-26's bans at and within 100 yards of all privately or publicly owned "parks." "Parks" is not a defined term. The coverage of Section 57-11(a) was previously amended by Bill 4-21 in 2021 to specifically eliminate the prior definition of "parks" as including only parks "identified by the Maryland-National Capital Park and Planning Commission." Bill 23-26 is thus **not** limited to parks which are specifically designated as such by signage or otherwise. By common dictionary definitions, "parks" could include every open grassy spot open to the public. Without a specific definition, there is no way to know the scope of "parks." For example, it is far from clear whether "park" would include the "Whale Art" area at the corner of Wayne Ave. and Georgia Ave. in downtown Silver Spring. Merely walking on the sidewalk within 100 yards of this intersection on the way to the nearby FedEx store or the ATT store outlet or the Sweetgreen, Subway, or El Taco restaurants or the Massage Envy outlet would risk the imposition of strict criminal liability, including imprisonment.

A similar lack of notice or definition applies to other places of public safety specified by Bill 23-26, such as a "recreational facility" and "multipurpose exhibition facility." While *Engage Armament* makes clear that these locations must be open to the public, neither of these terms is defined. While a "multipurpose

exhibition facility" includes examples "*such as* a fairgrounds or conference center," the term is not limited to those two types of facilities. The scope of a "recreational facility" does not even include such examples, much less a definition. People are left to guess. More fundamentally, there is simply no way for a person to know he or she is walking within 100 yards of recreational facility or a "multipurpose facility" which, as the Maryland Supreme Court noted in *Engage Armament*, may well be "buildings or locations that might not abut or even be visible from the road" or even the adjoining sidewalk. *Engage Armament*, slip op. at 61. The risk of "arbitrary enforcement" is apparent. At a minimum, these realities make clear that the Council should make Section 57-11(a) subject **only** to **civil** enforcement, **not** criminal enforcement. That is a simple amendment.

The lack of sufficient notice is intolerable for a criminal statute like Bill 23-26. See, e.g., *United States v. Lanier,* 520 U.S. 259, 266 (1997) ("[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope"); *Marks v. United States,* 430 U.S. 188, 191-82 (1977) (Due process protects against judicial infringement of the "right to fair warning" that certain conduct will give rise to criminal penalties). "The prohibition of vagueness in criminal statutes 'is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law,' and a statute that flouts it 'violates the first essential of due

process.'" *Johnson v. United States,* 576 U.S. 591, 596 (2015). "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that **ordinary people** can understand what conduct is prohibited **and in a manner that does not encourage arbitrary and discriminatory enforcement**." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (emphasis added). For the same reasons, vagueness is also barred by the Maryland Constitution. See, e.g., *Pizza di Joey, LLC v. Mayor of Baltimor*e, 470 Md. 308, 343-44, 235 A.3d 873 (2020) (collecting State case law).

**Section 57-10 of the County Code:**

The Court in *Engage Armament* made clear that the only reason the County has any authority to enact legislation regarding firearms is due to the authority granted by MD Code, Criminal Law, § 4-209(b)(1). Otherwise, such legislation is expressly preempted by the very broad preemption imposed by Section 4-209(a), which provides that "the State preempts the right of a county, municipal corporation, or special taxing district to regulate the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation of: (1) a handgun, rifle, or shotgun; and (2) ammunition for and components of a handgun, rifle, or shotgun."

For example, *Engage Armament* expressly struck down the County's attempt to regulate the possession of firearms by adults in the presence of minors under

Section 57-7(d) of the County Code, holding that this regulation "prohibits a broad swath of otherwise lawful (and constitutionally protected) conduct by adults merely because it occurs in the presence of a minor, without any apparent connection to whether that activity might result in minors gaining unsupervised access to those firearms." Slip op. at 39. The Court found that regulation "is not authorized by § 4-209(b)(1)(i) **and so is preempted by § 4-209(a).**" *Id.* at 40 (emphasis added). The same result obtained for the County's regulation of places of public assembly authorized by Section 4-209(b)(1)(iii). The Court specifically struck down the County's attempt to regulate certain areas, holding that such areas were not places of public assembly. Slip op. at 34-36.[5] Regulation of these areas was thus likewise barred by the express preemption provisions of Section 4-209(a).

---

[5] The Court in *Engage Armament* held that "[h]ospitals, community health centers, long-term facilities, and childcare facilities are not generally open to the public for any purpose of assembly." Slip op. at 34-35. The Court likewise rejected the County's attempt to define place of public assembly to include any government building or area owned or controlled by the County, holding that "§ 4-209(b)(1)(iii) does not authorize the County to preclude carry of firearms within 100 yards of its property unless the property is a 'place of public assembly.'" *Id.* at 35. Finally, the Court rejected the County's attempt to ban firearms within 100 yards of a "gathering" of people expressing their constitutional rights, holding that "[a]lthough that language may describe a "public assembly," it does not describe a 'place of public assembly' for which § 4-209(b)(1)(iii) authorizes local regulation." *Id.* at 36. As the Court thus made plain, the County is not free to define a "place of public assembly" anyway it wants.

The controlling principle from these holdings is that the County's power to regulate firearms is strictly limited to the locations authorized by Section 4-209(b)(1)(iii). Section 57-10 is in blatant violation of these limitations. It provides: "It shall be unlawful for any person to have upon his person, concealed or exposed, or in a motor vehicle where it is readily available for use, any gun designed to use explosive ammunition." That regulation is **County-wide** and is thus not limited to 100 yards of any place of public assembly, as that phrase was interpreted by *Engage Armament.*[6] That means Section 57-10 is **expressly preempted by Section 4-209(a) because it does not fall within any exception specified by Section 4-209(b)(1)**.

And because Section 57-10 is **not** authorized by Section 4-209(b)(1) it is also expressly preempted by other express preemption provisions of State law, including MD Code, Public Safety, § 5-133(a), which provides that "[t]his section supersedes any restriction that a local jurisdiction in the State imposes on the possession by a private party of a regulated firearm, and the State preempts the right of any local jurisdiction to regulate the possession of a regulated firearm," and Section 6 of 1972 Maryland Laws, Ch. 13, which provides "[t]hat all restrictions imposed by the law, ordinances, or regulations of the political subdivisions on the wearing, carrying, or transporting of handguns are superseded by this Act, and the State of Maryland

[6] The Court in *Engage Armament* did not reach the validity of Section 57-10 on grounds that it was not specifically cited in the operative complaint. Slip op. at 16-17. Any complaint challenging Bill 23-26 will correct that omission.

hereby preempts the right of the political subdivisions to regulate said matters." See *Engage Armament,* slip op. at 26 (holding that these express preemption provisions did not apply where local regulation was otherwise authorized "in the three specific areas set forth in § 4-209(b)(1)").

Section 57-10 is not limited to within 100 yards of a place of public assembly and it contains no exception for permit holders or for persons traveling with or possessing firearms on their person or in a vehicle in accordance with State law. See MD Code, Criminal Law, § 4-209(b), MD Code, Criminal Law, § 4-111(b), and MD Code, Natural Resources, § 10-410(c)(1). Section 57-10 is also an invalid "general law" for the same reasons Section 57-11(a) was invalidated by the Court in *Engage Armament* because it "significantly" affects possession and transport of firearms by non-residents. Any challenge to Bill 23-26 will include a State law count challenging Section 57-10. In short, enact Bill 23-26 and Section 57-10 will be doomed in any suit challenging that enactment.

**Second Amendment:**

As is apparent from the foregoing discussion, the prohibitions on permit holders imposed by Bill 23-26 include many locations that are private property held open to the public, such as stores, shops and adjoining private sidewalks. In 2023, the Maryland General Assembly attempted to ban all firearms in such places without the prior consent of the private owner, either by signage or otherwise. See MD Code,

Criminal Law, § 6-411(d). The Maryland federal district court promptly enjoined that legislation, holding that this restriction was unconstitutional under *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). See *Kipke v. Moore,* 695 F.Supp. 638 (D.Md. 2023). The United States Court of Appeals for the Fourth Circuit recently affirmed that ruling in *Kipke v. Moore,* 165 F.4th 194, 218-19 (4th Cir. 2026) ("Maryland's rule would effectively declare most public places 'gun-free zones.' But that likely stretches the sensitive places doctrine too far.").[7]

That decision in *Kipke* is supported by decisions by other federal courts of appeals concerning similar State laws. *Antonyuk v. James,* 120 F.4th 941, 1007-09 (2d Cir. 2024); *Wolford v. Lopez,* 116 F.4th 959, 981-82 (9th Cir. 2024), *cert. granted* 146 S.Ct. 79 (Oct. 3, 2025); *Koons v. Attorney General New Jersey,* 156 F.4th 210, 248 (3d Cir. 2025), *vacated on the grant of rehearing en banc*, 162 F.4th 100 (3d Cir. 2025). The Ninth Circuit in *Wolford* invalidated a California law that imposed this ban on firearms on private property open to the public because it allowed private owner consent only by signage and did not allow a private owner to consent to

[7] On March 2, 2026, the Fourth Circuit stayed its mandate under Rule 41, FRAP, at the plaintiffs' request, pending a petition for certiorari. On April 20, 2026, Maryland filed a petition for certiorari from this ruling. *Moore v. Kipke*, No. 25-1206. On May 20, 2026, the plaintiffs filed a non-conditional cross petition for certiorari seeking review as to other aspects of the Fourth Circuit's ruling regarding sensitive places. *Novotny v. Moore*, No. 25-1324. The stay of the mandate continues until such time as the plaintiffs' petition is fully disposed of by the Supreme Court.

firearms via oral permission. The Ninth Circuit nonetheless sustained a Hawaii law that allowed such oral consent by a private owner on private property.

That Ninth Circuit ruling with respect to Hawaii is currently before the United States Supreme Court in *Wolford v. Lopez*, No. 1046 (argued Jan. 20, 2026), and a merits decision is expected this month. We expect the Supreme Court to reverse the Ninth Circuit and invalidate Hawaii's ban on firearms on private property held open to the public.[8] That Supreme Court ruling will definitively settle the issue and the Court is likely to set forth "principles" that may well govern "sensitive places" restrictions. See *United States v. Rahimi*, 602 U.S. 680, 692 (2024) ("As we explained in *Bruen,* the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition."), citing *Bruen*, 597 U.S. at 26-31. At a minimum, the Council should defer consideration of Bill 23-26 until after *Wolford* is decided by the Supreme Court and after the pending petitions for certiorari in *Kipke* are fully adjudicated. Those petitions could be acted upon as soon as the first Monday of October 2026, at the start of the Court's new Term. A rush to enactment will result in an immediate challenge in federal court in a suit that will raise both federal claims and pendent State law claims, including a challenge to Section 57-10.

