**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| Silver Spring Jewish Center, Inc., *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | Civil Action No. 8:26-cv-02963-DKC |
| | ) | |
| v. | ) | |
| | ) | |
| Montgomery County, Maryland, | ) | |
| *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

## REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

Contrary to Defendants' arguments, Plaintiffs have standing, are likely to prevail on their claims, and will suffer irreparable harm without an injunction.

### I. Plaintiffs Have Standing to Bring Their Constitutional Claims

Plaintiffs have standing. It is beyond dispute that Plaintiff Rabbi Shapiro has standing, as he wishes to engage in conduct that the challenged law prohibits. *See* Dkt. 5-2, Shapiro Decl., ¶¶ 9–12; Dkt. 1, Compl. ¶¶ 37–44. Where a plaintiff "alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, … and there exists a credible threat of prosecution thereunder," standing is met. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 160 (2014) (citation omitted). And, indeed, although Defendants assert that "[both] Plaintiffs" lack standing, their only arguments are against Plaintiff SSJC alone. Dkt. 26-1, Opp. to Pls.' Mot. for Prelim. Inj. ("Opp.") 9–12.

Rabbi Shapiro's standing suffices for both Plaintiffs because, when "multiple plaintiffs" seek the same relief, only one plaintiff needs have standing. *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017). SSJC, however, also possesses standing, both on its own behalf and on behalf of its members.

First, SSJC itself suffers an injury because it wishes to provide its security through its armed volunteer security team, but EB 23-26 prohibits that. SSJC thus has "an intention to engage in a course of conduct arguably affected with a constitutional interest, … and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List*, 573 U.S. at 159. And, of course, SSJC asserts *its own* governance interests in its church autonomy claim. Thus, SSJC has a "personal stake in the controversy" that is "likely to be redressed by a favorable decision," *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261–62 (1977), not merely a "setback to [its] abstract social interests," *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

Second, SSJC alleges a classic pocketbook injury because compliance with EB23-26 reasonably requires spending money to "mitigate or avoid harm." *See Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 622 (4th Cir. 2018) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). As even Defendants concede, compliance with EB23-26 would require Plaintiff SSJC to hire armed guards. *See* Opp. at 12.

Third, SSJC has associational standing for its members. Defendants' assertion that "the interests at stake here are not germane to [SSJC's] purpose," Opp. at 10,

is false. SSJC exists for the study and observance of Jewish law. Contrary to Defendants' (impermissible[1]) assertions about Jewish law, the *halachic* obligation of self-defense—which necessarily involves firearms—is integral to SSJC's mission. Under Jewish law, providing communal security is at least as important as building a synagogue. *See* SHULCHAN ARUCH, CHOSEN MISHPAT 163:1 (authorizing community to force residents to pay for security measures and building a synagogue). That obligation falls on everyone, including those normally exempt under Jewish law from communal obligations. *Id.* at 163:4.

## II. Plaintiffs Will Likely Prevail on the Merits

### A. Plaintiffs Are Likely to Prevail on Their Second Amendment Claim

#### 1. Defendants Have Not Justified the Places-of-Worship Ban

Defendants have "not pointed to a single regulation banning firearms at places of worship or any analogous place" enacted anywhere in the United States "[f]rom the colonial times through the ratification of the Second Amendment and continuing through the ratification of the Fourteenth Amendment." *Wolford v. Lopez*, 116 F.4th 959, 996 (9th Cir. 2024), *rev'd in part on other grounds*, 146 S. Ct. 2032 (2026). Instead, Defendants largely rely on the same state and territorial laws from the 1870s through the 1890s that California cited in its case—which the Ninth Circuit held were not relevant historical analogues. *See id.* (considering laws of Georgia,

---

[1] Although courts may test sincerity, they may not test religious *truth*. *United States v. Seeger*, 380 U.S. 163, 185 (1965). Given their perception of the security situation, Plaintiffs have alleged that their religious law obligates at least some Jewish volunteers (including Rabbi Shapiro) to carry a firearm in synagogue. Defendants have not challenged the sincerity of that belief and may not challenge the belief itself. *See Barnett v. Inova Health Care Servs.*, 125 F.4th 465, 470 (4th Cir. 2025).

Texas, Missouri, Virginia, Arizona, and Oklahoma); Opp. at 23–24 (same, plus some later state and local laws in the same jurisdictions).

