**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| SILVER SPRING JEWISH CENTER, INC., *et al.*, | : | |
| Plaintiffs, | : | Case No.: 8:26-cv-02963-DKC |
| v. | : | |
| MONTGOMERY COUNTY, MARYLAND, *et al.* | : | |
| Defendants. | : | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO AMEND JUDGMENT OR, IN THE ALTERNATIVE, FOR INJUNCTION PENDING APPEAL**

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** .......... **ii**

**I. FACTS** .......... **2**

**II. STANDARDS OF REVIEW** .......... **3**

A. Reconsideration of an Interlocutory Order .......... 3

B. Injunction Pending Appeal. .......... 4

**III. APPLICABLE LAW AND ARGUMENT** .......... **5**

A. Neither Reconsideration Nor Injunctive Relief Is Warrnated Based On Plaintiffs' Newly Reframed Second Amendment Challenge To The 100-Yard Rule. .......... 5

1. Plaintiffs made a facial challenge—not an as-applied challenge—in their Injunction Motion. .......... 5

2. To the extent that Rabbi Shapiro made and as-applied challenge to the 100-Yard Rule, this Court did not commit clear legal error in denying it . .......... 7

3. Plaintiffs are not likely to succeed on the merits that Buffer Zones surrounding schools and parks are unconstitutional. .......... 10

B. Neither Reconsideration Nor Injunctive Relief Is Warranted Based On Plaintiffs' Free Exercise Challenge To The 100-Yard Rule. .......... 13

1. The 100-Yard Rule is generally applicable. .......... 14

2. The 100-Yard Rule does not fail strict scrutiny. .......... 20

C. Plaintiffs Fail To Establish The Remaining Prongs Of Injunctive Relief. .......... 23

TABLE OF AUTHORITIES

**Cases**

*Antonyuk v. Chiumento*, 589 F.4th 271 (2d Cir. 2023) .......... 19

*Cahaly v. Larosa*, 796 F.3d 399 (4th Cir. 2015) .......... 20, 21

*Carlson v. Boston Sci. Corp.*, 856 F.3d 320 (4th Cir. 2017) .......... 3

*Direx Isr., Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802 (4th Cir. 1992) .......... 4

*Fulton v. City of Philadelphia*, 593 U.S. 522 (2021) .......... 17, 21

*Hines v. S.C. Dep't of Corr.*, 148 F.3d 353 (4th Cir. 1998) .......... 21

*Kimberly B. v. Kijakazi*, Civil Action No. TJS-20-2877, 2022 WL 748097, (D. Md. Mar. 11, 2022) .......... 13, 15

*Kipke v. Moore*, 165 F.4th 194 (4th Cir. 2026) .......... 10, 11

*Maryland Shall Issue, Inc. v. Montgomery County, Maryland*, 680 F. Supp. 3d 567 (D. Md. 2023) .......... 10, 13, 17

*Minter v. Wells Fargo Bank, N.A.*, No. CIV.A. WMN-07-3442, 2013 WL 4603006, (D. Md. Aug. 28, 2013) .......... 13

*Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108 (11th Cir. 2025) .......... 10

*New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022) .......... 10

*Nken v. Holder*, 556 U.S. 418 (2009) .......... 4

*Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147 (2d Cir. 2003) .......... 3

*Ohio Citizens for Responsible Energy, Inc. v. NRC*, 479 U.S. 1312 (1986) .......... 4

*Pac. Ins. Co. v. Am. Nat. Fire Ins. Co.*, 148 F.3d 396 (4th Cir. 1998) .......... 5

*Protect Our Parks, Inc. v. Buttigieg*, 10 F.4th 758 (7th Cir. 2021) .......... 4

*Respect Me. PAC v. McKee*, 562 U.S. 996 (2010) .......... 4

*Tandon v. Newsom*, 593 U.S. 61 (2021) .......... 17

*U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Virginia, LLC*, 899 F.3d 236 (4th Cir. 2018) .......... 1, 3, 9

*United States v. Hemani*, 608 U.S. 772 (2026) ........ 10

*United States v. McKenzie*, No. 22-6658, 2023 WL 418447, (4th Cir. Jan. 26, 2023) ........ 14

*White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179 (4th Cir. 2022) ........ 7

*Williams v. Fontanez*, Civil Action No. GLR-22-1882, 2023 WL 8174323, (D. Md. June 5, 2023) ........ 14

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........ 4

*Wolford v. Lopez*, 609 U.S. 185 (2026) ........ 6

*Wolford v. Lopez*, 116 F.4th 959 (9th Cir. 2024) ........ 9, 11

**Statutes**

18 U.S.C. § 922(q)92)(B)(ii) ........ 21

Balt., Md., Code art. 19, § 59-5(b) ........ 21

Balt., Md., Code art. 19, § 59-5(d) ........ 21

Md. Code Ann., Crim. Law, § 4-111 ........ 21, 22

Prince George Cnth., Md., Code § 14-140) ........ 21

**Rules**

Fed. Rule Civ. Proc. 7 ........ 5

Fed. Rule Civ. Proc. 54 ........ 3, 5

Fed. Rule Civ. Proc. 62 ........ 4

Under the guise of a motion to amend, Plaintiffs fault this Court for ruling incorrectly on arguments that Plaintiffs hadn't made. Plaintiffs barely mentioned what they call the "100-Yard Rule" in their Motion for Temporary Restraining Order or Preliminary Injunction (the "Injunction Motion"). They devoted only a paragraph to it in their Second Amendment argument (ECF 5-1 at 11), and mentioned it only once with regard to the First Amendment. *See* ECF 5-1 at 13 (stating that the Rule "prevents" Rabbi Shapiro from carrying a firearm while walking to synagogue.); *see generally id*. (mentioning the walk to the synagogue with respect to Rabbi Shapiro only). Plaintiffs now bring the 100-Yard Rule to the forefront, devoting their entire Motion to new arguments that Plaintiffs failed to raise before.

As to the Second Amendment, Plaintiffs' written Injunction Motion facially challenged Section 57-11(a)'s inclusion, through Section 57-1, of places of worship and 100-yard buffer zones as places of public assembly in which firearms are banned. Having failed that facial challenge because "they must do more than they have" (ECF 35 at 38), Plaintiffs now try to recast their request for preliminary injunctive relief as an as-applied challenge to the 100-Yard Rule. Similarly, Plaintiffs advanced a Free Exercise argument that the 100-Yard Rule shared the same constitutional defects as the in-premises ban on firearms in places of worship. This Court considered that argument and rejected it. Plaintiffs now supply new theories that were available at the time of—but never raised in—their preliminary briefs and then summarily brand this Court's failure to address those theories that weren't before the Court as "clear error."

