**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | | |
|---|---|---|
| Silver Spring Jewish Center, Inc., *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | Civil Action No. 8:26-cv-02963-DKC |
| | ) | |
| v. | ) | |
| | ) | |
| Montgomery County, Maryland, *et al.*, | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**REPLY IN SUPPORT OF MOTION TO AMEND JUDGMENT, OR IN THE ALTERNATIVE, FOR INJUNCTION PENDING APPEAL**

Defendants' opposition rests on a premise the record refutes: that Plaintiffs never challenged the 100-yard rule as applied to their walk to synagogue. Plaintiffs pleaded that challenge, supported it with sworn evidence, pressed it at the hearing at the Court's invitation, and obtained a ruling on it. On the merits, Defendants defend the Court's pre-*Bruen* standard rather than meet the burden *Bruen* places on them, and the historical laws they now offer for the first time do not support restricting licensed carry past a school, park, or house of worship. Defendants also no longer oppose relief within the zone surrounding Silver Spring Jewish Center ("SSJC") itself, which makes one more of several reasons why the 100-yard rule is not generally applicable in violation of the Free Exercise Clause as applied to Plaintiffs.

## ARGUMENT

### I. Plaintiffs Sought Both Facial and As-Applied Relief in Their Second Amendment Challenge to the 100-Yard Rule

Defendants contend that Plaintiffs now "try to recast" a facial challenge to the 100-yard rule as an as-applied one. Dkt. 45 ("Opp.") 1, 5–7. Not so. Plaintiffs pleaded the as-applied challenge, supported it with sworn evidence, pressed it at the hearing at the Court's invitation, and obtained a ruling on it. And the facial/as-applied label goes to the breadth of the remedy; it does not bar a court from granting narrower relief within a broader request.

#### A. Plaintiffs Raised the As-Applied Challenge in Their Papers

The Complaint alleges that the only path between Rabbi Shapiro's home and his synagogue passes within 100 yards of nine places of public assembly, so that he "cannot carry a firearm while walking to his synagogue," Dkt. 1 ("Compl.") ¶¶ 41–42; alleges the same burden on SSJC's members, *id.* ¶ 55; and seeks a declaration that the rule is unconstitutional "on its face and as applied," *id.*, Prayer for Relief ¶ C. Defendants say the Complaint "was not before this Court," Opp. 5, but the Plaintiffs' memorandum presented the same circumstances. It defined "the Ban"

to include the 100-yard rule, Dkt. 5-1 ("PI Mem.") 2; set out Rabbi Shapiro's route from his sworn declaration, *id.* at 5; and argued—in the very paragraph Defendants quote for their reference to the right to carry "at all," Opp. 6—that the rule "makes it impossible for Plaintiff Shapiro to walk to his synagogue while armed," PI Mem. 11–12. "An as-applied challenge is one which depends on the identity or circumstances of the plaintiff." *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 204 (4th Cir. 2022). The motion put those circumstances in play.

Plaintiffs' proposed order, it is true, was not confined to that walk; it asked the Court to enjoin the 100-yard rule as to Plaintiffs generally. Dkt. 5-5 ("Proposed Order") 1–2. The request thus had "characteristics of both" kinds of challenge: it did not seek to invalidate the rule in all applications, but it reached beyond the particular circumstances on which Plaintiffs' as-applied challenge rests. *Doe v. Reed*, 561 U.S. 186, 194 (2010). Plaintiffs thus had to "satisfy [the] standards for a facial challenge to the extent of that reach." *Id.* But it does not follow that a plaintiff who fails to justify the broader reach forfeits the narrower. The Court's treatment of places of worship shows as much. The proposed order sought relief for any firearm "in a place of worship," Proposed Order at 2, but the Court granted narrower relief—handguns only, in Plaintiffs' "respective places of worship." Order 2. Plaintiffs ask the same here: grant, within the broader relief requested, the narrower relief the particular circumstances support.

It makes no difference that Plaintiffs' motion argued broadly that the government could not justify the 100-yard rule. *See* PI Mem. 11; Opp. 8. Plaintiffs were not obligated to address historical analogues to bans on firearms in places of worship, parks, and schools—i.e., the places relevant to their as-applied challenge—both because *Bruen* does not place that obligation upon them and because, as the briefing on the merits shows, no relevant analogues exist. The preliminary-

injunction briefing lacks any discussion of analogues that would be specifically relevant to Plaintiffs' as-applied challenge only because Defendants did not attempt to offer any.