[8] Full disclosure, the undersigned is counsel for plaintiffs in both *Wolford* and *Kipke*.

The bans imposed by Bill 23-26 are worse than either the California statute or the Hawaii statute at issue in *Wolford* or the Maryland law invalidated in *Kipke.* The legislation at issue in those cases at least allowed the private property owner to bear arms **and** consent to such arms-bearing conduct by others. In contrast, Bill 23-26 appears to completely prohibit firearms in privately owned locations open to the public without regard to the owner's rights or the consent of the private owner. Worse still, Bill 23-26 imposes its bans not only **at t**hese locations, but also **within 100-yards** of these locations. As the discussion above makes clear, the 100-yard bans imposed by Bill 23-26 sweeps broadly to encompass many stores, shops and other private properties open to the public. The Bill expressly includes privately owned parks, places of worship, schools, libraries, recreational facilities and multipurpose facilities open to the public and bans firearms within 100 yards of these privately owned locations. Enacting Bill 23-26 would be in direct defiance of this body of federal case law, including the controlling authority of *Kipke.* Performative legislation enacted in defiance of this case law invites a judicial smack down that will prove costly to the County just in the Section 1988 attorneys' fees and costs it will owe to the prevailing parties.

The specific "places of public assembly" specified in Bill 23-26 are also open to attack under the Second Amendment. *Bruen* rejected New York's "attempt to characterize its proper-cause requirement as "a 'sensitive-place' law," ruling that

"expanding the category of 'sensitive places' simply to all places o*f public congregation* that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly" because it "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense." 597 U.S. at 30-31 (emphasis added). See *Kipke*, 165 F.4th at 219. Similarly, in *Wolford,* the Ninth Circuit **rejected** California's argument that there was "a national tradition of banning firearms at public gatherings in general." 116 F.4th at 998. Places of "public congregation" or "gatherings," without more, are simply not "sensitive places" under *Bruen*. Whether the County likes it or not, the Second Amendment protects the "general right to publicly carry arms." That "general right" obviously includes public sidewalks falling within 100 yards of a place of public assembly.

Specifically, in *Wolford*, the Ninth Circuit struck down a California law which prohibited carry of firearms at places of worship, holding that "we conclude that Plaintiffs are likely to succeed on their Second Amendment challenge" to that ban. *Wolford,* 116 F.4th at 997. Similarly, several district courts have invalidated such bans in places of worship. See S*pencer v. Nigrelli*, 648 F. Supp. 3d 451, 467–68 (W.D.N.Y. 2022) (holding that the plaintiffs were likely to succeed on a Second Amendment challenge to a ban on firearms at places of worship because of the insufficiency of the historical laws offered by the defendant), *affirmed on other*

*grounds by Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023), *vacated and remanded,* 144 S.Ct. 2709 (2024), *reaffirmed sub nom. Antonyuk v. James,* 120 F.4th 941 (2d Cir. 2024); *Hardaway v. Nigrelli*, 639 F. Supp. 3d 422, 439–43 (W.D.N.Y. 2022) (same), a*ffirmed in part, vacated in part, and remanded by Antonyuk*, 89 F.4th 271; and *Antonyuk v. Hochul*, 639 F. Supp. 3d at 319–22 (same).

**Banning Firearms In Places of Worship Is Particularly Poor Public Policy:**

Banning firearms in places of worship also exposes these locations to violent attacks, forcing these places of worship to spend tens of thousands of dollars on licensed security guards rather than relying on their members who have carry permits. Going without armed security is not an option. See, e.g., https://www.adl.org/resources/article/decade-attacks-synagogues-worldwide. Montgomery County is not immune from these threats. See https://www2.montgomerycountymd.gov/mcgportalapps/Press_Detail_Pol.aspx?Item_ID=48248 (noting an incident of vandalism that occurred at Shaare Tefila Synagogue, located in the 16600 block of Georgia Avenue); https://www.wusa9.com/article/news/crime/montgomery-county-police-hate-speech-graffiti-beth-el-synagogue/65-11c497d0-3e48-440b-9d6c-6bce2b15f859 ("In the past two weeks, Montgomery County Police have gotten calls on eight separate incidents of hate speech graffiti, at synagogues, schools, and businesses —

but it's not just graffiti. Rabbi Harris says Bethesda United Methodist Church, just across the street, had its pride flag torn down, and it's happening elsewhere too.").

These sorts of incidents are precisely why the Maryland General Assembly elected **NOT** to identify places of worship as a "sensitive place" when it enacted Senate Bill 1 in 2023 in its *Bruen* response legislation. See MD Code, Criminal Law, § 4-111(a). The New York legislature likewise amended its law to **exclude** places of worship for that reason as well. See *Antonyuk*, 120 F.4th at 1014 ("The New York legislature amended the place of worship provision after the district courts enjoined it," noting the law as amended "has an exception for 'those persons responsible for security at such place of worship.'"). The governing body at each church, synagogue or mosque is best situated to attend to security. If the County wants to meddle in that decision, then it should be prepared to provide 24-7-armed security, cost-free. It does not now do so. If the County is not willing to provide or pay for such security, then the County should eliminate "places of worship" from the coverage of Section 57-11(a) to allow places of worship to secure appropriate security from fully trained members of their own congregations.

## CONCLUSION

For all the foregoing reasons, Bill 23-26, as written, should be withdrawn or rejected or otherwise amended to bring it into compliance with *Engage Armament* and the Second Amendment. In particular, the County should immediately repeal

Section 57-10 as that section is expressly preempted by Section 4-209(a) and by other express preemption provisions and simply does not survive the reasoning and holdings of *Engage Armament*. Finally, the Bill should be at least amended to make Section 57-11(a) subject only to civil enforcement, not criminal enforcement.

Respectfully submitted,

*/s/ Mark W. Pennak*

Mark W. Pennak
MARYLAND SHALL ISSUE, INC.
9613 Harford Road, Ste C #1015
Baltimore, MD 21234
mpennak@marylandshallissue.org
(301) 873-3671

Dated: June 9, 2026

**Testimony of Mark W. Pennak, President of Maryland Shall Issue, Inc., In Opposition to County Bill 23-26**

**Summary:**

I am counsel and President for Maryland Shall Issue, Inc., and appear today in opposition to Bill 23-26. I am also counsel of record for the petitioners in the Maryland Supreme Court's decision in *Engage Armament, LLC, et al. v. Montgomery County, MD*, --- Md. ---, --- A.3d ----, 2026 WL 1144313 (April 28, 2026). A copy of that decision is attached to the Staff Report for the Bill.

Bill 23-26 is a flawed attempt to bring County law into compliance with the Court's decision in *Engage Armament.* As detailed below, that attempt fails. In so far as the Bill bans firearms completely within 100 yards of places of public assembly or in or on private property held open to the public (including a privately owned library), the Bill also violates the Second Amendment under controlling precedent. Federal court of appeals precedent also makes clear that the Bill's imposition of bans on places of worship likewise violates the Second Amendment. The Bill's bans in other places, such as in "recreational" facilities or at a "multipurpose exhibition facility" are the types of bans under active litigation in the federal courts and will also likely also fail. In so far as it incorporates vague,

undefined terms in a criminal statute, the Bill fails under the Due Process Clause of the State and federal Constitutions.[1]

Any suit in federal district court challenging Bill 23-26 will also challenge the County-wide application of Section 57-10 as unauthorized by MD Code, Criminal Law, § 4-209. While *Engage Armament* did not reach Section 57-10, the reasoning of the Court makes clear that the County's power of enact firearms legislation is allowed only to the extent of the authority granted by MD Code, Criminal Law, § 4-209(b)(1). That section cannot be read as allowing the County to enact County-wide restrictions. The federal district court will have ancillary jurisdiction over these State law claims. Should plaintiffs prevail on either the State law claims or the federal Constitutional claim, County will then be liable for equitable relief and substantial attorneys' fees and costs under federal law, 42 U.S.C. § 1988. Those fees will be sought in the *Engage Armament* litigation and will likely be quite substantial.

To be clear, Section 1988 fees are available in cases where state law claims are mixed with federal claims filed under Section 1983, and Section 1988 fees may be awarded even though the plaintiff prevails only on the State law claims. See, e.g.,

---

[1] Bill 23-26 amends Chapter 57 of the County Code. Under Section 57-15, any violation of Chapter 57 (other than for Section 57-8) "is a Class A violation to which the maximum penalties for a Class A violation apply." Under Section 1-19 of the County Code, a Class A violation is punishable by a $1,000 fine and 6 months in jail. Under Section 1-20(c) "[e]ach day any violation of County law continues is a separate offense."

*State v. Braverman*, 228 Md. App. 239, 253-54, 137 A.3d 377 (2016) (collecting case law). See also *Maher v. Gagne*, 448 U.S. 122, 132 (1980) (holding that an award of fees is permitted where "the plaintiff prevails on a wholly statutory, non-civil-rights claim pendent to a substantial constitutional claim."); *Osterweil v. Bartlett*, 92 F.Supp.3d 14, 23 (N.D.N.Y. 2015) (same). "It is enough" that a court order has "provide[d] a party with some of the relief sought in the complaint." *Cities4Life, Inc. v. City of Charlotte,* 52 F.4th 576, 580 (4th Cir. 2022), citing *Maher*, 448 U.S. at 127-130. "[A] civil-rights plaintiff need not prevail on every claim or obtain all relief sought to receive attorney's fees." *Id.* at 581. "[T]he prevailing party inquiry does not turn on the magnitude of the relief obtained." *Id.*, citing *Farrar v. Hobby*, 506 U.S. 103, 114 (1992). Any suit challenging Bill 23-26 will be precisely such a mixed case as it will include a federal challenge under the Second Amendment and state law challenges as permitted by *Engage Armament*.