As the Ninth Circuit recognized, one reason the laws on which Defendants rely fail as historical analogues is because they were enacted nearly a century after the Second Amendment's ratification and years after the Fourteenth Amendment's. *See also Hardaway v. Nigrelli*, 639 F. Supp. 3d 422, 442 (W.D.N.Y. 2022) ("handful" of "outlier" laws "passed nearly a century after the Second Amendment's ratification" did not establish tradition of banning firearms in places of worship). Historical analogues serve to identify the public understanding, at the time of ratification, of which firearm restrictions were consistent with the right to keep and bear arms. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 34–36 (2022). Pre-ratification laws may provide some evidence of this—though even that evidence may not be conclusive, as the existence of just a few laws imposing a particular restriction does not necessarily evince a "tradition." *See id.* at 46. Laws enacted after ratification—especially long after ratification—"do not provide as much insight into the original meaning as earlier sources.'" *Id.* at 36 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 614 (2008)). And "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.*

Moreover, the Supreme Court has recognized that laws enacted in the territories—such as the Arizona and Oklahoma laws that Defendants cite—are not "instructive" in determining the meaning of the Second Amendment. *Id.* at 67. The

Court concluded: "[W]e will not stake our interpretation on a handful of temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption, governed less than 1% of the American population, and also contradict the overwhelming weight of other, more contemporaneous historical evidence." *Id.* at 67–68 (cleaned up). Also, Arizona and Oklahoma broadly prohibited the carrying of pistols nearly everywhere, *see id.* at 66—so their inclusion of places of worship among the places where firearms were banned is hardly remarkable.

As for the post-ratification Texas statute, the state not only banned firearms in places of worship but also prohibited the carrying of pistols *everywhere* unless a person had "reasonable grounds for fearing an unlawful attack on his person." *See id.* at 64–65. That placed Texas law in direct conflict with the Second Amendment—which, per *Bruen*, *does* protect the right to carry a pistol without special grounds—and *Bruen* rejected the laws, and the court decisions upholding them, as "outliers." *Id.* at 65–66. Defendants have presented no reason to give Texas's law restricting firearms in places of worship any more credit than the Court gave Texas's law restricting the carrying of firearms generally.

The Georgia, Missouri, and Virginia laws on which Defendants rely are likewise outliers. They were novel and stood in contrast with the laws of *all other states*, which had *never* prohibited firearms in places of worship. In *Bruen*, the Court "doubt[ed] that *three* colonial regulations could suffice to show a tradition of public-carry regulation." 597 U.S. at 46. Post-ratification regulations enacted by just a few

states are even weaker evidence. *See id*. at 70 ("a few late-in-time outliers" could not outweigh the practice of all other states).

Contrary to Defendants' argument, the Fourth Circuit has not condoned upholding firearms regulations against Second Amendment challenges based on analogous laws enacted at any time "throughout American history." Opp. at 26 (quoting *Kipke v. Moore*, 165 F.4th 194, 207 (4th Cir. 2026)). The language Defendants quote from *Kipke* was followed by a citation to *Bianchi v. Brown*, 111 F.4th 438, 446 (4th Cir. 2024), where the Fourth Circuit upheld a ban on certain "assault weapons." *Bianchi*'s examination of history and traditions did consider laws enacted throughout the nation's history, including laws enacted in the twentieth century. *See id*. at 464–71. It did so, however, in reviewing the development of firearms laws since the founding—explaining how, as new weapons came into existence, laws arose to restrict them. Many of the laws *Bianchi* discussed were enacted long *before* ratification of the Fourteenth Amendment. And nothing in *Bianchi*'s discussion suggests that the post-ratification laws it referenced would suffice in the absence of any pre-ratification analogues. And in *Kipke*, which upheld prohibitions on the carrying of firearms in various "sensitive locations" (not including places of worship), the court relied primarily on pre-ratification analogues, and *none* of the restrictions it upheld depended on post-ratification analogues alone, if at all. *See Kipke*, 165 F.4th at 208–18.