A court does not err by declining to consider arguments never raised. Plaintiffs' new arguments are not properly before this Court, and in any event, they are not "dead wrong" legal error (*U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Virginia, LLC*, 899 F.3d 236, 258 (4th Cir.

2018)), which must exist before this Court's 72-page, well-reasoned Memorandum Opinion may be disturbed.

## I. FACTS

Upon full briefing by all parties on Plaintiffs' Injunction Motion, this Court held a full hearing—occupying half a day—at which this Court and the parties were prepared for the arguments made in the parties' respective filings.[1] This Court began the hearing with guidance for the parties on what precise topics it needed to hear, and in particular asked the parties to focus arguments "on whatever type of challenge you think I need to address at this stage." Transcript of September 3, 2026 hearing ("Tr.") at 12:16-14:16. Indicating that the Court will find "as many [hours] as I need" fully to hear the parties, this Court also "recognize[d] the urgency of making some of these decisions before" the Jewish high holidays, beginning at sundown just a few days later, on September 11, 2026. Tr. at 14:23-15:10.

At the end of the hearing, this Court took the Injunction Motion under advisement. One week later, on Thursday September 10, 2026, this Court issued a thorough, detailed, and reasoned Memorandum Opinion and Order—comprising 72-pages of analysis of the arguments that the parties made in both their written filings and at oral argument. This Court granted Plaintiffs' Injunction Motion in part, preliminarily enjoining enforcement of Montgomery County Code §§ 57-1 and 57-11(a)(1) against SSJC and Rabbi Shapiro "to the extent that those provisions prohibit Plaintiffs from selling, transferring, possessing, or transporting a handgun in THEIR respective places of worship." ECF 36 at 1-2.

[1] Defendants incorporate by reference the facts stated in their Memorandum of Law in Support of Opposition by Defendants, Montgomery County, Maryland, Marc Elrich, and Marc Yamada to Plaintiffs' Motion for Temporary Restraining Order or Preliminary Injunction. ECF 26-1, at 2-8.

Two weeks later, on September 24, 2026, Plaintiffs filed their instant Motion to Amend Judgment or, in the Alternative, for Injunction Pending Appeal (the "Motion"). ECF 39. Plaintiffs filed their Motion on the last day permitted by the Local Rules (*see* ECF 39-1 at 4). Plaintiffs did not seek any shortening of time for Defendants' response to the Motion.

## II. STANDARDS OF REVIEW

### A. Reconsideration of an Interlocutory Order

Under Federal Rule of Civil Procedure 54(b), a court may, in its discretion, revise an interlocutory order on the basis of: "(1) 'a subsequent trial produc[ing] substantially different evidence'; (2) a change in applicable law; or (3) clear error causing 'manifest injustice.'" *Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017). To qualify as a "clear error causing manifest injustice" as a basis for revision of an interlocutory judgment (*see* ECF 39-1 at 3, citing *Carlson*, 856 F.3d at 325)), a purported error cannot be "just maybe or probably wrong; it must strike us as wrong with the force of a five-week-old, unrefrigerated dead fish. It must be dead wrong.'" *U.S. Tobacco Coop.*, 899 F.3d at 258 (citation omitted).

Notwithstanding any general flexibility of this Court to revise interlocutory orders "as the litigation develops and new facts or arguments come to light," Rule 54(b) discretion "is not limitless." *Id*. "'[W]here litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'" *Id*. at 257 (quoting *Official Comm. Of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003)). Moreover, while Federal Rule of Civil Procedure 54(b) "account[s] for potentially different evidence discovered during litigation," it is not a vessel for presenting evidence that already existed but was lacking from a party's initial submission. *Carlson*, 856 F.3d at 326.

**B. Injunction Pending Appeal**

"While an appeal is pending from an interlocutory order … that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction," Federal Rule of Civil Procedure 62(d) generally permits a court to "suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." A request for an injunction pending appeal "[d]emands a significantly higher justification" than a request for a stay, because unlike a stay, an injunction "does not simply suspend judicial alteration of the status quo but grants judicial intervention…" *Respect Me. PAC v. McKee*, 562 U.S. 996 (2010) (citing *Ohio Citizens for Responsible Energy, Inc. v. NRC*, 479 U.S. 1312, 1313 (1986)).

The "demanding" four-part test for evaluating a request for injunction articulated by the U.S. Supreme Court is: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 433-434 (2009) (citation omitted). The first two factors of this standard are the most critical, and it is not enough to show some "possibility of irreparable injury" or that the chance of success on the merits be "better than negligible." *Id*. at 434-35 (citations omitted); *Protect Our Parks, Inc. v. Buttigieg*, 10 F.4th 758, 763 (7th Cir. 2021) ("the mere possibility of success is not enough; [a plaintiff] must make a "strong" showing on the merits.")

Preliminary injunctions are "extraordinary remed[ies] involving the exercise of very farreaching power." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (preliminary injunction is "an extraordinary remedy"); *Direx Isr., Ltd. v. Breakthrough Med. Corp.,* 952 F.2d 802, 811 (4th Cir. 1992).

## III. APPLICABLE LAW AND ARGUMENT

### A. Neither Reconsideration Nor Injunctive Relief Is Warranted Based On Plaintiffs' Newly Reframed Second Amendment Challenge To The 100-Yard Rule.

1. *Plaintiffs made a facial challenge—not an as-applied challenge—in their Injunction Motion.*

Plaintiffs improperly use Rule 54 to raise a new, *post facto* as-applied challenge to the 100-yard buffer zones ("Buffer Zones") surrounding the sensitive places identified in Section 57-1. While Plaintiffs contend that their "challenge to the 100-yard rule is limited here to an as-applied challenge as to the places Rabbi Shapiro and SSJC members must pass while walking to synagogue" (ECF 39-1 at 6), that is not the challenge they raised in their original Injunction Motion. Tellingly, Plaintiffs cite the allegations in their Complaint—not their Injunction Motion—for that proposition. ECF 39-1 at 6, n.2. *See also* ECF 39-1 at 15-16 (citing paragraphs 41, 42, 43, 55, 74 and 76 of the Complaint to suggest that "Rabbi Shapiro properly raised this as-applied challenge from the outset."). The Complaint in general, however, was not before this Court on Plaintiffs' Injunction Motion. Plaintiffs were required to "state with particularity the grounds for seeking" injunctive relief in their Injunction Motion. Fed. R. Civ. P. 7(b)(1)(B).