In discussing their burden, Defendants say they do not have to "show a historical tradition of restricting permit holders [in particular] from carrying a firearm near any of the relevant places of public assembly," citing the Ninth Circuit's rejection of that premise in *Wolford v. Lopez*, 116 F.4th 959, 981 (9th Cir. 2024). Opp. 9. There is no need for this Court to reach that question, however, because, as discussed below, Defendants have failed to show a historical tradition of prohibiting *any* law-abiding persons from carrying near any of the relevant places.

**B. Plaintiffs Argued the As-Applied Challenge at the Hearing, at the Court's Invitation**

The hearing confirms the point. Before argument began, the Court asked the parties to specify the type of challenge at issue and noted that Judge Chuang had not addressed "the impact on a person passing by a sensitive place on foot." Tr. 13:18–14:6. Plaintiffs' counsel responded:

> Certainly the ban on places of worship generally is a facial challenge. The 100-yard rule challenge may also be as-applied in as much as there are details about how this particularly affects the synagogue's members and Rabbi Shapiro in their ability to walk to the synagogue while armed, as their religious beliefs require.

Tr. 77:5–10. Defendants quote only the fragment "[t]he 100-yard rule challenge may also be as-applied," Opp. 6, omitting the remainder, which describes the challenge Plaintiffs press. The Court then asked counsel to consider "enjoining enforcement within a hundred yards of a different … place of assembly while … on the way to a place of worship." Tr. 83:21–84:1. And on rebuttal, where Defendants extract a single sentence, Opp. 6, the Court returned to the point:

> THE COURT: … [Y]ou are only asking me to grant relief for the synagogue and this plaintiff, your co-plaintiff here.
>
> MR. HUEBERT: That's right. The synagogue's members and our co-plaintiff.
>
> THE COURT: Yeah, their walk toward the place of worship. …
>
> THE COURT: For purposes of preliminary injunctive relie[f], or TRO at this point, it would -- your most pressing need is the trip from home to place of worship.

> MR. HUEBERT: I agree with that. We've asked for broader relief. … But, of course, the relief that the Court has just suggested would certainly greatly mitigate the overall constitutional injury and address the most pressing need.

Tr. 102:15–103:10. Plaintiffs thus requested broader relief and expressly accepted the narrower relief the Court described—the relief they seek here. Dkt. 39-1 ("Mem") 24. Defendants' assertion that Plaintiffs "did not argue an as-applied challenge … at any other point during the hearing," Opp. 7, cannot be squared with the transcript.

**C. The Court Decided the As-Applied Challenge, and the Label Does Not Limit Relief**

The Court likewise understood Plaintiffs to challenge the rule as applied to their walk. It described the challenge as one to the provisions "prohibiting possession of a firearm by a licensed gun owner while walking within 100 yards of any other place of public assembly." Dkt. 35 ("Mem. Op.") 7. It recognized that Plaintiffs "purport to mount both facial and as-applied challenges." *Id.* at 15. And after rejecting the facial challenge, *id.* at 38–42, it addressed "Rabbi Shapiro's challenge, as applied, and limited to the places of public assembly along his walk" and held that it "fails." *Id.* at 42–43; *id.* at 55 ("As-Applied Challenge to Firearm Restrictions Within 100 Yards … ."). The Court's doubt whether Rabbi Shapiro had "properly asserted" that challenge rested not on failure to raise it, but on the *Lehman* test requiring him to "identify the particular reason he is prohibited," *id.* at 42–43—the error addressed in Section II.A below.

Plaintiffs therefore ask the Court to revisit a ruling it made, not to entertain "a novel legal theory." Opp. 5. The sentence Defendants quote for that phrase begins "Rule 59(e) motions may not be used," *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998); Rule 54(b), by contrast, "involves broader flexibility to revise interlocutory orders … as the litigation develops and new facts or arguments come to light," *Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017). In any event, the facial/as-applied distinction "is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case

involving a constitutional challenge"; it "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). Having concluded that Plaintiffs had not shown the rule invalid in every application, the question that remained was whether the record supports narrower relief—the question the Court itself posed at the hearing, Tr. 83:21–84:1, and the one Plaintiffs' motion revisits.