The *Engage Armament* litigation is precisely such a mixed case as plaintiffs in that case sought relief on a federal claim in the initial Complaint (Count IV) filed in 2021, on two federal claims in the First Amended Complaint (Counts IV and V) and in multiple federal claims in the Second Amended Complaint (Counts IV-VIII).[2]

---

[2] In Maryland such attorney fee requests are collateral to and independent of the merits. See, e.g., *Williams v. Board of Education of Prince Georges Co.*, 2023 WL 3476326 at *9 (MD Appellate Ct. 2023), citing *Grove v. Grov*e, 192 Md. App. 428, 430, 994 A.2d 1032 (2010).

The fee award in *Engage Armament* will soon be determined by the Circuit Court of Montgomery County and is likely to be hundreds of thousands of dollars. The pending **federal court** litigation against the County on **federal** claims with respect to Bill 21-22E, enacted in 2022 and Bill 4-21, enacted in 2021, will result in additional Section 1988 fees liability against the County.[3] If the County wishes to avoid a similar substantial fee liability with respect to Bill 23-26, it must reject Bill 23-26 or amend the Bill to bring it into full and strict compliance with the Maryland Supreme Court's decision in *Engage Armament* and the Second Amendment.

**Article XI-A of the Maryland Constitution and *Engage Armament*:**

In the *Engage Armament* decision, the Maryland Supreme Court held that Section 57-11(a), of the County Code constituted an impermissible "general law" within the meaning of Article XI-A of the Maryland Constitution. The Court stated: "We hold that § 57-11(a), as amended, is not a local law because of its application to holders of State-issued wear-and-carry permits traveling on public highways who cross within 100 yards of a place of public assembly." Slip op. at 61. The Court explained that "[i]n effect, the County's regulation creates pockets of roadway

[3] Plaintiffs' Second Amendment claim as to these bills is currently pending in the United States Court of Appeals for the Fourth Circuit. *Maryland Shall Issue, Inc. v. Montgomery Co.*, Nol 23-1719 (4th Cir.). Those proceedings are currently stayed pending the upcoming decision of the Supreme Court in *Wolford v. Lopez*, No. 25-1046 (argued Jan. 20, 2026), and petitions for certiorari filed in *Moore v. Kipke*, No. 25-1206 (SCt), and in Novotny v. Moore, No. 25-1324 (SCt). See note 7, *infra*.

throughout the County's lengthy and complex highway system in which travelers with State-issued wear-and-carry permits are banned from carrying firearms based on the proximity of those segments of roadway to buildings or locations that might not abut or even be visible from the road." *Id.*

The Court rejected the County's proposed solutions for permit holders, under which permit holders could create "maps" of all banned areas and avoid those areas, or by "placing their firearms in an enclosed case or locked firearms rack." *Id.* at 61-62. The Court explained that "both options burden permit holders, including the many who reside outside the County but drive within it, with the choice of significant travel restrictions or regularly yielding their benefits as permit holders." *Id.* at 62. The Court thus concluded that "[a]s currently constructed, § 57-11(a) has significant extraterritorial impact" that made it into a prohibited general law. *Id.*

Bill 23-26 attempts to read *Engage Armament* as allowing the County to narrow the scope of Section 57-11(a) to permit holders while traveling in vehicles. The Bill provides that Section 57-11(a) does not "apply to the possession of a handgun by a person who has a permit to carry the handgun under State law while the person travels on public highways within 100 yards of a place of public assembly." That amendment is simply insufficient to convert Section 57-11(a) into a permissible local law within the meaning of Article XI-A of the Maryland Constitution. Permit holders outside the County do not simply drive through the

County without stopping and getting out of their vehicles. Rather, such permit holders come into the County to work, to shop and to conduct other activities that involve getting out of their vehicles. This Bill would slap criminal penalties on every such permit holder the moment he or she gets out of the vehicle or walked within 100 yards of a place of public assembly, as that term is defined by the Bill.[4]

Even as narrowed by the Bill, places of public assembly literally encompass thousands of locations. Specifically, Montgomery County is home to **1,262** public bikeways, https://bit.ly/40MxYgZ, **605** houses of worship, https://bit.ly/3OLbfvG, **693** *public* parks, https://bit.ly/3qjHLfb (not including four federal parks and any privately owned "parks"), **258** private schools, https://bit.ly/3RyA0wd, **137** public elementary schools, https://bit.ly/40JIzcB, **40** middle schools, https://bit.ly/3PTz8RL, **25** high schools, https://bit.ly/4htvDNF, **42** public recreation centers, https://bit.ly/3WB1VhL, **10** colleges and universities, https://bit.ly/3Csn5Yr, **29** municipalities https://bit.ly/4g9jAE8, **45** Post Offices, https://bit.ly/4h8YAhZ, **38** fire stations, https://bit.ly/4gfCxVy, 15 public swimming

[4] Specifically, the Bill narrows the definition of places of public assembly to include: "a publicly or privately owned park, place of worship, school, library, recreational facility; multipurpose exhibition facility, such as a fairgrounds or conference center," or a "government building open to the public for the business of government, polling place, courthouse, or legislative assembly." The Bill further provides that "[a] 'place of public assembly' includes all property associated with the place, such as a parking lot or grounds of a building." This narrowing does not save the Bill from attack.

pools, https://bit.ly/4awPtW2, **13** Metro stations, https://bit.ly/4aySiG0, and **11** MARC commuter train locations, https://bit.ly/3Cdo3b7.

In short, the 100-yard zones for each of these places often encompass ordinary places of commerce and associated public sidewalks. A few additional examples are sufficient to illustrate the point. Caroline Freeland Urban Park on Arlington Road in downtown Bethesda is easily within 100 yards of Giant Foods grocery store across Elm street from the park. That park is also within 100 yards of the Shoppes of Bethesda, part of Bethesda Row, a Lenscrafter store and a Tesla supercharger station. Similarly, the 100-yard zone from either side of the Capital Crescent Trail that runs through downtown Bethesda includes numerous stores, such as Ourisman Honda, Anthropologie, a Safeway grocery store, a CVS drug store and the Chevy Chase Pediatric Center, which is precisely the type of licensed medical facility that the *Engage Armament* held the County may **not** regulate under Section 4-209(b)(1)(iii). See slip op. at 34-35.

Further up Arlington Road in Bethesda, the 100-yards zone, as measured from the outer edge of parking lot of Bethesda Elementary School or Canaan Oromo Evangelical Church on Wilson Lane, sweeps broadly to include shops along Old Georgetown Road, including the Prestipino Dental Group, another licensed medical facility that the County may not regulate. The 100 yards zone from Elm Street Urban Park in Bethesda includes a Panera Bread outlet and the entirety of the large adjacent

public parking lot. Similar effects can be found along Wisconsin Avenue in Bethesda within 100 yards of Chase Avenue Urban Park (an area that includes a public parking lot, a CVS drug store, Chase Bank and United Bank) and Cheltenham Drive Urban Park (an area that includes the same CVS drug store, an Acura car dealership and still another large public parking area). People do not "assemble" in these locations. See *Engage Armament,* slip op. at 32 ("a place of public assembly is a location that is open for members of the public *to gather for a common purpose*, such as deliberating, legislating, worship, entertainment, education, or recreation") (emphasis added).

The same kind of broad scope can be found within every urban area in the County, including Silver Spring and Rockville. These are all places in which visitors from outside the County may shop, work or conduct other activities outside of vehicles. See *Engage Armament,* slip op. at 60 (noting that Section 57-11(a) "prohibits all permit holders from carrying their firearms in a substantial portion of Montgomery County"). Banning carry within these areas "burden permit holders, including the many who reside outside the County but drive within it, with the choice of significant travel restrictions or regularly yielding their benefits as permit holders." *Id.* at 62. Basically, the Bill would prevent permit holders from outside the County from shopping or working or even walking on public sidewalks within "a substantial portion" of the County. Bill 23-26 plainly has "significant extraterritorial

impact." *Id.* Bill 23-26 would thus enact a general law for the same reason that the existing version of Section 57-11(a) was struck down in *Engage Armament*. Bill 23-26 will suffer the same fate.

Indeed, in *Engage Armament,* the Maryland Supreme Court **specifically warned the County** not to narrowly construe its opinion as limited to vehicular travel. Specifically, in footnote 23, the Court stated: "Our holding that § 57-11(a) is not a local law because it reaches non-Montgomery County residents traveling within the County on public highways **should not be interpreted** as a determination that an exception for travel on public highways would alone remedy the problem and transform § 57-11(a) into a local law." *Id*. at 63 n.23 (emphasis added). The Court noted that the constitutionality of any amended law (like Bill 23-26) "will depend on the scope of the amended law and evidence concerning its effects." *Id.* As outlined above, the scope of Bill 23-26 is self-evident in its effect on non-resident permit holders who shop, work or walk within the County. The evidence of such effect will be simple to present in court. A challenge to Bill 23-26 will succeed on this ground alone. In the face of footnote 23, Bill 23-26, if enacted, would effectively constitute County defiance of the Maryland Supreme Court. That claim will be presented in any suit challenging Bill 23-26.

**Bill 23-26 is Vague:**

The Bill also suffers from vagueness. Vagueness is particularly evident in Bill 23-26's bans at and within 100 yards of all privately or publicly owned "parks." "Parks" is not a defined term. The coverage of Section 57-11(a) was previously amended by Bill 4-21 in 2021 to specifically eliminate the prior definition of "parks" as including only parks "identified by the Maryland-National Capital Park and Planning Commission." Bill 23-26 is thus **not** limited to parks which are specifically designated as such by signage or otherwise. By common dictionary definitions, "parks" could include every open grassy spot open to the public. Without a specific definition, there is no way to know the scope of "parks." For example, it is far from clear whether "park" would include the "Whale Art" area at the corner of Wayne Ave. and Georgia Ave. in downtown Silver Spring. Merely walking on the sidewalk within 100 yards of this intersection on the way to the nearby FedEx store or the ATT store outlet or the Sweetgreen, Subway, or El Taco restaurants or the Massage Envy outlet would risk the imposition of strict criminal liability, including imprisonment.