The nineteenth-century court decisions that Defendants reference are no more pertinent than the statutes they cite. *See* Opp. at 24–25. *Hill v. State*, 53 Ga. 472

(1874), took the militia-centered view of the Second Amendment that the Supreme Court rejected in *Heller*. The Georgia court held that the Constitution protected the right to keep and bear arms so that people could "become familiar with [their] use, so that when an exigency of the state arose, they would be ready and capable for its defense." *Hill*, 53 Ga. at 479. It thus upheld a ban on carrying arms in various places, including places of worship, because prohibiting arms in those places would not prevent people from becoming sufficiently familiar with the use of arms to serve the state's purposes. *Id*. at 479–82. *Heller*, however, concluded that the Second Amendment protects a preexisting "individual right unconnected to militia service." 554 U.S. at 577–619. Thus, *Hill*'s analysis is fundamentally flawed and provides no insight into the Second Amendment's meaning. *See Young v. Hawaii*, 896 F.3d 1044, 1057–58 (9th Cir. 2018) (concluding that *Heller* "knocks out the load-bearing bricks in the foundation of cases like [*Hill*]" which therefore are of "little instructive value"), *vacated on reh'g en banc*, 992 F.3d 765 (9th Cir.2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022) (for reconsideration in light of *Bruen*).

*English v. State*, 35 Tex. 473 (Tex. 1872), also cannot be squared with the Second Amendment. In *Bruen*, the State of New York cited *English's* approval of a statutory "reasonable grounds" standard for the public carrying of firearms to defend New York's proper-cause requirement. The Court gave *English* (and another Texas decision) no weight, however, because the statute and decisions were "outliers." *Bruen*, 597 U.S. at 64–65. Because *English* was wrong about the right to carry a firearm in general, its view of the right to carry in places of worship in

particular lacks value. *See also Young*, 896 F.3d at 1057–58 (deeming *English*, like *Hill*, of "little instructive value"); *State v. DiCiccio*, 105 A.3d 165, 196 (Conn. 2014) (rejecting *English* as "anachronistic" in light of *Heller*).

Finally, *Andrews v. State*, 50 Tenn. 165 (Tenn. 1871), considered a state constitutional provision less protective of the right to keep and bear arms than the Second Amendment. The state included an exception for "regulat[ing] the wearing of arms, with a view to prevent crime." *Id.* at 177 (quoting Tenn. Const. § 26 (1870)). And its comment approving of prohibitions on "carrying arms to church," *id.* at 182—in a single sentence, with no reference to case law, history, or tradition—was dicta, as the case did not present the issue.

As for the order denying a preliminary injunction in *Maryland Shall Issue, Inc. v. Montgomery County*, 680 F. Supp. 3d 567 (D. Md. 2023), it "is not binding precedent in … [this] district, or even upon the same judge in a different case." *Camreta v. Greene*, 563 U.S. 692, 709 n.2 (2011) (quoting 18 J. Moore, et al., *Moore's Federal Practice* § 134.02[1][d] p.134-26 (3d ed. 2011)). Indeed, the order is not even binding "precedent" *in that case*, as no final decision on the merits and no judgment have been entered. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits … ."); Fed. R. Civ. P. 54(b) (providing that any order that "adjudicates fewer than all the claims or the rights … of fewer than all of the parties … may be revised at any time before entry of a judgment adjudicating all the claims and all the parties' rights").

In sum, Defendants have not met their burden under *Bruen* or shown that they are likely to do so.

**2. Defendants Decline to Defend the 100-Yard Rule**

Plaintiffs' Second Amendment claim challenges not only Montgomery County's ban on firearms in places of worship, but also its ban on firearms within 100 yards of any place of public assembly. Compl. ¶ 76; Dkt. 5-1, Memo. in Supp. of Pls.' Mot. for PI at 11–12. In their response to Plaintiffs' Motion for Preliminary Injunction, Defendants have not offered *any* Second Amendment justification for that rule. Defendants, of course, carry the burden to justify the restriction, *Bruen*, 597 U.S. at 17, 24—and their lack of any attempt to do so shows that Plaintiffs are highly likely to prevail on the merits of that portion of their Second Amendment claim.

**B. Plaintiffs Will Likely Prevail on Their First Amendment Claims**

Plaintiffs are likely to prevail on their claims under the First Amendment's Free Exercise Clause and Establishment Clause because Plaintiffs have alleged First Amendment injuries, and Defendants make no attempt to satisfy their burden under strict scrutiny.

**1. Plaintiffs Are Likely to Prevail on Their Free Exercise Claim.**

As the parties agree, strict scrutiny applies when a law burdens a sincere religious practice and is either not neutral or not generally applicable. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022). EB23-26 is neither.