Defendants opposed, and this Court prepared for and heard, the arguments for injunctive relief that Plaintiffs made in writing. This Court issued a lengthy, detailed, and reasoned Memorandum Opinion on those arguments. Motions to amend "may not be used [ ] to raise arguments which could have been raised prior to the issuance of the judgment, nor may they be used to argue a case under a novel legal theory that the party had the ability to address in the first instance." *Pac. Ins. Co. v. Am. Nat. Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998).

Plaintiffs did not bring an as-applied challenge. Instead, Plaintiffs moved for relief on the premise that "Montgomery County's ban on firearms in places of worship violates the Second

Amendment *on its face* … ." ECF 5-1 at 1 (emphasis added). Plaintiffs devoted only a paragraph of their Injunction Motion to Buffer Zones, and in that lone paragraph they argued that, based on *Wolford v. Lopez*, 609 U.S. 185 (2026), Section 57-11(a)'s 100-Yard Rule comprises "an unjustified obstruction of an individual's right to carry a firearm *at all*." ECF 5-1 at 11 (emphasis added).

That is the sole argument Plaintiffs made at the September 3 hearing. This Court made clear at the beginning of the hearing that "[t]he parties need to focus very clearly on whether it's a facial challenge or an as-applied, and make sure your arguments are focused on whatever type of challenge you think I need to address at this stage." Tr. at 13:18-21. Responding to that inquiry, Plaintiffs' counsel confirmed Plaintiffs' facial challenge at the outset:

> The plaintiffs in the Silver Spring Jewish Center case, unlike the plaintiffs in the Barreto case, challenge only two provisions of Montgomery County law. We challenge the ban on firearms and places of worship, and we … challenge the ban on firearms within a hundred yards of *any* place of public assembly, and that's all.
>
> **And these are facial challenges to the – to the provisions**.

Tr. at 76:21-77:4 (emphasis added). Following the argument made in their papers, Plaintiffs' counsel then argued that the 100-Yard Rule, "much like the statutes struck down in *Wolford* [ ] does, indeed, restrict people from exercising the right that the Court recognized in *Bruen*, the right to carry a firearm as they go about their daily lives," and "makes it essentially impossible … to exercise the right that *Bruen* recognized." Tr. at 82:13-22.[2]

At best, Plaintiffs made passing reference to an as-applied challenge during oral argument. *See* Tr. at 77:6-7 ("[t]he 100-yard rule challenge *may* also be as-applied"); Tr. at 102:11-12 (that *could be* looked at as facial or as-applied") (emphasis added). That argument seemingly was made

[2] Plaintiffs do not—because they cannot—suggest that this Court made *any* error in determining that Plaintiffs' "cursory and conclusory" facial challenge of Buffer Zones "fails at this stage" because Plaintiffs "must do more than they have." ECF 35 at 38.

as an afterthought and/or a pivot after hearing this Court's targeted exchange with the *Barreto* Plaintiffs' counsel regarding the *Barreto* Plaintiffs' similar facial argument that the "cumulative effect" of the 100-Yard Rule is that "you cannot walk within anywhere in the county [without] risking entering one of the 100-yard zones." *See, e.g.,* Tr. at 50:7-58:16. Plaintiffs otherwise did not argue an as-applied challenge—including the standard that it now says this Court must apply—at any other point during the hearing. This alone warrants denial of Plaintiffs' current Motion.

2. *To the extent that Rabbi Shapiro made an as-applied challenge to the 100-Yard Rule, this Court did not commit clear legal error in denying it.*

Assuming *arguendo* that this Court believes it necessary to reconsider its ruling as to the 100-Yard Rule, Plaintiffs offer no basis on which this Court may do so for anyone *other* than Rabbi Shapiro. This Court correctly observed in its Memorandum Opinion that an as-applied challenge "is one which depends on the identity or circumstances of the Plaintiff." ECF 35 at 15 (citing *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 204 (4th Cir. 2022)). Plaintiffs fail, however, to state, in an affidavit or otherwise, *any* of the "particular circumstances" (*id*. at 16) they contend apply to any Member of SSJC other than Rabbi Shapiro. Plaintiffs generically posit that "SSJC members' walking routes, like Rabbi Shapiro's, pass within 100 yards of *a* place of public assembly" (ECF 39-1 at 16), but do not say *which* Members, or *which* place—or places—of public assembly. Nor do Plaintiffs posit, for anyone other than Rabbi Shapiro, that any other SSJC Members must walk *at all* to synagogue on Sabbath and/or Jewish holidays, let alone that "the *only* path" (ECF 1, ¶ 41) to synagogue requires that theoretical congregant to walk past any place(s) of public assembly.[3] Indeed, the only cited paragraphs of the Complaint—

[3] Plaintiffs expect this Court to assume that each unidentified SSJC Member holds precisely the same "sincerely held religious beliefs" as Rabbi Shapiro, and that among those beliefs is one requiring them to "walk to the synagogue for communal prayer." ECF 5-2, ¶ 11. No SSJC Member other than Rabbi Shapiro provided a Declaration to that effect.

notably, again, *not* the Injunction Motion—that mention SSJC Members other than Rabbi Shapiro (*see* ECF 39-1 at 15-16) at best relate to Plaintiffs' facial challenge to the Buffer Zones restrictions. *See, e.g.,* ECF 1, ¶ 77. With no facts before it, this Court has no basis to consider any "particular circumstances" on which unidentified SSJC Members may claim an as-applied challenge.