## II. THE 100-YARD RULE VIOLATES THE SECOND AMENDMENT

### A. The Court Utilized an Incorrect Standard in Considering Plaintiffs' As-Applied Second Amendment Challenge to the 100-Yard Rule

In their opening brief, Plaintiffs explained that the Court applied a pre-*Bruen* standard in analyzing the as-applied challenge to the 100-yard rule. Mem. 6–8. Defendants fail to refute that argument. Quoting the Court, they say Rabbi Shapiro "did not '*identify* the particular reason he is prohibited'"—and that this means he "failed even to mount an as-applied challenge." Opp. 8 (quoting Mem. Op. 42). But under *Bruen*, a plaintiff bringing an as-applied challenge has no duty to "identify the particular reason he is prohibited." *See id*. An as-applied challenge instead turns on whether a statute's application in *particular circumstances* violates the Second Amendment. Thus, for example, in *United States v. Hemani*, the Court applied the usual *Bruen* analysis to hold that the federal prohibition on firearm possession by unlawful drug users could not constitutionally be applied to a defendant prosecuted solely because he regularly used marijuana. 608 U.S. 772, 780, 794–95 (2026).[1]

So here the question is whether the 100-yard rule, analyzed through the *Bruen* framework, violates the Second Amendment as applied to Rabbi Shapiro's and SSJC members' walks to their synagogue (i.e., past places of worship, parks and schools)—not whether Rabbi Shapiro can

---

[1] Thus, Defendants are incorrect in asserting that, if the *Bruen* burden always rests on the government, facial and as-applied challenges "collapse." Opp. 8–9 n.4.

identify some personal characteristic that sets him apart from other licensed carriers. That Rabbi Shapiro is "like any other licensed gun carrier," Mem. Op. 43, is beside the point: an as-applied challenge may depend on the "circumstances of the plaintiff," not only his "identity," *White Coat Waste*, 35 F.4th at 204, and Rabbi Shapiro's challenge rests on the circumstances of his walk.

**B. Defendants Fail to Meet Their Burden Under *Bruen***

In their response, Defendants attempt, for the first time,[2] to meet their burden to justify the 100-yard rule with historical analogues. Their attempt fails. Defendants first say, however, that they do not need to cite historical analogues because, *Kipke v. Moore* held that "the zone around a sensitive place is 'analogous to' the sensitive place itself." Opp. 11. But that is incorrect. *Kipke* held that "*school grounds* are analogous to *school buildings*," based on specific similarities between the two. *Kipke v. Moore*, 165 F.4th 194, 212 (4th Cir. 2026) (emphases added). It neither said nor implied anything about public ways *outside* school grounds, as at issue here.

Defendants then cite supposed historical analogues—none of which suffices. First, Defendants cite various Maryland local laws and a Louisiana law that prohibited firearms near polling places. Opp. 11. These laws cannot meet Defendants' burden because they were enacted after the Fourteenth Amendment's ratification and do not pertain to areas near places of worship, parks, or schools. Defendants also misdescribe them. None of the Maryland laws imposed a one-mile restriction: the 1886 Calvert County statute applied within "three hundred yards of the polls," Dkt. 45-1, § 1; the "1888" law is simply a codification of that same statute, Dkt. 45-2, § 71; and the 1874 statute contains no distance limit at all, Dkt. 45-3, § 1. And each of these laws—like

[2] Defendants' own authority says that Rule 54(b) is "not a vessel for presenting evidence that already existed but was lacking from a party's initial submission," Opp. 3 (citing *Carlson*, 856 F.3d at 326)—yet all 14 of their exhibits far predate their PI opposition.

Louisiana's—applied only on election or registration days, unlike the rule's permanent prohibition. *See* Dkt. 45-1, § 1; Dkt. 45-3, § 1; Dkt. 45-4, § 73.