A similar lack of notice or definition applies to other places of public safety specified by Bill 23-26, such as a "recreational facility" and "multipurpose exhibition facility." While *Engage Armament* makes clear that these locations must be open to the public, neither of these terms is defined. While a "multipurpose

exhibition facility" includes examples "*such as* a fairgrounds or conference center," the term is not limited to those two types of facilities. The scope of a "recreational facility" does not even include such examples, much less a definition. People are left to guess. More fundamentally, there is simply no way for a person to know he or she is walking within 100 yards of recreational facility or a "multipurpose facility" which, as the Maryland Supreme Court noted in *Engage Armament*, may well be "buildings or locations that might not abut or even be visible from the road" or even the adjoining sidewalk. *Engage Armament*, slip op. at 61. The risk of "arbitrary enforcement" is apparent. At a minimum, these realities make clear that the Council should make Section 57-11(a) subject **only** to **civil** enforcement, **not** criminal enforcement. That is a simple amendment.

The lack of sufficient notice is intolerable for a criminal statute like Bill 23-26. See, e.g., *United States v. Lanier,* 520 U.S. 259, 266 (1997) ("[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope"); *Marks v. United States,* 430 U.S. 188, 191-82 (1977) (Due process protects against judicial infringement of the "right to fair warning" that certain conduct will give rise to criminal penalties). "The prohibition of vagueness in criminal statutes 'is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law,' and a statute that flouts it 'violates the first essential of due

process.'" *Johnson v. United States,* 576 U.S. 591, 596 (2015). "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that **ordinary people** can understand what conduct is prohibited **and in a manner that does not encourage arbitrary and discriminatory enforcement**." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (emphasis added). For the same reasons, vagueness is also barred by the Maryland Constitution. See, e.g., *Pizza di Joey, LLC v. Mayor of Baltimor*e, 470 Md. 308, 343-44, 235 A.3d 873 (2020) (collecting State case law).

**Section 57-10 of the County Code:**

The Court in *Engage Armament* made clear that the only reason the County has any authority to enact legislation regarding firearms is due to the authority granted by MD Code, Criminal Law, § 4-209(b)(1). Otherwise, such legislation is expressly preempted by the very broad preemption imposed by Section 4-209(a), which provides that "the State preempts the right of a county, municipal corporation, or special taxing district to regulate the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation of: (1) a handgun, rifle, or shotgun; and (2) ammunition for and components of a handgun, rifle, or shotgun."

For example, *Engage Armament* expressly struck down the County's attempt to regulate the possession of firearms by adults in the presence of minors under

Section 57-7(d) of the County Code, holding that this regulation "prohibits a broad swath of otherwise lawful (and constitutionally protected) conduct by adults merely because it occurs in the presence of a minor, without any apparent connection to whether that activity might result in minors gaining unsupervised access to those firearms." Slip op. at 39. The Court found that regulation "is not authorized by § 4-209(b)(1)(i) **and so is preempted by § 4-209(a).**" *Id.* at 40 (emphasis added). The same result obtained for the County's regulation of places of public assembly authorized by Section 4-209(b)(1)(iii). The Court specifically struck down the County's attempt to regulate certain areas, holding that such areas were not places of public assembly. Slip op. at 34-36.[5] Regulation of these areas was thus likewise barred by the express preemption provisions of Section 4-209(a).

---

[5] The Court in *Engage Armament* held that "[h]ospitals, community health centers, long-term facilities, and childcare facilities are not generally open to the public for any purpose of assembly." Slip op. at 34-35. The Court likewise rejected the County's attempt to define place of public assembly to include any government building or area owned or controlled by the County, holding that "§ 4-209(b)(1)(iii) does not authorize the County to preclude carry of firearms within 100 yards of its property unless the property is a 'place of public assembly.'" *Id.* at 35. Finally, the Court rejected the County's attempt to ban firearms within 100 yards of a "gathering" of people expressing their constitutional rights, holding that "[a]lthough that language may describe a "public assembly," it does not describe a 'place of public assembly' for which § 4-209(b)(1)(iii) authorizes local regulation." *Id.* at 36. As the Court thus made plain, the County is not free to define a "place of public assembly" anyway it wants.

The controlling principle from these holdings is that the County's power to regulate firearms is strictly limited to the locations authorized by Section 4-209(b)(1)(iii). Section 57-10 is in blatant violation of these limitations. It provides: "It shall be unlawful for any person to have upon his person, concealed or exposed, or in a motor vehicle where it is readily available for use, any gun designed to use explosive ammunition." That regulation is **County-wide** and is thus not limited to 100 yards of any place of public assembly, as that phrase was interpreted by *Engage Armament.*[6] That means Section 57-10 is **expressly preempted by Section 4-209(a) because it does not fall within any exception specified by Section 4-209(b)(1)**.

And because Section 57-10 is **not** authorized by Section 4-209(b)(1) it is also expressly preempted by other express preemption provisions of State law, including MD Code, Public Safety, § 5-133(a), which provides that "[t]his section supersedes any restriction that a local jurisdiction in the State imposes on the possession by a private party of a regulated firearm, and the State preempts the right of any local jurisdiction to regulate the possession of a regulated firearm," and Section 6 of 1972 Maryland Laws, Ch. 13, which provides "[t]hat all restrictions imposed by the law, ordinances, or regulations of the political subdivisions on the wearing, carrying, or transporting of handguns are superseded by this Act, and the State of Maryland

[6] The Court in *Engage Armament* did not reach the validity of Section 57-10 on grounds that it was not specifically cited in the operative complaint. Slip op. at 16-17. Any complaint challenging Bill 23-26 will correct that omission.

hereby preempts the right of the political subdivisions to regulate said matters." See *Engage Armament,* slip op. at 26 (holding that these express preemption provisions did not apply where local regulation was otherwise authorized "in the three specific areas set forth in § 4-209(b)(1)").

Section 57-10 is not limited to within 100 yards of a place of public assembly and it contains no exception for permit holders or for persons traveling with or possessing firearms on their person or in a vehicle in accordance with State law. See MD Code, Criminal Law, § 4-209(b), MD Code, Criminal Law, § 4-111(b), and MD Code, Natural Resources, § 10-410(c)(1). Section 57-10 is also an invalid "general law" for the same reasons Section 57-11(a) was invalidated by the Court in *Engage Armament* because it "significantly" affects possession and transport of firearms by non-residents. Any challenge to Bill 23-26 will include a State law count challenging Section 57-10. In short, enact Bill 23-26 and Section 57-10 will be doomed in any suit challenging that enactment.

**Second Amendment:**

As is apparent from the foregoing discussion, the prohibitions on permit holders imposed by Bill 23-26 include many locations that are private property held open to the public, such as stores, shops and adjoining private sidewalks. In 2023, the Maryland General Assembly attempted to ban all firearms in such places without the prior consent of the private owner, either by signage or otherwise. See MD Code,

Criminal Law, § 6-411(d). The Maryland federal district court promptly enjoined that legislation, holding that this restriction was unconstitutional under *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). See *Kipke v. Moore,* 695 F.Supp. 638 (D.Md. 2023). The United States Court of Appeals for the Fourth Circuit recently affirmed that ruling in *Kipke v. Moore,* 165 F.4th 194, 218-19 (4th Cir. 2026) ("Maryland's rule would effectively declare most public places 'gun-free zones.' But that likely stretches the sensitive places doctrine too far.").[7]

That decision in *Kipke* is supported by decisions by other federal courts of appeals concerning similar State laws. *Antonyuk v. James,* 120 F.4th 941, 1007-09 (2d Cir. 2024); *Wolford v. Lopez,* 116 F.4th 959, 981-82 (9th Cir. 2024), *cert. granted* 146 S.Ct. 79 (Oct. 3, 2025); *Koons v. Attorney General New Jersey,* 156 F.4th 210, 248 (3d Cir. 2025), *vacated on the grant of rehearing en banc*, 162 F.4th 100 (3d Cir. 2025). The Ninth Circuit in *Wolford* invalidated a California law that imposed this ban on firearms on private property open to the public because it allowed private owner consent only by signage and did not allow a private owner to consent to

[7] On March 2, 2026, the Fourth Circuit stayed its mandate under Rule 41, FRAP, at the plaintiffs' request, pending a petition for certiorari. On April 20, 2026, Maryland filed a petition for certiorari from this ruling. *Moore v. Kipke*, No. 25-1206. On May 20, 2026, the plaintiffs filed a non-conditional cross petition for certiorari seeking review as to other aspects of the Fourth Circuit's ruling regarding sensitive places. *Novotny v. Moore*, No. 25-1324. The stay of the mandate continues until such time as the plaintiffs' petition is fully disposed of by the Supreme Court.

firearms via oral permission. The Ninth Circuit nonetheless sustained a Hawaii law that allowed such oral consent by a private owner on private property.

That Ninth Circuit ruling with respect to Hawaii is currently before the United States Supreme Court in *Wolford v. Lopez*, No. 1046 (argued Jan. 20, 2026), and a merits decision is expected this month. We expect the Supreme Court to reverse the Ninth Circuit and invalidate Hawaii's ban on firearms on private property held open to the public.[8] That Supreme Court ruling will definitively settle the issue and the Court is likely to set forth "principles" that may well govern "sensitive places" restrictions. See *United States v. Rahimi*, 602 U.S. 680, 692 (2024) ("As we explained in *Bruen,* the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition."), citing *Bruen*, 597 U.S. at 26-31. At a minimum, the Council should defer consideration of Bill 23-26 until after *Wolford* is decided by the Supreme Court and after the pending petitions for certiorari in *Kipke* are fully adjudicated. Those petitions could be acted upon as soon as the first Monday of October 2026, at the start of the Court's new Term. A rush to enactment will result in an immediate challenge in federal court in a suit that will raise both federal claims and pendent State law claims, including a challenge to Section 57-10.

---

[8] Full disclosure, the undersigned is counsel for plaintiffs in both *Wolford* and *Kipke*.

The bans imposed by Bill 23-26 are worse than either the California statute or the Hawaii statute at issue in *Wolford* or the Maryland law invalidated in *Kipke.* The legislation at issue in those cases at least allowed the private property owner to bear arms **and** consent to such arms-bearing conduct by others. In contrast, Bill 23-26 appears to completely prohibit firearms in privately owned locations open to the public without regard to the owner's rights or the consent of the private owner. Worse still, Bill 23-26 imposes its bans not only **at t**hese locations, but also **within 100-yards** of these locations. As the discussion above makes clear, the 100-yard bans imposed by Bill 23-26 sweeps broadly to encompass many stores, shops and other private properties open to the public. The Bill expressly includes privately owned parks, places of worship, schools, libraries, recreational facilities and multipurpose facilities open to the public and bans firearms within 100 yards of these privately owned locations. Enacting Bill 23-26 would be in direct defiance of this body of federal case law, including the controlling authority of *Kipke.* Performative legislation enacted in defiance of this case law invites a judicial smack down that will prove costly to the County just in the Section 1988 attorneys' fees and costs it will owe to the prevailing parties.