*Sincere religious practice*. As explained above, Plaintiffs sufficiently allege that EB23-26 prohibits their sincere religious practice. Defendants cite an out-of-circuit

District Court opinion for the proposition that "[c]arrying a gun is not a religious act." Opp. at 14. But that decision could not establish that this is not a "religious act" for *anyone*; and, as shown above, for Plaintiffs, it is. Moreover, in another case shortly afterward, the Second Circuit held that the same law *did* unconstitutionally burden other plaintiffs' religious practice. *Antonyuk v. Chiumento*, 89 F.4th 271, 347–51 (2d Cir. 2023), *vacated sub nom.*, *Antonyuk v. James*, 144 S. Ct. 2709 (2024) (mem.), *amended and reinstated in part by* 120 F.4th 941 (2d. Cir. 2024).

*Neutrality*. A law is not neutral when it "single[s] out houses of worship for especially harsh treatment." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 17 (2020). As Defendants concede, EB23-26 singles out "places of worship." Opp. at 16. That alone triggers strict scrutiny. But Defendants argue that, with no contemporary evidence of animus toward religion, the ban is neutral. *Id.* at 17–18. That is untrue: while showing animus would be *sufficient*, it is not necessary. *See Kennedy*, 597 U.S. at 525–26 & n.1 (holding policy not neutral without finding "official expressions of hostility"). In fact, the Supreme Court in *Roman Catholic Diocese* emphasized that its decision was *not* based on any "statements" but rather the textual "singl[ing] out [of] houses of worship." 592 U.S. at 17.

*General applicability*. The law also is not generally applicable because it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Kennedy*, 597 U.S. at 526. Defendants argue that EB23-26 applies to *some* secular settings. Opp. at 15–17. But, as the Supreme Court has explained, "[i]t is no answer that a State treats some

comparable secular businesses or other activities as poorly as or even less favorably than the religious exercise at issue." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). "[G]overnment regulations are not neutral and generally applicable … whenever they treat *any* comparable secular activity more favorably than religious exercise." *Id*. Because EB23-26 treats most comparable secular entities—e.g., restaurants, fraternal lodges, and stores—better than houses of worship, it is neither generally applicable nor neutral.

Nor have Defendants offered any explanation as to why a highly trained, religiously motivated volunteer security team is a greater threat to "public safety" than an average "security guard," Code § 57-11(b)(2), at a Wendy's or an Apple Store. Without evidence of that risk, EB23-26 is not generally applicable. Because the law is neither neutral nor generally applicable, strict scrutiny applies. And because Defendants have made no attempt to meet their burden under strict scrutiny, Plaintiffs are therefore likely to prevail on their claims.

**2. Plaintiffs Are Likely to Prevail on Their Church Autonomy Claim.**

Defendants propose that the only types of cases that implicate the church autonomy doctrine are those that "involve the state inserting itself into a dispute over religious doctrine, religious leadership, or religious governance. Opp. at 20. But Defendants' own arguments show that EB23-26 implicates those very things. Straining against the declarations of SSJC's senior rabbi and Rabbi Shapiro, Defendants insert themselves into the "theological thicket" to claim that, under Jewish law, it is "indistinguishable" who protects the synagogue. *See* Opp. at 21.

That the Defendants regard the role as a "seemingly secular task[]" is irrelevant because, *for Plaintiffs*, it is "imbued with religious significance." *Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316, 332 (4th Cir. 2024). The First Amendment forbids the government from "telling religious institutions what to believe or how to worship." *McRaney v. N. Am. Mission Bd.*, 157 F.4th 627, 636 (5th Cir. 2025). Here, security is a crucial fulfillment of SSJC's religious mission and involves protected "internal management decisions that are essential to the institution's central mission." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020); *see supra* Part II.B.1. Thus, "*any* attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion" and necessarily violate Plaintiffs' church autonomy rights. *Our Lady*, 591 U.S. at 746.

**III. Preventing Irreparable Harm Requires an Injunction**

As Plaintiffs have explained, any violation of constitutional rights causes irreparable harm for which there is no adequate remedy at law. *See Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009); *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021).