As to Rabbi Shapiro, Plaintiffs suggest that this Court erred by "employ[ing] a pre-*Bruen* framework that required a party raising an as-applied Second Amendment challenge to 'establish … that his [particular prohibitor] is insufficient to justify the challenged regulation of Second Amendment rights.'" ECF 39-1 at 7-8. Plaintiffs' argument ignores the context of this Court's legally correct determination that "Rabbi Shapiro's current as-applied challenge fails." ECF 35 at 43. This Court began by noting that "it is not clear that [Rabbi Shapiro] has properly asserted an as-applied challenge." *Id*. at 42. Specifically, Rabbi Shapiro did not "*identify* the particular reason he is prohibited that he claims is insufficient." *Id*. (emphasis added). Thus, Rabbi Shapiro failed even to mount an as-applied challenge to any Buffer Zones because, on the argument made before the Court on the Injunction Motion, "he is like any other licensed gun carrier." *Id*. In other words, there is no "particular circumstance" presented by Rabbi Shapiro on which any as-applied challenge conceivably could be made. Having failed to assert an as-applied challenge at all, there was no improper burden shifting here, because Rabbi Shapiro's unarticulated as-applied "challenge" never even got that far. Plaintiffs' discussion about burdens (ECF 39-1 at 6-8)—correct or not—is a red herring.[4]

---

[4] The interplay between the *Bruen* two-step analysis and the burdens on facial and as-applied challenges is far from clear. Plaintiffs posit that the post-*Bruen* "burden allocation does not shift depending on whether a challenge is facial or as-applied, or on whether the plaintiff seeks preliminary or permanent relief." ECF 39-1 at 6. Plaintiffs' argument, however, cannot be reconciled with a plaintiff's uncontroverted burden in raising a facial challenge, which is to "show that there is no set of circumstances in which the law can be applied constitutionally." ECF 35 at 16. Taking Plaintiffs' current argument to its logical conclusion, both facial and as-applied challenges would simply collapse into the two-step *Bruen* analysis, where there would be no facial

Far from being "dead wrong" (*U.S. Tobacco Coop.*, 899 F.3d at 258) and requiring amendment, this Court's approach is consistent with the Ninth Circuit's rejection "as illogical" of a similar argument made in *Wolford v. Lopez*, 116 F.4th 959 (9th Cir. 2024), upon which Plaintiffs relied in their Injunction Motion. *See* ECF 5-1 at 8, 10. There, the Ninth Circuit rejected the argument that sensitive place bans are invalid because "there is no national historical tradition of banning the carry of firearms by those who have concealed-carry permits." *Wolford*, 116 F.4th at 981. The Court reasoned as follows:

> The issue in this case concerns categories of property, not categories of people. If a particular place is a "sensitive place" such that firearms may be banned, then firearms may be banned—for everyone, including permit holders—consistent with the Second Amendment. The Nation also has a tradition of requiring concealed-carry permits, as *Bruen* recognized, and that tradition is an additional permissible restraint on the carry of firearms. But just because a person has qualified for a concealed-carry permit does not give that person the right to carry at a banned location. Persons in California or Hawaii need a permit to carry a concealed weapon; that Plaintiffs have permits does not affect the constitutional analysis as to whether those States may ban the carry of firearms at specific locations like schools and government buildings.

*Id*. (citations omitted, cleaned up, underline in original). Here, and as more fully explained below, United States Supreme Court and Fourth Circuit precedent establish that bans are constitutional under the Second Amendment in schools and parks, as sensitive places. It would be nonsensical to require Defendants to then take an additional step to "show a historical tradition of restricting permit holders from carrying a firearm near any of the relevant places of public assembly" (ECF 39-1 at 6), when no legal authority requires Defendants to do so.

---

challenge burden whatsoever on a plaintiff. Plaintiffs, however, cite no authority for such a proposition, and correspondingly do not suggest that a post-*Bruen* plaintiff does not bear an affirmative burden in a facial challenge. By extension, their current argument on an as-applied challenge also must be rejected.

3. *Plaintiffs are not likely to succeed on the merits that Buffer Zones surrounding schools and parks are unconstitutional.*[5]

Plaintiffs' suggestion that "Defendants cannot carry their burden with respect to the 100-yard-Rule's application" (ECF 39-1 at 9) defies United States Supreme Court and Fourth Circuit precedent that schools and parks—and by association, the Buffer Zones surrounding them—are "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 30 (2022).

*Bruen* itself "assume[d] it settled" that schools are among "'sensitive places where arms carrying could be prohibited consistent with the Second Amendment.'" 597 U.S. at 30. Citing *Kipke v. Moore*, 165 F.4th 194 (4th Cir. 2026), this Court correctly observed that "[t]he Fourth Circuit has 'adopted the Supreme Court's dicta as to schools' and determined that schools are sensitive places." ECF 35 at 40. Plaintiffs "do not challenge the County's ban with respect to school grounds." ECF 39-1 at 14. Similarly, in *Kipke*, the Fourth Circuit "join[ed] the reasoning of the Second and Ninth Circuits" to hold that a prohibition "on carrying guns in urban public

[5] For the reasons stated in their Opposition to Plaintiffs' Motion for Temporary Restraining Order or Preliminary Injunction, Defendants maintain that the historical analogues cited therein are sufficient to justify the inclusion of places of worship as a place of public assembly at which firearms may be banned, consistent with the sensitive places doctrine. *See* ECF 26-1 at 23-25. Defendants respectfully disagree with this Court's assessment of the impact of the Eleventh Circuit's decision in *Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108 (11th Cir. 2025) on Judge Chuang's acceptance of the same analogues to decide that a ban of firearms in places of worship likely is constitutional. *See Maryland Shall Issue, Inc. v. Montgomery County, Maryland*, 680 F. Supp. 3d 567, 584-85 (D. Md. 2023). Among other things, despite the Eleventh Circuit's "reli[ance] on sources from the Founding era to interpret the Bill of Rights, including the Second Amendment" (*Bondi*, 133 F.4th at 1116), the United States Supreme Court to date has not decided "'whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868' or when the Bill of Rights was ratified in 1791." *United States v. Hemani*, 608 U.S. 772, 783, n.3 (2026), nor has it precluded reliance on Reconstruction Era analogues. Nonetheless, Defendants respect this Court's decision as a preliminary, interlocutory determination, and will present their analogues and argument thereon during the ultimate adjudication of the claims here on their merits. Without waiving those arguments, Defendants therefore do not oppose Plaintiffs' request for preliminary injunctive relief as to the Buffer Zone specifically surrounding SSJC.

parks is constitutional." 165 F.4th at 214. Notably, courts—including the Fourth Circuit—that have examined the issue have determined that "'as soon as modern parks arose, municipalities and states enacted laws prohibiting the carrying of firearms into parks.'" *Id*. (citing *Wolford*, 116 F.4th at 982).

Moreover, the Fourth Circuit has held that the zone around a sensitive place is "analogous to" the sensitive place itself and therefore is "considered sensitive for the same reasons [the sensitive place is] considered sensitive." *Kipke*, 165 F.4th at 212. Given the weight of these authorities, there is no need to further examine historical analogues specific to buffer zones. Indeed, on that basis, this Court was correct to determine that the Buffer Zones around schools comprise "[o]ne likely constitutional application under Section 57-11(a)." ECF 35 at 40.