Next, Defendants cite an 1837 Maryland statute governing the waters near Smith's Island, in Somerset County, which Defendants say "banned guns in or within 50 yards of any water fowl blind on Smith Island." Opp. 11. Contrary to Defendants' description, however, the law did *not* ban the carrying of firearms for self-defense: it banned carrying a gun in an open boat within fifty yards of a hunting blind "*with intent to shoot or molest any wild fowl or fowls*." Dkt. 45-5 (1837 Md. Acts Ch. 100), § 1 (emphasis added). Although the statute deemed possession in that location to be "prima facie evidence" of the requisite intent, the law was *not* an absolute ban on firearms—by definition, "prima facie evidence" can be refuted by contradictory evidence. *See Evidence*, Black's Law Dictionary (12th ed. 2024). Moreover, in determining whether a historical law is analogous, the Court "must … consider … whether its rationale was similar to that of the new law." *Wolford v. Lopez*, 609 U.S. 185, 196 (2026). And the rationale of that law was entirely different than the law at issue here: its title makes clear that its purpose was "the preservation of Wild Fowl in the waters of Smith's Island and its vicinity." Dkt. 45-5.

Defendants next cite several nineteenth-century laws that restricted firearms near parks in various municipalities. All of these, save one, were enacted after the Fourteenth Amendment's ratification. Defendants cite a local Pennsylvania law they say was enacted in 1867 (Opp. 12), a year before the Fourteenth Amendment's ratification. The copy attached to their opposition (Dkt. 45-6), however, states that it was enacted on April 14, *1868*—just months before national ratification of the Fourteenth Amendment. (Defendants' Exhibit 7 is the same 1868 statute, reprinted in an 1870 compilation. Dkt. 45-7.) And regardless of its year of enactment, it could not

establish that such restrictions were "widespread, well-known, and widely accepted" by that time. *Wolford*, 609 U.S. at 211.

Defendants cite a New Mexico territorial law from 1887 (Opp. 12–13), but that fails for three reasons: (1) it was enacted long after the Fourteenth Amendment; (2) it was a territorial law; and, most important, (3) it *did not prohibit the carrying of firearms*. The law made it unlawful to "*draw*, *flourish*, or *discharge* a rifle, gun or pistol [in the applicable locations], except the same be done by lawful authority, *or in the lawful defense of himself, his family or his property*." Dkt. 45-12 (1887 N.M. Laws), § 4 (emphasis added). Indeed, the same statute expressly allowed "[p]ersons traveling" to "carry arms for their own protection while actually prosecuting their journey" and to "pass through settlements on their road without disarming." Dkt. 45-12, § 9.

The 1892 Mississippi law on which Defendants rely was enacted too late to be relevant and is similarly off-point. Defendants assert that, under this law, the "concealed carry of weapons could not occur within two miles of a university, college, or school." Opp. 13. That is misleading in two respects. First, the provision applied only to students, and to teachers who permitted students to carry. Dkt. 45-13, § 1030. Second, under Mississippi law, the concealed carry of the weapons at issue was prohibited *everywhere*. A section of the law on the preceding page of the statute book, not included in Defendants' exhibit, prohibited *any* concealed carry of "any bowie-knife, dirk-knife, butcher-knife, pistol, brass or metallic knuckles, slung-shot, sword or other deadly weapon of like kind or description." R.H. Thompson, *The Annotated Code of the General Statute Laws of the State of Mississippi* 326, § 1026 (*see* Ex. 1). The penalty for violation of that statute was a fine of 25 to 100 dollars, imprisonment for one to three months, or both. The section that Defendants have cited then prohibited students from carrying, bringing, receiving, owning, or having "any weapon the carrying of which concealed is prohibited"—i.e., any of the weapons listed in § 1026—

within two miles of a school and allowed a greater-than-usual penalty for student violations: a fine of up to 300 dollars, imprisonment for as long as three months, or both. Dkt. 45-13, § 1030. Thus, the Mississippi law did not restrict carrying by the general public near schools; it imposed heightened restrictions and penalties on students with respect to weapons that the public at large was already forbidden to carry concealed.

Finally, Defendants cite an 1859 Connecticut law that banned the sale of liquor within a mile of a military parade-ground, muster-field, or encampment. Opp. 13. It is not apparent what this has to do with restrictions on the carrying of firearms.