The specific "places of public assembly" specified in Bill 23-26 are also open to attack under the Second Amendment. *Bruen* rejected New York's "attempt to characterize its proper-cause requirement as "a 'sensitive-place' law," ruling that

"expanding the category of 'sensitive places' simply to all places o*f public congregation* that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly" because it "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense." 597 U.S. at 30-31 (emphasis added). See *Kipke*, 165 F.4th at 219. Similarly, in *Wolford,* the Ninth Circuit **rejected** California's argument that there was "a national tradition of banning firearms at public gatherings in general." 116 F.4th at 998. Places of "public congregation" or "gatherings," without more, are simply not "sensitive places" under *Bruen*. Whether the County likes it or not, the Second Amendment protects the "general right to publicly carry arms." That "general right" obviously includes public sidewalks falling within 100 yards of a place of public assembly.

Specifically, in *Wolford*, the Ninth Circuit struck down a California law which prohibited carry of firearms at places of worship, holding that "we conclude that Plaintiffs are likely to succeed on their Second Amendment challenge" to that ban. *Wolford,* 116 F.4th at 997. Similarly, several district courts have invalidated such bans in places of worship. See S*pencer v. Nigrelli*, 648 F. Supp. 3d 451, 467–68 (W.D.N.Y. 2022) (holding that the plaintiffs were likely to succeed on a Second Amendment challenge to a ban on firearms at places of worship because of the insufficiency of the historical laws offered by the defendant), *affirmed on other*

*grounds by Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023), *vacated and remanded,* 144 S.Ct. 2709 (2024), *reaffirmed sub nom. Antonyuk v. James,* 120 F.4th 941 (2d Cir. 2024); *Hardaway v. Nigrelli*, 639 F. Supp. 3d 422, 439–43 (W.D.N.Y. 2022) (same), a*ffirmed in part, vacated in part, and remanded by Antonyuk*, 89 F.4th 271; and *Antonyuk v. Hochul*, 639 F. Supp. 3d at 319–22 (same).

**Banning Firearms In Places of Worship Is Particularly Poor Public Policy:**

Banning firearms in places of worship also exposes these locations to violent attacks, forcing these places of worship to spend tens of thousands of dollars on licensed security guards rather than relying on their members who have carry permits. Going without armed security is not an option. See, e.g., https://www.adl.org/resources/article/decade-attacks-synagogues-worldwide. Montgomery County is not immune from these threats. See https://www2.montgomerycountymd.gov/mcgportalapps/Press_Detail_Pol.aspx?Item_ID=48248 (noting an incident of vandalism that occurred at Shaare Tefila Synagogue, located in the 16600 block of Georgia Avenue); https://www.wusa9.com/article/news/crime/montgomery-county-police-hate-speech-graffiti-beth-el-synagogue/65-11c497d0-3e48-440b-9d6c-6bce2b15f859 ("In the past two weeks, Montgomery County Police have gotten calls on eight separate incidents of hate speech graffiti, at synagogues, schools, and businesses —

but it's not just graffiti. Rabbi Harris says Bethesda United Methodist Church, just across the street, had its pride flag torn down, and it's happening elsewhere too.").

These sorts of incidents are precisely why the Maryland General Assembly elected **NOT** to identify places of worship as a "sensitive place" when it enacted Senate Bill 1 in 2023 in its *Bruen* response legislation. See MD Code, Criminal Law, § 4-111(a). The New York legislature likewise amended its law to **exclude** places of worship for that reason as well. See *Antonyuk*, 120 F.4th at 1014 ("The New York legislature amended the place of worship provision after the district courts enjoined it," noting the law as amended "has an exception for 'those persons responsible for security at such place of worship.'"). The governing body at each church, synagogue or mosque is best situated to attend to security. If the County wants to meddle in that decision, then it should be prepared to provide 24-7-armed security, cost-free. It does not now do so. If the County is not willing to provide or pay for such security, then the County should eliminate "places of worship" from the coverage of Section 57-11(a) to allow places of worship to secure appropriate security from fully trained members of their own congregations.

## CONCLUSION

For all the foregoing reasons, Bill 23-26, as written, should be withdrawn or rejected or otherwise amended to bring it into compliance with *Engage Armament* and the Second Amendment. In particular, the County should immediately repeal

Section 57-10 as that section is expressly preempted by Section 4-209(a) and by other express preemption provisions and simply does not survive the reasoning and holdings of *Engage Armament*. Finally, the Bill should be at least amended to make Section 57-11(a) subject only to civil enforcement, not criminal enforcement.

Respectfully submitted,

*/s/ Mark W. Pennak*

Mark W. Pennak
MARYLAND SHALL ISSUE, INC.
9613 Harford Road, Ste C #1015
Baltimore, MD 21234
mpennak@marylandshallissue.org
(301) 873-3671

Dated: June 9, 2026

# Opposition Testimony – Montgomery County Bill 23-26

## Full Written Testimony

Good afternoon Council Members.

My name is Julio Barreto, and I am a Montgomery County resident, a Maryland Wear and Carry Permit holder, a firearm instructor, and a law-abiding citizen. I appreciate the opportunity to provide testimony regarding Bill 23-26.

I respectfully oppose this legislation because I believe it places additional restrictions on citizens who have already complied with Maryland's extensive firearm laws while doing little to deter criminals who ignore those laws altogether.

To obtain a Maryland Wear and Carry Permit, citizens must undergo background checks, training, and a thorough vetting process. Permit holders have demonstrated a willingness to follow the law and accept the responsibilities that accompany firearm ownership. Yet proposals such as Bill 23-26 continue to impose additional burdens on those who are already complying with every legal requirement.

I am 69 years old, and my wife is 68 years old. Our age alone places us at a greater physical disadvantage when confronted by younger, stronger, or multiple attackers. While we hope never to face such circumstances, the reality is that violent crime does not discriminate by age, and older citizens often have fewer options available to defend themselves.

For us, lawful firearm ownership and lawful concealed carry are not about intimidation, aggression, or confrontation. They are about providing a means of self-defense and personal protection until law enforcement can arrive. Even the best police departments cannot be everywhere at once, and response times are not instantaneous.

I am also concerned that this legislation continues a troubling pattern of treating law-abiding firearm owners as though they are the source of criminal violence. As a person of color, I am particularly sensitive to the dangers of stereotyping and broad assumptions about entire groups of people. Responsible firearm owners should not be viewed through the same lens as criminals simply because both possess firearms.

The County should focus its efforts on violent offenders, illegal firearm trafficking, repeat criminals, and those who misuse firearms—not on citizens who have completed training, passed background checks, and demonstrated a commitment to responsible firearm

ownership.

I respectfully urge the Council to reject Bill 23-26 and instead focus on policies that directly target criminal behavior while preserving the rights of responsible citizens to protect themselves and their families.

Thank you for your time and consideration.

## 2–3 Minute Oral Testimony

Good afternoon Council Members.

My name is Julio Barreto. I am a Montgomery County resident, a Maryland Wear and Carry Permit holder, a firearm instructor, and a law-abiding citizen. I am here today to respectfully oppose Bill 23-26.

Like every Maryland permit holder, I have completed the required training, passed background checks, and complied with all applicable state laws. Yet this bill places additional burdens on citizens who already follow the law while doing little to impact those who choose to ignore it.

I am 69 years old, and my wife is 68. As we age, we recognize that we are at a greater physical disadvantage than we were in our younger years. The ability to lawfully carry a firearm provides us with an important means of self-defense should we ever face a violent threat before law enforcement can arrive.

For us, carrying a firearm is not about confrontation. It is about protection, responsibility, and ensuring that we have a means to defend ourselves and our loved ones during those critical moments when seconds matter and help may still be minutes away.

I am also concerned that policies like this increasingly treat law-abiding firearm owners as if they are the problem. As a person of color, I understand the harm that can result from broad assumptions and stereotypes. Responsible firearm owners should be judged by their actions and conduct, not by the criminal acts of others.

I believe the County's efforts would be better focused on violent offenders, illegal gun trafficking, and repeat criminals rather than imposing additional restrictions on citizens who have already demonstrated their commitment to following the law.

I respectfully ask the Council to reject Bill 23-26 and focus on measures that target criminal behavior while preserving the rights of responsible citizens to protect themselves and their

families.

Thank you for your time and consideration.

Karan Singh
Montgomery County Resident

**ERRATA Sheet for Testimony Citations**

Apologies to the Council, but here is a corrected list of citations for today's live testimony:

## 1. Minority Permit Holders and Self-Defense Motivation

- John Gramlich, *Key facts about Americans and guns*, Pew Research Center (July 24, 2024), (available at https://www.pewresearch.org/short-reads/2024/07/24/key-facts-about-americans-and-guns/). (Most ownership is generally for personal protection reasons)
- Kim Parker, *The Demographics of Gun Ownership,* Pew Research Center (June 2017), (available at https://www.pewresearch.org/social-trends/2017/06/22/the-demographics-of-gun-ownership/ ) (Indicating that 71% of "urban" gun owners cited self protection)
- Degli Esposti M, Sokol RL, Lee DB, et al, *Firearm ownership for protection in the USA, 2023: results from a nationally representative survey*, Injury Prevention 2025; 31:257-261 (available at https://injuryprevention.bmj.com/content/31/3/257) (Gallup survey analysis showing "black and Asian women (98.8%) almost exclusively owned for protection and . . . owning for protection was more common among black (88.4%) than white men (69.7%)")
- Julie A. Ward, et al., *Reasons for Gun Ownership Among Demographically Diverse New and Prior Gun Owners*, 67 Am J. Prev. Med 5, 730 (Nov. 2024) (available at https://www.sciencedirect.com/science/article/pii/S0749379724002265) (NORC survey analysis indicating "Black gun owners most frequently selected protection at home (93%) and protection out of home (92%)")

## 2. Socio-Economic and Housing Density Disparities

- Montgomery County Planning Department, *Findings from the 2024 American Community Survey: Montgomery County, Maryland and the United States* (Sept. 2025), available at https://montgomeryplanning.org/blog-design/2025/09/findings-from-the-2024-american-community-survey-montgomery-county-maryland-and-the-united-states/.
- Montgomery County Planning Board, *Attainable Housing Strategies Final Report* (June 2024), available at https://montgomeryplanningboard.org/wp-content/uploads/2024/05/Attachment_A_2024-AHS-Report-Tracked-Changes_6-13-24.pdf (documenting the geographic clustering within down-county transit corridors which maintain significantly higher concentrations of non-white residents compared to low-density zoning areas like Potomac).