Attempting to undermine Plaintiffs' irreparable-harm argument, Defendants argue that "the same prohibitions have existed in County law, in substantially the same form, *since 1997*," and argue that Plaintiffs' supposed "delay" in seeking relief evinces a lack of irreparable harm. Opp. at 28. This ignores critical facts. First, the challenged bans were enjoined on December 15, 2023, which allowed Plaintiffs to

engage in the conduct that EB 23-36 prohibits without fear of prosecution. *See* Ex. C, Motion to Dismiss Counts I, II, and III of Second Amended Complaint, *Md. Shall Issue, Inc. v. Montgomery Cnty.*, No. 485899-V at 1 (Aug. 12, 2026). That situation continued until EB23-26 took effect on July 21, 2026. *See id.* at 2–3; *see also* Memorandum from Christine Wellons, Chief Legislative Attorney, to the Montgomery County Council (May 7, 2026)[2] (purpose of EB 23-26 is to align County law "with the [Maryland] Supreme Court's opinion in *Engage Armament* so that the County law is *valid and enforceable*") (emphasis added). Plaintiffs filed this action on July 30, 2026, a mere nine days after the prohibition on firearms in houses of worship became enforceable.

Second, under the 1997 enactment, holders of Maryland State Police concealed carry permits *were exempt*. *See* Opp. at 9 ("Bill 21-22 would prevent an individual from possessing a firearm within 100 yards of a place of public assembly *even when the individual has a wear-and-carry permit from the State of Maryland*.") (emphasis added). In this action, Plaintiffs seek only to allow *permitted* volunteers to carry firearms, which would have been allowed under the 1997 ordinance.

In summation, the course of action Plaintiffs wish to undertake was legally permissible before 1997. It was legally permissible after 1997. It was briefly prohibited by Montgomery County in 2022, but it again became legally permissible

[2] https://montgomerycountymd.granicus.com/MetaViewer.php?view_id=169&event_id=16861&meta_id=222428

in December of 2023. Plaintiffs organized their security plan based on that permission and filed this action very shortly after it was revoked.

Also, Defendants ignore another fact that refutes their "delay" argument: Plaintiffs were motivated to organize a volunteer security team because of the threats to the American Jewish community that started in the months that followed the October 7, 2023 attacks in the Middle East. Until then, Plaintiff SSJC[3] may not have had standing to bring this case. *See Lafave v. Cnty. of Fairfax*, 149 F.4th 476, 486 (4th Cir. 2025) (holding that the plaintiffs lacked standing when they did not allege "conduct that risks sanction under the ordinance").

For the American Jewish community, life after October 7, 2023[4] is a different—and more dangerous—world. *See* AUDIT OF ANTISEMITIC INCIDENTS 2025, ADL (2026) (describing October 7, 2023 as having "fundamentally transformed the landscape of antisemitism in America"). Thanks to the Maryland court system's well-timed injunction, Plaintiffs were perfectly permitted to organize, expend resources to train, and rely on their volunteer security team.

This timely action presents the Plaintiffs' very first opportunity to challenge the law. Especially since synagogues around the country have become targets, the urgency of this action cannot be denied. *See, e.g.*, Emma Goldberg and Maia Coleman, *Central Synagogue Attack Rattles Jewish New Yorkers*, N.Y. TIMES (Aug.

---

[3] Rabbi Shapiro did not move to Montgomery County until 2024—during the window when carrying in houses of worship was permissible. *See Warth v. Seldin*, 422 U.S. 490, 504 (1975). His challenge is therefore especially timely.

[4] While Jews experienced a short period of sympathy in the immediate aftermath of the deadliest day for Jews since the Holocaust; the need for security became apparent a few months later, *exactly* when Montgomery County's firearms laws were enjoined.

15, 2026). This is especially true during the upcoming "High Holiday" season—starting September 11, 2026—which the United States warns is particularly dangerous for the Jewish community. *See* Mike Wagenheim, *US State Department Urges Countries to Protect Jews During High Holidays*, JNS (Aug. 26, 2026).

## IV. Conclusion

For the reasons set forth above and in Plaintiffs' memorandum in support, the Court should grant Plaintiffs' Motion for Temporary Restraining Order or Preliminary Injunction.

Dated: August 31, 2026

Respectfully Submitted,

/*s*/ Jacob Huebert
Andrew J. Morris
Jacob Huebert
New Civil Liberties Alliance
4250 N. Fairfax Drive
Suite 300
Arlington, VA 22204
(202) 869-5210
andrew.morris@ncla.legal
jacob.huebert@ncla.legal

Attorneys for Plaintiff Silver Spring Jewish Center

/*s*/ J. Menashe Shapiro
Rabbi J. Menashe Shapiro,
Pro Se Plaintiff
805 Whittington Terrace
Silver Spring, Maryland 20901
T: (216) 645-2094
F: (216) 831-3736
RabbiMenasheShapiro@gmail.com