Even assuming, *arguendo*, some separate buffer zone analysis is required, there are ample historical analogues to satisfy any arguable burden Defendants have on a preliminary injunction:

Maryland prohibited guns within one mile of polling places, recognized by *Bruen* as a sensitive area, on election days in Calvert County (1886 and 1888) and in Kent, Queen Anne's, and Montgomery Counties (1874). *See* 1886 Md. Laws 315, ch. 189, § 1 (Ex. 1); John Prentiss Poe, Maryland Code: Public Local Laws, Adopted by the General Assembly of Maryland, March 14, 1888, at 604 § 71 (1888) (Ex. 2); 1874 Md. Laws 366, ch. 250, § 1 (Ex. 3). Louisiana in 1870 similarly prohibited guns on within "one-half mile of any place of registration" for elections. *See* 1870 La. Acts 159-160, no. 100, § 73 (Ex. 4).

To protect water fowl, Somerset County in 1837 banned guns in or within 50 yards of any water fowl blind on Smith Island. *See* 1837 Md. Acts Ch. 100, An Act for the Preservation of Wild Fowl in the Waters of Smith's Island and its Vicinity, in Somerset County, §§ 1-2 (Ex. 5).

Many localities (Philadelphia; St. Paul; Pittsburgh; Reading, Pennsylvania; Trenton, New Jersey) banned guns within 50 or 100 yards of their parks, squares, or common areas. *See* Pa. – General Assembly, P.L. 1083, No. 1020, A Supplement to An Act appropriating ground for public purposes in the city of Philadelphia § 21.2 (1867) (prohibiting the carry of firearms or shooting at birds in the park or "within 50 yards thereof") (Ex. 6); Acts of Assembly Relating to Fairmount Park (Philadelphia, PA) § 21(II) (1870) (prohibiting the carry of fire-arms or shooting birds in the Fairmount Park in Philadelphia, or "within fifty yards thereof") (Ex. 7); Annual Reports of the City Officers and City Boards of the City of Saint Paul, for the Fiscal Year Ending December 31, 1888, at 689 (prohibiting the carry of firearms of shooting birds in any park or "within fifty yards thereof") (Ex. 8); A Digest of the Acts of Assembly Relating to and the General Ordinances of the City of Pittsburgh, from 1804 to Jan. 1, 1897, Ordinances–Executive Departments, Bureau of Parks (1893) (prohibiting firearms "within the limits of parks or within one hundred yards thereof") (Ex. 9); A Digest of the Laws and Ordinances for the Government of the Municipal Corporation of the City of Reading, Pa., Park Rules and Regulations, 240 (1897) (prohibiting carry of firearms "in the common, or within fifty yards thereof") (Ex. 10); City of Trenton, N.J., Charter and Ordinances 390, An Ordinance providing for the government and protection of public parks and squares of the city of Trenton (1903) (prohibiting the carry firearms or shooting birds "in said park or squares, or within fifty yards thereof") (Ex. 11).

New Mexico, when it was still a Territory,[6] prohibited the unlawful brandishing of a weapon within a "settlement," defined to mean "any point within three hundred yards of any

[6] *See* Andrew Willinger, *Territorial Gun Regulation and the "Lost" History of the Federal Second Amendment*, Duke Center for Firearms Law Blog (August 8, 2022) https://firearmslaw.duke.edu/2022/08/territorial-gun regulation-and-the-lost-history-of-thefederal-second-amendment/ (arguing the Second Amendment has always applied in territories, and historical territorial laws should be given weight despite *Bruen* court's discount of same).

inhabited house." *See* 1887 N.M. Laws 56, An Act to Prohibit the Unlawful Carrying and Use of Deadly Weapons, ch. 30, § 4; An Act to Prohibit the Unlawful Carrying and Use of Deadly Weapons, Feb. 18, 1887, reprinted in Acts of the Legislative Assembly of the Territory of New Mexico, Twenty-Seventh Session 55 (1887) (Ex. 12).

The concealed carry of weapons could not occur within two miles of a university, college, or school in Mississippi in 1892. R. H. Thompson, *The Annotated Code of the General Statute Laws of the State of Mississippi* 327, § 1030 (1892) (Ex. 13). And Connecticut in 1859 banned the sale of liquor "within one mile of any military parade-ground, muster-field, or encampment." *See* 1859 Conn. Acts 62, An Act in Addition to and in Alteration of "An Act For Forming And Conducting The Military Force," chap. 82, § 5 (Ex. 14).

These historical laws are sufficient because they "further presumptively valid restrictions on the right to self-defense in the area immediately adjacent to such locations for purposes of public safety and [ ] allow the activity at issue, such as voting or the education of children, to occur without concern for violence or other interruption. They are therefore 'comparably justified' to Section 57-11's 100-yard buffer zone." *Maryland Shall Issue*, 680 F. Supp. 3d at 590.

**B. Neither Reconsideration Nor Injunctive Relief Is Warranted Based On Plaintiffs' Free Exercise Challenge To The 100-Yard Rule.**

Similar to their Second Amendment argument, the "errors" Plaintiffs would have this Court review in its First Amendment analysis are nothing more than new arguments never presented in their Injunction Motion. Plaintiffs may not use the Motion in such fashion. *See, e.g.*, *Kimberly B. v. Kijakazi*, Civil Action No. TJS-20-2877, 2022 WL 748097, at *1 (D. Md. Mar. 11, 2022) (quotation marks and citation omitted) (A motion for reconsideration "may not be used … to raise arguments[,] or present evidence that could have been raised prior to the entry of judgment."); *see also Minter v. Wells Fargo Bank, N.A.*, No. CIV.A. WMN-07-3442, 2013 WL 4603006, at *3 (D.

Md. Aug. 28, 2013), *aff'd*, 762 F.3d 339, 2014 WL 3827671 (4th Cir. 2014) ("Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple.") (internal citation and quotations omitted); *United States v. McKenzie*, No. 22-6658, 2023 WL 418447, at *1 (4th Cir. Jan. 26, 2023) ("[M]otions for reconsideration may not be used to revisit issues already addressed or advance arguments that could have been raised earlier.").