## III. THE 100-YARD RULE VIOLATES THE FREE EXERCISE CLAUSE

### A. Plaintiffs' Free Exercise Arguments Were Properly Presented

As with the Second Amendment claim, Defendants urge the Court to deny the motion to amend on the ground it raises "new arguments never presented" previously. Opp. 13. Not so. Lack of general applicability—particularly with respect to wholly unregulated places of public assembly—was the core of Plaintiffs' free exercise argument. PI Mem. 14–15 (contrasting "many types of retail businesses open to the public" (quoting *Antonyuk v. Chiumento*, 89 F.4th 271, 350 (2d Cir. 2023)); Dkt. 29 ("PI Reply") 10–11 ("restaurants, fraternal lodges, and stores"). Those arguments apply equally to the house-of-worship and 100-yard bans and—for all the reasons set forth in Parts I.A., B., and C. above—were presented to the Court. Those arguments alone are sufficient for the Court to grant the motion to amend as to the Free Exercise claim.

The vehicle-carry exception only reinforces the argument. Rather than present new argument, this explicit statutory exception simply provides an additional legal example of how the challenged ordinance is not generally applicable. Defendants' restrictive reading of Rule 59 to bar such argumentation would render the Rule useless. A motion to amend that made the same old arguments with the same old examples would be dismissed as "relitigating old issues." *Minter v.*

*Wells Fargo Bank, N.A.*, No. CIV. A. WMN-07-3442, 2013 WL 4603006, at *3 (D. Md. Aug. 28, 2013), *aff'd*, 762 F.3d 339 (4th Cir. 2014); *see also Mayo v. Bd. of Educ. of Prince George's Cnty.*, 713 F.3d 735, 745 (4th Cir. 2013) (denying Rule 59 motion because it "advance[s] no new argument"). Yet, if Defendants had their way, motions that elucidate claims with sharpened legal perspectives would also be dismissed as presenting "new contentions," Opp. 14, and "novel legal theory," Opp. 5.

The balance is to distinguish motions that "merely relitigate[] … prior contentions" from those that clearly demonstrate an earlier opinion "rests on an erroneous interpretation of the [law]." *Worsham v. Disc. Power, Inc.*, No. CIV. A. RDB-20-0008, 2021 WL 5742382, at *3 (D. Md. Dec. 1, 2021) (cleaned up), *aff'd*, No. 22-1942, 2023 WL 2570961 (4th Cir. 2023). Here, Plaintiffs' motion explicitly challenged the 100-yard rule, PI Mem. 2, 11–12, and emphasized comparable places of public assembly that are not regulated, PI Mem. 14–15; PI Reply 10–11. The Court adopted those arguments with respect to houses of worship. Mem. Op. 48–53. Plaintiffs now contend merely that the same analysis should have applied to the 100-yard rule.

The flexibility provided by Rule 54(b) is especially applicable at the preliminary injunction stage, where the parties and Court are newly acquainted with the facts and applicable law. At this stage, there is little reason to disregard purely legal arguments that clarify the questions all agree are at issue and that must be addressed at one stage or another. For these reasons, the Court should not hesitate to fully consider the motion to amend.

**B. The 100-Yard Rule Is Not Generally Applicable**

On the merits of the free exercise claim, the County again relies on misdirection and misrepresentation of Plaintiffs' arguments. The County first suggests that Plaintiffs are "indirectly and belatedly" raising some new challenge to the vehicle exception to the 100-yard rule. Opp. 15. That's wrong. Plaintiffs challenge the 100-yard rule only as it applies to prohibit Rabbi Shapiro

and synagogue members from walking to synagogue with their firearms. *See* Compl. 11–13. Plaintiffs point to the vehicle exemption simply as a comparator for purposes of determining whether the 100-yard rule is generally applicable.

Next, the County mischaracterizes Plaintiffs' position as being about whether "lawful carriage" can be compared with "an assault launched from a car." Opp. 17. But Defendants agree that the relevant question is whether carrying a gun in a car inside of a buffer zone "undermines the County's interest in preventing gun violence … 'in a similar way'" as carrying a gun on foot does. Opp. 17. Using that rubric, the two forms of carriage pose exactly the same risks of violence. Both potential lawful carriers are in the same location, with the same firearm, and with the exact same opportunity to engage in violence *if they chose to*. Indeed, as Plaintiffs have explained, the individual in the vehicle would have a greater opportunity to engage in violence. Mem. 19–20. That the County allows the individual in the vehicle to carry, but not the individual walking to synagogue, renders the 100-yard rule not generally applicable.