Karan Singh
Montgomery County Resident

## 3. Regional Inequality and Traveling Permit Holders

- Jenny Schuetz, *The DMV Housing Market on the Precipice*, Brookings Institution (May 2023), available at https://www.brookings.edu/articles/dmv-housing-market-on-the-precipice/ (tracking intra-regional commuter and residential migration patterns across Maryland county lines).
- Center for Policing Equity, *Testimony before the House Judiciary Committee in support of HB - 81* (available at https://mgaleg.maryland.gov/cmte_testimony/2026/jud/1Q68DKVR7JOqXTcsNx2xdEVKelw9Cq-mb.pdf) ("Data from the Governor's Office of Crime Prevention and Policy show that in 2024, Black drivers were subjected to almost 43% of all vehicle traffic stops and over 47% of all searches at traffic stops, despite only making up less than 32% of the state's population.")(source report available at https://dlslibrary.state.md.us/publications/Exec/GOCPYVS/SG9-3602(b)_2023.pdf)
- *See also Engage Armament, LLC, et al. v. Montgomery County, Maryland*, No. 485899-V (Md. Apr. 28, 2026) (overturning previous localized sensitive place transit restrictions)

Karan Singh
Montgomery County Resident

## 1. Opening Statement (Citations at end of document)

- **Good Afternoon, Council President and members of the Council.**
- Thank you for the opportunity to speak on **Expedited Bill 23-26**.
- **The Bottom Line:** While I share the Council's concerns about violence involving firearms, we should be aware of the potential unintended consequences of this legislation.
- Unless a wear and carry permit exception is included, this bill is very likely to have an unfair disparate impact on **law-abiding Black and Brown Wear-and-Carry permit holders that puts them into a second class status compared to other MD permit holders.**

*** My written testimony addressed disparate policing, today I'll cover disparate impact**
- **Who carries, where they are, and contrast their experience with other areas**

## 2. Black and Brown citizens are more likely to carry for self protection

- *Pew Research Center* surveys show *Black and Brown citizens are more likely to cite protection as main reason for owning and carrying a firearm.*
- MoCO is most diverse county in the state (see: gun range customers)

## 3. The Structural Neighborhood Trap

- **This law effectively hits black and brown permit holders unequally:**
  - Black and Brown residents are disproportionately concentrated in **high-density mid- and downcounty regions** (i.e., more area parks, schools, churches)
  - Contrast: An affluent (white) suburban permit holder can more easily walk out their door and carry their firearm legally around their area without legal risk.
- By blanketing places within 100 yards of public assemblies with strict criminal penalties, you turn dense minority neighborhoods into legal minefields for local permit holders.

## 4. The Regional Gap (Creating Second-Class Permits)

- **Person with same permit, doing same daily activities, will have more legal risks in MoCO**
- **Look at our neighbors:** Less-diverse counties' residents carry freely without jail time.
- Bill creates tiered system of state citizenship. Not the best public policy for **licensed Black or Brown permit holders** in Montgomery County to have fewer rights than peers?

## 5. Closing

- Please do not limit a state-granted permit into an exclusive privilege for some, while rendering **vetted, minority permit holders** into second-class status.
- **Vote NO on Expedited Bill 23-26, or add a permit holder exception.** Thank you.

Supporting Citations

## 1. Minority Permit Holders and Self-Defense Motivation

- John Gramlich, *Key facts about Americans and guns*, Pew Research Center (July 24, 2024), available at https://www.pewresearch.org/short-reads/2024/07/24/key-facts-about-americans-and-guns/.
- Pew Research Center, *Amid a Rise in Gun Violence, a Profile of American Gun Owners* (Aug. 2023) (demonstrating that Black and Hispanic gun owners—particularly minority women and urban dwellers—cite personal protection and safety as their primary or exclusive motivation for firearm ownership and carry at statistically higher rates than white, suburban, or rural demographics).
- Julia A. Wolfson et al., *The 2021 National Firearms Survey: Gun Ownership and Carry Patterns in the United States*, 112 Preventive Medicine 106742 (2021), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC8273872/.

## 2. Socio-Economic and Housing Density Disparities

- Montgomery County Planning Department, *Findings from the 2024 American Community Survey: Montgomery County, Maryland and the United States* (Sept. 2025), available at https://montgomeryplanning.org/blog-design/2025/09/findings-from-the-2024-american-community-survey-montgomery-county-maryland-and-the-united-states/.
- Montgomery County Planning Board, *Attainable Housing Strategies Final Report* (June 2024), available at https://montgomeryplanningboard.org/wp-content/uploads/2024/05/Attachment_A_2024-AHS-Report-Tracked-Changes_6-13-24.pdf (documenting the geographic clustering within down-county transit corridors which maintain significantly higher concentrations of non-white residents compared to low-density zoning areas like Potomac).

## 3. Regional Inequality and Traveling Permit Holders

- Jenny Schuetz, *The DMV Housing Market on the Precipice*, Brookings Institution (May 2023), available at https://www.brookings.edu/articles/dmv-housing-market-on-the-precipice/ (tracking intra-regional commuter and residential migration patterns across Maryland county lines).
- Maryland State Police, *2024 Annual Report on Vehicle Stops and Law Enforcement Trends* (2025) (confirming persistent, documented statistical disproportionality in law enforcement traffic stops involving minority motorists statewide).
- *See also Engage Armament, LLC, et al. v. Montgomery County, Maryland*, No. 485899-V (Md. Apr. 28, 2026) (overturning previous localized sensitive place transit restrictions)

Karan Singh
Montgomery County Resident

June 9, 2026

Montgomery County Council
100 Maryland Avenue
Rockville, MD 20850

**Re: Opposition to Emergency Bill 23-26**

Dear Council President and Councilmembers:

I respectfully urge the Council to reject Emergency Bill 23-26.

This legislation raises serious concerns regarding equity, fiscal responsibility, and respect for the guidance recently provided by Maryland's highest court.

First, Montgomery County should carefully consider the disparate impact that additional firearm-possession offenses may have on minority communities. As Montgomery County continues its efforts to reduce inequities in policing, it should be cautious about adopting new firearm-possession restrictions that may create additional opportunities for discretionary police stops, searches, and arrests with uneven impacts across communities.

The County's own Office of Legislative Oversight ("OLO") has documented significant racial disparities in traffic stops, searches, arrests, and use-of-force incidents. OLO reported that although Black residents comprised approximately 18% of Montgomery County's population, they accounted for approximately 32% of traffic stops and 55% of police use-of-force incidents. Subsequent OLO analysis found that racial disparities in traffic enforcement persisted or worsened even as overall traffic stops declined.[1] [2]

These concerns have also been emphasized by the Maryland Office of the Public Defender. Following two recent Maryland court decisions involving firearm-related police stops, Maryland Public Defender Natasha Dartigue warned that police have too often harassed people under generalized claims that they were present in "high-crime" areas. She further cautioned that such labels frequently overlap with communities defined by poverty and race, and that conduct police characterize as "flight" may simply reflect a citizen's constitutional right to go about their business. In reference to the court's decision in *Hicks v. State*, Dartigue also stated: "This court decision protects all Marylanders, but it matters most to communities of color that have long borne the weight of over-policing. Constitutional rights do not depend on where you live, who you are, or how heavily your community is policed."[3] [4]

Second, the County should not spend taxpayer resources pursuing legislation that the Maryland Supreme Court has already indicated may not solve the legal problems it identified in *Engage Armament*. As you know, in that case, the Court held that Montgomery County's firearm ordinance was not a valid local law because it imposed substantial burdens on permit holders traveling on public highways through the County and therefore had significant extraterritorial effects.[5]

The Court went out of its way to address the type of legislative workaround reflected in Emergency Bill 23-26. In Footnote 23, the Court stated:

> "Our holding that § 57-11(a) is not a local law because it reaches non-Montgomery County residents traveling within the County on public highways should not be interpreted as a determination that an exception for travel on public highways would alone remedy the problem and transform § 57-11(a) into a local law."[6]

The significance of this statement is difficult to overlook. The Court specifically cautioned that adding a public-highway travel exception would not cure the legal defects that rendered the prior ordinance invalid. Yet Emergency Bill 23-26 appears to rely on precisely that type of approach.

Given that guidance from Maryland's highest court, the County should carefully consider whether Emergency Bill 23-26 is worth the inevitable litigation costs that will accompany it.

Montgomery County already faces substantial budget pressures and difficult spending decisions. County leaders have repeatedly discussed structural fiscal challenges and competing demands on limited public resources.[7] Under these circumstances, as a taxpaying resident, it is difficult to justify diverting additional taxpayer funds to defend unnecessary[8] and legally vulnerable legislation. Every dollar spent defending this proposed ordinance in court is a dollar unavailable for schools, transportation, public safety, immigrant rights, healthcare, libraries, housing, and other essential County services.

For these reasons, I respectfully urge the Council to reject Emergency Bill 23-26. Alternatively, to reduce litigation risk and taxpayer expense, the Council should consider adding an exception for Maryland Wear and Carry Permit holders.

Respectfully submitted,

Karan Singh
Montgomery County Resident

---

**Footnotes**

1. Montgomery County Office of Legislative Oversight, *Racial Equity and Social Justice Impact Statement: Bill 13-20, Police – Traffic Stops – Data Collection* (July 21, 2020), https://www.montgomerycountymd.gov/OLO/Resources/Files/2020%20Reports/OLOReport2020-7.pdf

2. Montgomery County Office of Legislative Oversight, *Traffic Stops in Montgomery County: Analysis of Fiscal Years 2018–2022* (2023), https://www.montgomerycountymd.gov/OLO/Resources/Files/2023%20Reports/OLOReport2023-9.pdf

3. Ian Round, "Montgomery County police stop violated 4th Amendment, court rules," *The Daily Record* (May 27, 2026), https://thedailyrecord.com/2026/05/27/police-stop-montgomery-county/

4. Hallie Miller, “Maryland police can no longer stop and search people based solely on seeing a gun, appeals court rules,” *The Baltimore Banner* (Feb. 20, 2025), https://www.thebanner.com/community/criminal-justice/maryland-police-searches-guns-appeals-court-U76C47MBCBC7PGMAKKIBCKNAZM/

5. *Engage Armament LLC v. Montgomery County*, No. 9, September Term 2025, Maryland Supreme Court (Apr. 28, 2026), https://www.mdcourts.gov/data/opinions/coa/2026/9a25.pdf

6. *Id.* at 62 n.23, https://www.mdcourts.gov/data/opinions/coa/2026/9a25.pdf

7. Montgomery County Council FY 2026 Budget Resources, https://www.montgomerycountymd.gov/council/budget/

8. Maryland state law already criminalizes carrying a handgun in public areas except in very narrow circumstances. See MD Criminal Law §4–203.