Stripped of the new contentions, Plaintiffs' Free Exercise arguments are reduced to nothing more than their disagreement with the Court's conclusion that, whatever burden it may place on religious exercise, the 100-Yard Rule is neutral and generally applicable. To constitute error of the nature warranting reconsideration, there must be more than "mere disagreement." *Williams v. Fontanez*, Civil Action No. GLR-22-1882, 2023 WL 8174323, at *1 (D. Md. June 5, 2023) (internal citation and quotations omitted). Plaintiffs' new arguments therefore are not properly before this Court. In any event, they supply no basis for reconsideration of this Court's ruling on the propriety of the 100-Yard Rule.

1. *The 100-Yard Rule is generally applicable.* [7]

Plaintiffs first fault the Court for failing to "consider relevant comparators" in finding the 100-Yard Rule generally applicable. ECF 39-1 at 1. Specifically, Plaintiffs insist that this Court

---

[7] Defendants do not concede that § 57-11(a) burdens Plaintiffs' religious exercise. In opposing the Injunction Motion, Defendants argued that Bill 23-26E "prevents no one from praying, attending synagogue, or observing any particular tenet of Jewish law or religious practice, including an obligation to defend oneself and one's community"; that it "regulates only the instrumentality Plaintiffs wish to use for doing so"; and that Plaintiffs had "failed to tether" the carrying of firearms "to any religious command." ECF 26-1 at 15. This Court read that argument as challenging "not . . . the sincerity of SSJC and Rabbi Shapiro's beliefs regarding armed worship but their truth," and found a burden. ECF 35 at 48; *see id.* at 45–48. Defendants respectfully maintain that their argument never questioned the truth of any tenet of Jewish law. It asked whether Plaintiffs' professed obligation of self-defense in fact requires them to carry a firearm, and that question goes to sincerity, not truth. In deference to the Court's preliminary ruling, Defendants do not relitigate the issue here, but simply preserve it for further inquiry on the merits.

should have asked whether the transportation exception in § 57-11(b)(6)(B) undermines the County's interest in preventing gun violence "in a similar way that allowing Rabbi Shapiro or SSJC's members to walk past certain locations with a firearm on their way to synagogue would." ECF 39-1 at 18–19. That premise is false, because this Court did not overlook the vehicle exception, but rather expressly addressed it:

> Because Rabbi Shapiro must walk to the synagogue on certain days, and thus cannot avail himself of the provisions in Section 57-10—which allows vehicle transportation of firearms even within 100 yards of a place of assembly and is a part of the Code that Plaintiffs do not challenge—he contends that the buffer zones for other places of public assembly suffer from the same constitutional infirmities as the ban on firearm possession within a place of worship. That does not necessarily follow.

ECF 35 at 55. The Court thus identified the vehicle carve-out, recognized the inference Plaintiffs sought to draw from it, and affirmatively declined to make that leap. That the Court cited § 57-10 while Plaintiffs now cite § 57-11(b)(6) (*see* ECF 39-1 at 19), changes nothing; the carve-out language is the same. And the Court correctly observed that Plaintiffs did not challenge that provision—a challenge they now attempt indirectly and belatedly to mount, by recasting an unchallenged exception as a Free Exercise comparator.

What Plaintiffs actually seek is to stretch their "wide range of secular activities" (ECF 5-1 at 15) argument in a new direction. For the first time, they compare motorists using the transportation exception with pedestrians like themselves on days they may not use vehicles. *See* ECF 39-1 at 19. To the extent this Court did not run a full analysis treating motorists as the comparable secular class, that is not a proper ground for reconsideration, because Plaintiffs never offered motorists as a comparator. *See Kimberly B.*, 2022 WL 748097, at *1 (a motion for reconsideration "may not be used … to raise arguments[,] . . . that could have been raised [initially]") (quotation marks and citation omitted).

Plaintiffs' own filings confirm the point. In the Injunction Motion, Plaintiffs identified the relevant comparators as "private property owners generally, including but not limited to secular clubs and the proprietors of secular businesses." ECF 5-1 at 15. In their Reply, they added more locations. *See* ECF 29 at 11 ("Because EB23-26 treats most comparable secular entities—*e.g.*, restaurants, fraternal lodges, and stores—better than houses of worship, it is neither generally applicable nor neutral.").[8] Nowhere in either filing did Plaintiffs suggest that motorists traveling under the vehicle exception are comparable to pedestrians walking to synagogue. A comparison Plaintiffs never proposed is not one the Court erred in declining to draw.

Nor does the comparison succeed on the merits.[9] Plaintiffs contend that "[t]he vehicle exception undermines Montgomery County's asserted interest in preventing gun violence more than permitting congregants to walk with their firearms would." ECF 39-1 at 19. In their telling, a vehicle occupant "is only a few feet from where a pedestrian on the sidewalk would be"; "an assailant with a gun hidden in their car is less visible than an individual peacefully walking on the street"; and "the assailant in a car has an easier time escaping after committing an act of violence, making it more likely that an assault takes place from a car than from the sidewalk." *Id.* at 19. From this, Plaintiffs conclude that the County "permits secular conduct that is far more likely to

[8] Each of these comparators targeted the in-premises ban on firearms in places of worship, not the 100-Yard Rule. This Court analyzed them exactly that way: it considered Plaintiffs' "private property owners generally" and Reply comparators arguments in addressing the places-of-worship ban, and accepted the fraternal-lodge comparator because private owners, unlike places of worship, may "decide for themselves whether to allow firearms on the premises." ECF 35 at 50–52. None of the comparators clearly addressed the 100-Yard Rule, and none certainly involved driving or walking. Plaintiffs' motorist comparison is newly presented here, and thus not properly before the Court on reconsideration.

[9] The Rule is also neutral, and this Court so held. *See* ECF 35 at 55 ("The claim regarding all buffer zones, however, fails at this stage . . . A different provision is at work—one that applies to all designated places of public assembly. The 100-yard restriction is a neutral and generally applied provision and only a rational basis must be shown."). Plaintiffs take no issue with that holding. *See* ECF 39-1 at 18–20 (challenging only general applicability of the Rule).

enable gun violence than Plaintiffs' religious exercise of walking to synagogue ever would." *Id.* at 19–20.

The governing test refutes that conclusion. As Plaintiffs acknowledge, "[w]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." ECF 39-1 at 18 (quoting *Tandon v. Newsom*, 593 U.S. 61, 62 (2021)). The pertinent interests here are those this Court and Judge Chuang have already identified: "prevent[ing] gun violence" and "address[ing] possible gun violence in or near places of public assembly." *See* ECF 35 at 37 (quoting *Maryland Shall Issue*, 680 F. Supp. 3d at 587); *see also id*. at 50 ("The latter half of this statement arguably frames the amendments to Section 57-1 as 'a solution to prevent gun violence.'"). Plaintiffs have accepted this framing. *See* ECF 39-1 at 18. The question, then, is whether driving through a buffer zone undermines the County's interest in preventing gun violence near places of public assembly "in a similar way" as walking through it. *Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021). It does not.