When Defendants actually engage with Plaintiffs' argument, they fail to meaningfully distinguish the person in the car from the person on foot. First, Defendants insist that the difference lies in how accessible a gun is to the individual in the car compared with the individual on foot. Opp. 18. But as Defendants acknowledge, Opp. 18 n.10, "a person to whom a permit to wear, carry, or transport the handgun has been issued" by the Maryland State Police does *not* need to keep their gun in a locked container in order to have it with them in the car. Montgomery Cnty., Md., Code § 57-11(b)(6)(B). Thus, there is no accessibility difference between the person in a car and the person on the sidewalk.

Second, Defendants argue that the "time each carrier spends" in the buffer zone is a meaningful distinction. Opp. 18. But a person passing quickly through a buffer zone has the same ability to

open fire as someone passing through it slowly, as any victim of a drive-by shooting can easily attest. But even if a fast mover were less likely to incite violence than a slow one, the vehicle exception does not prescribe a minimum speed for passing through a buffer zone (or even require that the vehicle be *moving* at all). An individual lawfully carrying in a car can therefore spend as much time as a pedestrian inside the buffer zone with no repercussions. There is simply no meaningful difference here.

Third, Defendants appear to argue that because the 100-yard rule "protects places where people gather on foot," only someone who is "shar[ing] the sidewalks, crosswalks, and entrances" with those people needs to be prohibited from carrying a firearm. Opp. 18. This is not a distinction. A person in a vehicle drives (and parks) mere feet from the sidewalk; drives *through* the crosswalks; and takes the *same entrances* to places of public assembly as someone on foot. An armed individual in a car is no less dangerous to the County's "protected population" than an armed individual on foot.

Defendants' arguments against using other non-covered locations, such as fraternal lodges, as comparators fare no better. This Court's prior analysis of whether such locations were proper comparators did not hinge on the autonomy of such locations, *contra* Opp. 19, but on whether those locations posed a similar risk of "gun violence" as places of public assembly, Mem. Op. 51. The Court concluded that they did. *Id.* at 51–52. And the fact that "the challenged provisions of Chapter 57 apply differently as to places of worship in comparison to" these other locations meant that the challenged provisions were not generally applicable. *Id.* at 52. The same is true of the 100-yard rule. Where Defendants seek to prevent gun violence by imposing a buffer zone around locations where large groups of people gather, the fact that many such locations remain unregulated means that the law is not generally applicable. *See Tandon v. Newsom*, 593 U.S. 61,

63–64 (2021). Defendants' contention that both secular and religious pedestrians are allowed (or prohibited) to carry within the same locations, Opp. 19, focuses on the wrong question. The proper question is whether allowing individuals to carry firearms past places where large groups of people gather (like a lodge or a shopping center) undermines the County's interest in preventing gun violence in public spaces in the same way that allowing synagogue members to carry past (empty) schools or other houses of worship would. *See Tandon*, 593 U.S. at 63 (reversing decision that "did not conclude that [exempted] activities pose a lesser risk of transmission than *applicants'* proposed religious exercise"). Defendants identify no characteristic of a lodge or a shopping center that makes them less susceptible to gun violence than any of the places covered by the 100-yard rule. Thus, the challenged ordinance is not generally applicable and must satisfy strict scrutiny.[3]

**C. The 100-Yard Rule Fails Strict Scrutiny**

Defendants' arguments on strict scrutiny are also unavailing. As to their failure to show a compelling government interest, Defendants do not dispute that the 100-yard rule is underinclusive both (1) because it exempts carry "in a car" near places of public assembly where the ban applies and (2) because it fails to restrict carry at "materially identical" locations. Opp. 20–21. And the County also does not dispute that such underinclusiveness undermines any claim of a compelling government interest that cannot be met in a less restrictive way. *See id*. Nor could it. Mem. 21; *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) ("[A] law cannot be regarded as protecting an interest 'of the highest order' … when it leaves appreciable damage to that supposedly vital interest unprohibited."); *see also Holt v. Hobbs*, 574 U.S. 352, 367–69 (2015).

[3] Defendants' reliance on the Fourth Circuit's 1998 ruling in *Hines v. South Carolina Department of Corrections*, Opp. 21, is misplaced. The Fourth Circuit has recently expressly adopted the test for general applicability as described by the Supreme Court in "*Fulton*" and "*Tandon*." *Kim v. Bd. of Educ. of Howard Cnty*, 93 F.4th 733, 748 (4th Cir. 2024).