## Expedited Bill 23-26, Weapons – Restrictions on Ghost Guns Near Minors and Carrying of Firearms in or Near Places of Public Assembly

**Opposition to Including Houses of Worship as "Places of Public Assembly"**

I oppose the inclusion of houses of worship within the definition of "places of public assembly." This classification is inappropriate, unnecessary, and infringes on the longstanding rights of clergy and congregational leadership to determine how best to safeguard their communities.

Houses of worship are not simply public venues. They are sacred spaces—governed by religious leadership, supported by voluntary membership, and rooted in deeply held beliefs about autonomy, community, and spiritual responsibility. For generations, clergy and congregational boards have exercised the authority to decide how their communities operate, including how they provide for the safety and security of their members.

By designating houses of worship as "public assembly," the government would be inserting itself into decisions that properly belong to religious leadership. This is especially concerning in the current environment, where we have seen an alarming rise in targeted attacks against faith communities by armed assailants. Clergy and congregations are already grappling with how to protect their members while preserving the openness and sanctity of their religious spaces. They must retain the freedom to determine whether security is provided by trained congregants, volunteers, hired professionals, or other means consistent with their religious values and practical needs.

Government should not be in the position of dictating who may or may not provide security within a house of worship. Such decisions require intimate knowledge of the community, its traditions, its vulnerabilities, and its theological commitments. Clergy are uniquely positioned to make these judgments. Imposing a one-size-fits-all regulatory framework—designed for stadiums, concert halls, or commercial venues—fails to respect the distinct nature of religious institutions.

In a moment when faith communities are under heightened threat, the priority should be empowering them, not restricting them. Houses of worship must remain free to determine their own security practices without being swept into a regulatory category that does not reflect their mission, structure, or constitutional protections.

For these reasons, I urge you to remove houses of worship from the definition of "places of public assembly" and preserve the right of clergy and congregational leadership to make their own decisions about how best to protect their communities.

Larry Jaffe

Silver Spring, MD

**Michael Cavaliere**
[redacted]
Frederick County, MD 21771
[redacted]

June 8, 2026

Re:Expedited Bill 23-26

I am OPPOSED to Expedited Bill 23-26 as it will do nothing to reduce or prevent crime. As we all know, criminals by definition ignore the law. It will only serve to unduly burden legally concealed carry permitted citizens of Montgomery County as well as others who wish to visit the county to work, shop or worship. By creating this patchwork of sensitive places with 100 yard perimeters, it is nearly impossible for sane, sober, moral and prudent MD HGP permit holders to avoid the risk of incarceration by simply shopping for groceries or stopping for gas in the county. Furthermore, this bill violates the Constitutional right to self protection granted by the Second Amendment.

I am also in strict opposition to this bill designating places of worship, synagogues and churches as so called “Sensitive Places.” Neither Maryland State law nor Federal law makes this distinction.

It's no secret that churches, like schools, are soft targets where maximum physical and emotional damage can be inflicted. Designating them as “Sensitive Places” softens them even more. An individual intent on inflicting harm will completely ignore this designation, and in fact welcomes it. For they know they will meet with minimal resistance, if any.

I've been attending my church in Montgomery County since 2006. Shortly after, our Pastor discovered I was a musician and quickly conscripted me into the Worship Team as a guitarist. Over time I became a Worship Leader. I directed the other musicians and singers and led our congregation in song and prayer. I continue in that role today as well as manage the Worship Ministry's budget, technology and resources. Though I don't know everyone in our congregation, I do know most. We have served on projects together, been on mission trips, distributed food to our neighbors, met in small groups and had social gatherings. The list goes on, we are family. The support I got from my church as my wife battled and eventually succumbed to cancer was immeasurable.

We are a uniquely multinational church as well with; Hispanic, Asian, British, German, Indian, Haitian, African, African American and Caucasian members. All age groups are represented as well; small children, teenagers, young adults, on up to seniors in their 90's. With many of them I know their joys, and their hardships. I see their faces and connect with them from the stage when I am leading. When I am not on the team I am up in the Tech Booth in the back keeping an eye on things.

Although we are a medium sized church we don't have the budget to hire an armed guard.

Personally, I think a well trained, armed Volunteer Security Team, spread out through the facility is much more effective. We can respond in seconds while the police may take several minutes to respond. Some of our elderly can barely walk let alone run from danger. They need to be protected where they are. I can't bear the thought of some of these dear souls being gunned down. For smaller churches in Montgomery County the prospect of a hired guard is even further from reach.

Throughout our history as a nation Americans have protected themselves and others by meeting force with equal-force. This is not just a 2nd Amendment right, it's a God given right. While I respectfully recognize the County Council is trying to do what it can to reduce criminal gun violence, this is not the way to go about it. Strict enforcement of existing criminal laws along with better equipping the police will go a lot further towards reducing crime. Thank you for you time and attention to this matter.

Sincerely,

Michael A Cavaliere

Testimony opposing Expedited Bill 23-26

Good afternoon. My name is Eli Shemony, and I am the head of security of the MDSC Congregation here in Montgomery County. I am here today to speak in strong opposition to expedited bill 23-26 — not because I am against public safety, but because this legislation would actively endanger Jewish lives.

Since the October 7th massacre in Israel, antisemitism in the United States has surged to levels not seen in decades. According to the FBI and the Anti-Defamation League, the Jewish community is the most targeted religious group for hate crimes in this country, year after year. That is not a statistic. That is our reality. We live it every time we walk into a synagogue, every time we drop our children off at Hebrew school, every time we attend a community event.

Our community has had to respond to this threat in a practical and serious way. Professional armed security is enormously expensive, and no organization — no matter how well-funded — can post guards at every minyan, every program, every service. We simply do not have the resources. As a result, our community has come to rely, in part, on trained, licensed members who carry legally. These are not casual gun owners. They are highly trained individuals who have invested significant time and resources to be prepared — precisely for the kind of attack that has already happened in Pittsburgh, in Poway, and in countless communities around the world.

For many of our members, carrying does not begin at the synagogue door. It begins the moment they leave their home. The walk from a car to a synagogue, the moment of arrival, the transition from public street to a house of worship — these are moments of vulnerability. Our members carry during those moments because threats do not wait for a convenient location.

This bill would eliminate that protection. It would disarm the very people standing between our community and those who wish us harm. It would not stop a motivated attacker — it would only stop our ability to respond to one.

I urge this Council: do not let the desire to appear tough on guns result in making Jewish residents of Montgomery County less safe. We are already a target. Please do not take away our ability to defend ourselves and our families.

I ask you to vote no on this bill. Thank you.

Expedited Bill 23-26, Weapons - Restrictions on Ghost Guns Near Minors and Carrying of Firearms in or Near Places of Public Assembly – **SUPPORT WITH AMENDMENTS**

Good afternoon Council President Fani-Gonzalez, Vice President Balcombe, Councilmembers, and members of the community.

My name is Esther Wells. I am a licensed conceal carry permit holder, a Second Amendment supporter, and a lifelong resident of Montgomery County. I testify today in support of Expedited Bill 23-26, with amendments. Thank you to Councilwoman Leudtke for introducing this necessary piece of good governance.

While this bill correctly aligns Montgomery County with state standards after the Maryland Supreme Court invalidated the prior 2022 law, we must address the process that brought us here. The original, unconstitutional Bill Bill 21-22E was co-sponsored by then Council Vice-President Glass, alongside Councilmembers Jawando, Friedson, Hucker, Navarro, Riemer, Katz, and Rice. Because that unlawful bill stood for nearly four years before the Supreme Court struck it down, the constitutional rights of law-abiding residents were actively violated for four years.

This demands immediate systemic accountability and financial transparency.

First, what is the standard operating procedure for reviewing council bills? Council attorneys draft them, and the County Attorney's office reviews them. If this review process is functional, how did an unconstitutional, pre-empted bill get passed? What specific remediation will be made to your legislative procedures to minimize the future erosion of our rights?

Second, we demand absolute financial accountability for this failure. How much taxpayer money was wasted litigating Bill 21-22E all the way to the Maryland Supreme Court over the last four years? What is the exact cost of this failure to Montgomery County taxpayers? How many adverse court cases, administrative burdens, and ongoing financial liabilities have resulted from righting this wrong? Over the last five years, what is this Council's exact track record and percentage of dissenting court opinions?

There is no problem our elected officials need to solve that requires violating our constitutional rights. If you cannot govern within constitutional boundaries, we need new leadership.

Taxpayers deserve immediate transparency. Where can residents find a County Council Legal Fees Report, similar to the model used by MCPS? (**See exhibit C**) We deserve a report detailing all outside counsel expenditures for Fiscal Year 2023 - 2026, a complete set of itemized bills paid to these law firms, a month-by-month chart comparing current and prior year expenses, and a clear breakdown of these legal services by department.

Stop wasting our money to restrict our freedoms. Pass Bill 23-26, fix your unconstitutional review process, and open your legal books to the public to show taxpayers exactly what your legal errors are costing us.

Thank you.

**Exhibit A:**

**MPIA Request Draft**

You can use the following template to ensure your request is legally specific:

---

**Date:** [Current Date]

**To:** Official Custodian of Records, Montgomery County Office of Public Information

**Re: Maryland Public Information Act Request – 2025 Legal Fees and Expenditures**

Dear Custodian of Records,

Under the **Maryland Public Information Act (MPIA)**, General Provisions Article § 4-101 et seq., I am requesting to inspect or receive copies of the following public records for the period of **January 1, 2025, to the present**:

1. Itemized invoices and billing statements from all outside law firms and legal consultants paid by Montgomery County, Maryland.
2. Records indicating the total dollar amount paid to each specific firm or consultant.
3. Documents detailing the "case purpose" or the specific legal matter for which each firm was retained (e.g., litigation name, contract negotiation, or advisory topic).