Plaintiffs' hypothetical about individuals in vehicles (ECF 39-1 at 19) answers the wrong question. The secular conduct the exception permits is lawful carriage, not an assault launched from a car. A criminal bent on violence is not exercising the vehicle exception, and the risk he poses has no bearing on whether the exempted activity undermines the County's interest in a way similar to pedestrian carry. Plaintiffs' remaining point—that a motorist travels "the exact same streets" and sits "only a few feet" from the sidewalk, ECF 39-1 at 19—rests on location, not risk. But comparability under *Tandon* is judged against the risk each activity poses to the government's interest, not against where each activity occurs on a map. *See Tandon*, 593 U.S. at 62 ("Comparability is concerned with the risks various activities pose[.]").

Measured against the County's interests, the two activities—driving and walking within the buffer zones—differ in three material respects. The most immediate difference lies in how readily the firearm can be used: Clause (A) of the exception covers a firearm "locked in a container." A secured firearm inside a passing vehicle cannot readily be drawn or used at the sensitive place, which is not the case for a pedestrian's holstered handgun. *See* § 57-11(b)(6)(A); *see also* § 57-10(1)-(2).[10] Additionally, the time each carrier spends in the protected zone differs sharply. A vehicle on a public roadway passes through a 100-yard zone in moments, whereas a pedestrian moves through the same zone at walking pace and can stop, wait, or linger beside the school, park, or place of worship the Buffer Zones protect. Because exposure is a function of time, the pedestrian remains in the protected area far longer. And that prolonged presence occurs in the very space the Buffer Zones exist to protect. The 100-Yard Rule protects places where people gather on foot: children arriving at school, families in parks, congregants walking to services. An armed pedestrian shares the sidewalks, crosswalks, and entrances those people use; a vehicle occupant moving through the County does not. The 100-Yard Rule targets armed presence among the protected population, and pedestrian carry produces that presence in a way vehicle transit does not. Vehicle transit does not undermine either the County's interest or its province to ensure public safety and to seek to prevent gun violence near places of public assembly "in a similar way" as pedestrian carry. The vehicle exemption therefore is not a comparable secular activity and does not disturb the Court's holding that the Rule is generally applicable.

Plaintiffs next contend that the 100-Yard Rule permits firearms to be transported within 100 yards of locations that are not defined as places of public assembly but "bear similar

---

[10] That difference is strongest as to Clause (A); because Clause (B) permits a permit holder to carry a handgun on his person while in the vehicle, the accessibility point does not reach that clause with the same force, and the County does not claim otherwise. The remaining two differences, however, apply to both clauses.

characteristics to covered locations," such as fraternal lodges, and that this "means the law is not generally applicable." ECF 39-1 at 20. This argument suffers the same procedural defect as the first. Plaintiffs invoked the comparable secular entities' argument in their Preliminary Injunction Motion only against the in-premises ban on places of worship.[11] Now, for the first time they impermissibly seek to expand it. *See supra* at 15. Analyzed substantively, the argument also fails on its own terms. This Court accepted the fraternal-lodge comparator for the in-premises ban because, under Chapter 57, private property owners, including those of fraternal lodges, "have the latitude to 'to decide for themselves whether to allow firearms on the premises while denying the same autonomy to places of worship.'" ECF 35 at 52 (quoting *Antonyuk v. Chiumento*, 89 F.4th 271, 350 (2d Cir. 2023), *cert. granted, judgment vacated sub nom. Antonyuk v. James*, 144 S. Ct. 2709, 219 L. Ed. 2d 1315 (2024), *and reinstated in part by Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024)). The defect this Court identified, in other words, was a disparity in owner autonomy: Chapter 57 let a lodge decide whether to permit firearms on its own premises and denied a synagogue that same choice over its own premises. *See id*. That disparity has no counterpart under the 100-Yard Rule: it reaches public and private property that lies beyond the premises of every place of public assembly, regardless of religion or absence thereof. Thus, the operative line is between places of public assembly and undesignated places, not between religious and secular conduct. This presents no Free Exercise problem. Plaintiffs identify no secular pedestrian who may carry within 100 yards of a covered place while Rabbi Shapiro or SSJC's congregants may

[11] *See* ECF 5-1 at 15 ("Here the Ban is not generally applicable: it specifically targets **carrying firearms in places of religious worship** while allowing the possession of firearms by people engaged in a wide range of secular activities… the County does treat comparable secular activities more favorably: private property owners generally, including but not limited to secular clubs and the proprietors of secular businesses, may allow any person licensed **to carry a firearm to do so on their premises**) (emphasis added); *see generally* ECF 29 at 11 (cabining general applicability argument to "EB23-26['s] treat[ment] of most comparable secular entities, *e.g.*, restaurants, fraternal lodges, and stores—better than houses of worship[.]").

not. Their real objection is to which locations are defined as places of public assembly. Those locations, however, extend well beyond places of worship to a broad range of sensitive places, and the Rule applies to every one of them alike. ECF 35 at 55.

2. *The 100-Yard Rule does not fail strict scrutiny*.

This Court determined that "[t]he 100-yard restriction is a neutral and generally applied provision and only a rational basis must be shown." ECF 35 at 55. Applying that standard, the Court found that Rabbi Shapiro "has not even attempted to show that rational basis is lacking," and noted Plaintiffs' concession that the County's interest "in protecting people from violence" is "a compelling interest." *Id.* at 56 (quoting ECF 5 at 20). Plaintiffs still offer no argument as to how the Rule fails rational basis review, or how a rule that limits carrying firearms within 100 yards of parks, schools, libraries, government buildings, polling places, courthouses, and places of worship is not rationally related to preventing gun violence near those places.

Plaintiffs again here make new arguments not raised previously. Specifically, Plaintiffs take issue with tailoring, arguing that the Rule is "underinclusive" because it "leav[es] appreciable damage to [the County's] interest unprohibited," *id.* (quoting *Cahaly v. Larosa*, 796 F.3d 399, 405 (4th Cir. 2015)), and that "less restrictive alternatives abound." ECF 39-1 at 22. None of these arguments were advanced in Plaintiffs' injunction filings. Their sole tailoring argument below concerned places of worship (*see* ECF 5-1 at 16), while their Reply baldly asserted only that the County had made "no attempt to meet [its] burden under strict scrutiny." ECF 35 at 53 (quoting ECF 29 at 11).