Rather, Defendants spend most of their time insisting that strict scrutiny does not apply. *See, e.g.*, Opp. 21–23. When they finally attempt to grapple with whether strict scrutiny is satisfied, they bungle the analysis. For example, in response to Plaintiffs' argument that federal, state and other county laws either have no buffer zones or exempt licensed carriers, Mem. 22, Defendants first response is to suggest they don't have to justify why they exercise "different judgment" than jurisdictions that "abandon[]" or "do[] nothing" about safety concerns "near places of public assembly." Opp. 22. But that is exactly what they must do: "when so many [others] offer an accommodation" or don't regulate at all, Defendants "must, at a minimum, offer persuasive reasons why … [they] must take a different course." *Holt*, 574 U.S. at 369. They fail to do that here. And their only other response is that they already exempt firearms in motor vehicles whether "locked in a container" or not. Opp. 22. But that only reinforces the point: if the County can provide that sort of tailoring for motor vehicles, it must at minimum explain why that isn't possible for pedestrians traveling by foot. *See Holt*, 574 U.S. at 365. It hasn't.

Defendants ultimately concede that under strict scrutiny, other jurisdictions' less-restrictive "regimes oblige the County to justify its own." Opp. 22–23. Rather than face that burden, Defendants simply pivot once more to contend that "strict scrutiny does not apply." *Id*. at 23. But as demonstrated in Part III.A above, strict scrutiny does apply, and Defendants' failure to satisfy it is fatal.

## IV. AN INJUNCTION IS NECESSARY TO PREVENT IRREPARABLE HARM

Defendants argue that the Court's preliminary injunction against the County's ban on firearms in places of worship "vastly reduces—if not eliminates—any arguable irreparable harm that Plaintiffs suggest they continue to suffer." Opp. 23. That is not true: on the Sabbath and Jewish holidays, they cannot carry their firearms to their synagogue to possess them there, and then cannot defend themselves en route to the synagogue, when they are perhaps the most vulnerable to attack.

As for Plaintiffs' purported "delay in filing," Opp. 23, it is no "delay" at all because they filed within the short time period that Local Rule 105.10 provides. And their use of the full fourteen days is easily understandable, given the issues the motion had to address and the fact that the time period included Jewish holidays that constrained Rabbi Shapiro's participation: Rosh Hoshana, Yom Kippur, and Tzom Gedaliah. Relief from the 100-yard rule remains urgent because it prevents Plaintiffs from exercising their First and Second Amendment rights at least once each week.

## CONCLUSION

For these reasons, and those stated in Plaintiffs' opening memorandum, Plaintiffs respectfully ask the Court to amend its order and enter a preliminary injunction prohibiting Defendants from enforcing the 100-yard rule against Rabbi Shapiro and SSJC's members as they walk between the synagogue and their homes. At a minimum, the Court should enjoin enforcement within the 100-yard zone surrounding SSJC, as to which Defendants no longer oppose relief.[4] Opp. 10 n.5. In the alternative, Plaintiffs ask the Court to grant the same relief as an injunction pending appeal.

Dated: October 13, 2026

[4] For clarity, Plaintiffs request that any order addressing this "minimum" injunction make clear that SSJC's members may carry within 100 yards of SSJC regardless of any buffer zones created by other places of public assembly.

Respectfully Submitted,

/s/ Jacob Huebert

Eric S. Baxter (Bar No. 15640)
Daniel L. Chen (*pro hac vice*)
Benjamin A. Fleshman (admission pending)
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave., NW
Suite 400
Washington, DC 20006

Andrew J. Morris (Bar No. 22945)
Jacob Huebert (*pro hac vice*)
New Civil Liberties Alliance
4250 N. Fairfax Drive
Suite 300
Arlington, VA 22204
(202) 869-5210
andrew.morris@ncla.legal
jacob.huebert@ncla.legal

*Attorneys for Plaintiff Silver Spring Jewish Center*

/s/ J. Menashe Shapiro

Rabbi J. Menashe Shapiro,
805 Whittington Terrace
Silver Spring, Maryland 20901
T: (216) 645-2094
F: (216) 831-3736
RabbiMenasheShapiro@gmail.com

*Pro Se Plaintiff*