Please contact me if costs exceed **$25.00**. I also ask that fees be waived as this request serves the public interest.

**Exhibit B**: https://www2.montgomerycountymd.gov/ocacasereport/default.aspx

| | | | | | | |
|---|---|---|---|---|---|---|
| **Maryland Shall Issue, et al. v. Montgomery Cnty., MD [4th Cir.** | 07/10/2023 | Erin Ashbarry, Edward Lattner, Matthew Johnson | County Council | SIF Appeal | | Open |
| **Montgomery County v. Engage Armament, LLC, et al. [SCM appeal]** | 12/20/2023 | Kristy Nunley, Erin Ashbarry, Edward Lattner, Matthew Johnson | County Council | SIF Appeal | | Open |

**Exhibit C**:
https://go.boarddocs.com/mabe/mcpsmd/Board.nsf/files/DKNQT36ACA27/$file/Legal%20Fees%20Rpt%20250531%20250630.pdf

ATTACHMENT A

## FY 2025 NON-SPECIAL EDUCATION LEGAL EXPENSES

| Outside Counsel | JULY | AUG | SEPT | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUNE | FY 2025 YTD | FY 2024 YTD | % Inc/(Dec) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **GENERAL LEGAL EXPENSES** | | | | | | | | | | | | | | | |
| Carney Kelehan | $ 9,203 | $ 16,145 | $ 8,617 | $ 21,067 | $ 14,536 | $ 11,314 | $ 5,221 | $ 11,174 | $ 13,657 | $ 18,370 | $ 11,358 | | $ 140,660 | $ 240,097 | -41.42% |
| Hogan Lovells | - | - | - | - | - | - | - | 62,171 | - | - | 4,099 | | $ 66,270 | $ 59,998 | 10.45% |
| Venable | 31,567 | 21,818 | 28,195 | 29,726 | 23,134 | 27,822 | 22,029 | 17,971 | 13,017 | 12,753 | 41,174 | | $ 269,205 | $ 500,578 | -46.22% |
| Morgan Lewis | 8,736 | - | - | 182 | - | - | - | 1,029 | - | - | - | | $ 9,947 | $ 33,461 | 29.69% |
| WilmerHale | 134,264 | 8,870 | 487,395 | 31,943 | 49,754 | 34,652 | - | - | - | 42,582 | 284,755 | | $ 1,074,215 | $ 535,435 | 100.62% |
| Jackson Lewis | 24,188 | 11,321 | 13,678 | 5,614 | 15,064 | 9,456 | 5,781 | 18,901 | 946 | 12,706 | 6,073 | | $ 123,727 | $ 364,709 | -66.08% |
| Education Lawyer | - | - | - | - | | - | - | - | - | - | - | | $ - | $ 68,500 | -100.00% |
| Asmar | 962 | 3,757 | - | 559 | 5,054 | - | 88 | 8,106 | 11,047 | 8,822 | - | | $ 38,396 | $ 27,852 | 37.86% |
| Tammy Turner Esq., LLP | 805 | - | - | - | | - | - | - | - | - | - | | $ 805 | $ 113,768 | -99.29% |
| Other | - | 13,396 | 59,273 | 23,626 | 17,180 | 20,429 | 9,340 | 5,363 | 23,778 | 12,824 | 24,864 | | $ 210,073 | $ 88,879 | 136.36% |
| **SUBTOTAL** | $ 209,725 | $ 75,307 | $ 597,158 | $ 112,716 | $ 124,721 | $ 103,673 | $ 42,458 | $ 124,715 | $ 62,445 | $ 108,056 | $ 372,322 | $ - | $ 1,933,297 | $ 2,033,276 | -4.92% |
| Capital Budget | - | | 18,976 | 10,012 | 1,770 | - | - | - | - | - | 24,445 | | $ 55,203 | $ 35,197 | 56.84% |
| Pension Trust | 113,297 | 20,812 | 5,578 | 17,545 | 22,772 | 22,173 | 2,844 | 17,303 | 16,431 | 18,026 | 6,897 | | $ 263,678 | $ 52,648 | 400.83% |
| **TOTAL** | $ 323,021 | $ 96,119 | $ 621,712 | $ 140,273 | $ 149,264 | $ 125,846 | $ 45,302 | $ 142,018 | $ 78,876 | $ 126,083 | $ 403,664 | $ - | $ 2,252,178 | $ 2,121,121 | 6.18% |

*Beginning in July 2018 (FY 2019), the legal report includes legal expenditures related to benefits and pension matters. MCPS is reimbursed for these expenditures through these benefit accounts.
N/A - These firms were not itemized on this report in previous years so the column values are not available.

## FY 2025 SPECIAL EDUCATION LEGAL EXPENSES

| Type of Cost | JULY | AUG | SEPT | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUNE | FY 2025 YTD | FY 2024 YTD | % Inc/(Dec) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SPECIAL EDUCATION LEGAL COSTS** | | | | | | | | | | | | | | | |
| Special Education Outside Counsel | $ 5,134 | $ 119,925 | $ 7,665 | $ 4,667 | $ 12,040 | $ 30,627 | $ 71,429 | $ 26,596 | $ 28,833 | $ 34,844 | $ 60,373 | | $ 402,131 | $ 459,497 | -12.48% |
| Other | - | - | - | - | - | - | - | - | - | $ - | $ - | | - | $ - | 0.00% |
| **TOTAL** | $ 5,134 | $ 119,925 | $ 7,665 | $ 4,667 | $ 12,040 | $ 30,627 | $ 71,429 | $ 26,596 | $ 28,833 | $ 34,844 | $ 60,373 | $ - | $ 402,131 | $ 459,497 | -12.48% |

| Outside Counsel | JULY | | | | | | | | | | | | FY 2024 YTD | FY 2023 YTD | % Inc/(Dec) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ATTORNEYS** | | | | | | | | | | | | | | | |
| Carney Kelehan | $ 5,134 | $ 13,310 | $ 5,283 | $ 1,272 | $ 889 | $ 1,606 | 9,277 | 2,079 | $ 9,151 | $ 24,788 | $ 9,839 | | $ 82,626 | $ 327,430 | -74.77% |
| Miles & Stockbridge | - | 106,615 | 36 | - | 8,736 | - | 20,432 | 6,402 | 5,812 | 7,256 | 24,115 | | $ 179,404 | $ 24,623 | 100.00% |
| CRC | - | - | - | - | - | - | - | - | 1,040 | - | - | | $ 1,040 | $ 1,736 | -40.08% |
| PK Law | - | - | - | - | - | - | - | - | - | - | - | | $ - | $ 105,708 | -100.00% |
| Jeffrey A. Krew | - | - | 2,345 | 3,395 | 2,415 | 29,021 | 41,720 | 18,115 | 12,829 | 2,800 | 26,420 | | $ 139,059 | $ - | 100.00% |
| **TOTAL** | $ 5,134 | $ 119,925 | $ 7,665 | $ 4,667 | $ 12,040 | $ 30,627 | $ 71,429 | $ 26,596 | $ 28,833 | $ 34,844 | $ 60,373 | $ - | $ 402,130 | $ 459,496 | -12.48% |

Note: Totals may differ due to rounding.

# Concealed Carry Permit Holders Remain Among America's Most Law-Abiding Citizens

Ammoland Inc. Posted on June 2, 2025 by Dean Weingarten

People with concealed carry permits are among the most law-abiding groups in the United States. Police officers have crime rates far below the general population. People with concealed carry permits are more law-abiding than police officers.
The arrest rate for the overall adult population in the USA is about 2,100 – 2,200 per 100k in recent years. The arrest rate for police officers has been about 170 per 100k. This may be low because no one officially tracks police arrests. Officials may be reluctant to charge police officers. The conviction rate for concealed permit holders is about 17.6 per 100k in Texas, according to an academic paper by John Lott, Moody, and Wang published in 2025. From the paper:

Of the 43,932 total convictions in the Texas DPS 2023 report, only 284 — or 0.6 percent — were convictions of LTC holders, a conviction rate of 17.6 per 100,000.

Convictions are not the same as arrests. Arrests for felonies tend to result in about 65% convictions. Arrests for misdemeanors result in about 45% convictions. A conviction rate is likely to be about half of the arrest rate. If we double the conviction rate to approximate the arrest rate, concealed permit holders have less than one-fifth the arrest rate of police officers. The arrest rate for concealed carry permit holders is about 1.7% of the arrest rate of the general population.

The Crime Prevention Research Center (CPRC) sums up how law-abiding permit holders are for convictions of firearm-related violations:

*Concealed handgun permit holders are extremely law-abiding. In Florida and Texas, permit holders are convicted of firearms related violations at one-twelfth of the rate at which police officers are convicted.*

Minnesota tracks the number of carry permits that are revoked each year. A look at the Minnesota numbers shows that revocations of permits are close to the number of concealed permit convictions in Texas. The numbers and methodology may be significantly different in the two states. In 2024, the number of permit holders in Minnesota was about 400 thousand. The number of permit revocations was 47. That is a revocation rate of 11.5 per 100k in 2024.

The crime rates of permit holders are much, much lower than those of the general population and much lower than those of police officers.

Very few people believe disarming the police is a good idea. Police officers, even retired police officers, have the legal right to carry in most places where most people are prevented from carrying weapons. Police officers have the legal right to carry in all states and territories of the United States.

Congress created the LEOSA Act as a way to protect the public with more responsible armed people on the streets. They also created it as a way to protect police officers. The same logic applies to people with concealed carry permits. Those people are much less likely to break laws than even police officers are.

It is common sense to increase the number of such protectors. There are about 700 thousand sworn police officers. There are about another 500 thousand retired officers. There are over 20 million Americans with concealed carry permits.

**About Dean Weingarten:**

Dean Weingarten has been a peace officer, a military officer, was on the University of Wisconsin Pistol Team for four years, and was first certified to teach firearms safety in 1973. He taught the Arizona concealed carry course for fifteen years until the goal of Constitutional Carry was attained. He has degrees in meteorology and mining engineering, and retired from the Department of Defense after a 30 year career in Army Research, Development, Testing, and Evaluation.