Even assuming, *arguendo*, this Court deems it necessary further to address these arguments, they supply no basis to revisit this Court's rational basis holding. Pertaining to underinclusivity, Plaintiffs identify two categories of "unprohibited conduct": carrying "within

100 yards of defined places of public assembly if they are in a car," and carrying, "whether walking or driving," within 100 yards of "other locations that bear materially identical characteristics and risks for violence as defined places of public assembly." ECF 39-1 at 21. Both, they allege, "pose at least the same risk of gun violence as permitting peaceable pedestrians to walk past another church on their way to synagogue." *Id.* That argument conflates two distinct inquiries. Underinclusiveness is a tailoring concept that is relevant only once strict scrutiny applies. *See, e.g.*, *Cahaly*, 796 F.3d at 405 (evaluating whether statute was underinclusive only after determining that strict scrutiny applied). By contrast, the concept of general applicability is concerned only with whether the law "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." ECF 35 at 48 (quoting *Fulton*, 593 U.S. at 534). A law may leave some risks unregulated and remain generally applicable, so long as it leaves them unregulated for religious and secular actors alike. "If the law makes no distinction between action based on religious conviction and action based on secular views, it is a generally applicable law[.]" *Hines v. S.C. Dep't of Corr.*, 148 F.3d 353, 357 (4th Cir. 1998). The 100-Yard Rule draws no such distinction. Every exemption and omission Plaintiffs identify is available to religious and secular actors on identical terms. *See supra* at Section III.B.1.

Plaintiffs' "alternatives" argument fares no better. Plaintiffs contend that "less restrictive alternatives abound," pointing to Maryland's criminal sensitive-places statute, which "does not have a buffer zone requirement"; buffer-zone ordinances in Baltimore and Prince George's County with exemptions "for permit holders" or "for unloaded firearms"; and the federal Gun-Free School Zones Act's exemption for state-licensed carriers. ECF 39-1 at 22 (citing Md. Code Ann., Crim. Law § 4-111; Balt., Md., Code art. 19, § 59-5(b), (d); Prince George Cnty., Md., Code § 14-140; 18 U.S.C. § 922(q)(2)(B)(ii)). From the existence of those regimes, Plaintiffs infer that the County

"could satisfy its security concerns through a means less restrictive" and "must, at a minimum, offer persuasive reasons why it believes that it must take a different course." *Id.* at 22–23. But by Plaintiffs' own formulation, the County must adopt a less restrictive alternative only if that alternative "would serve the Government's purpose." *Id.* at 22. The purpose here is specific: "address[ing] possible gun violence [ ] near places of public assembly." ECF 35 at 37. An alternative that does not serve that defined government purpose is not a less restrictive means of achieving it; it is an abandonment of it.

Examined under that lens, each of Plaintiffs' alternatives fail. *First*, by Plaintiffs' own description, § 4-111 "does not have a buffer zone requirement." ECF 39-1 at 22. A statute that regulates only the designated areas themselves does nothing to address gun violence *near* them, which is the precise risk the 100-Yard Rule targets. A law that does not reach the 100-yard zone cannot serve an interest defined by that zone. *Second*, the County already accommodates firearms that are secured and cannot readily be used: it exempts any firearm "locked in a container" in a motor vehicle. § 57-11(b)(6)(A). Prince George's County's exemption for unloaded firearms reflects a neighboring jurisdiction's different judgment about where to draw that line. It does not show that the County's line fails to serve its interest, much less that the County could protect schools, parks, and places of worship equally well by permitting pedestrians to carry firearms beside them. *Third*, the federal exemption for state licensees belongs to a statute that restricts firearms within 1,000 feet of schools. ECF 39-1 at 13–14; 22. Congress's judgment about the reach of a federal prohibition covering more than three times the Rule's radius says nothing about whether a 100-yard local buffer around a defined set of County locations is more restrictive than necessary to serve the County's interest. Finally, Plaintiffs' premise that other jurisdictions'

regimes oblige the County to justify its own, ECF 39-1 at 22–23, has force only under strict scrutiny, and strict scrutiny does not apply. The Court need look no further.

**C. Plaintiffs Fail To Establish The Remaining Prongs Of Injunctive Relief.**

Defendants fully briefed the remaining prongs of injunctive relief—lack of irreparable harm, the balance of the equities, and the public interest—in their Opposition to Plaintiffs' Injunction Motion. *See* ECF 26-1 at 27-29. Those same arguments—which Defendants incorporate by this express reference—weigh against imposition of any broader injunction pending appeal.

The Preliminary Injunction issued by this Court only strengthens those arguments. It not only already decided that Plaintiffs are not likely to succeed on the merits of their challenge to the 100-Yard Rule, it also vastly reduces—if not eliminates—any arguable irreparable harm that Plaintiffs suggest they continue to suffer. Plaintiffs' delay in filing their current Motion—along with their failure to seek any expediting of its consideration—shows the lack of emergency in the issue they now raise. Further injunctive relief—pending appeal or otherwise—should be denied.

Respectfully submitted,

JOHN P. MARKOVS
COUNTY ATTORNEY

By: /s/ Jeffrey M. Schwaber

Jeffrey M. Schwaber (Bar ID #06095)
jschwaber@steinsperling.com
(301) 354-8110 (facsimile)
Deanna L. Peters (Bar ID #15674)
dpeters@steinsperling.com
(301) 354-8131 (facsimile)
STEIN SPERLING BENNETT
DE JONG DRISCOLL PC
1101 Wootton Parkway, Suite 700
Rockville, Maryland 20852
(301) 340-2020

and

/s/ Erin J. Ashbarry

Erin J. Ashbarry (Bar ID #26298)
Chief, Division of Government Operations
erin.ashbarry@montgomerycountymd.gov
Office of the County Attorney
101 Monroe Street, Third Floor
Rockville, Maryland 20850
Tel: (240) 777-6700
Fax: (240) 777-6705

*Attorneys for Defendants, Montgomery County, Maryland, Marc Elrich, & Darren Francke*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 8th day of October, 2026, a copy of the foregoing was sent to all counsel of record via CM/ECF.

/s/ Jeffrey M. Schwaber

Jeffrey M. Schwaber (Bar ID #06095)